*DERRICK CAMPBELL, ET AL. VS.*

*EMPIRE MERCHANTS, LLC*

---

*DERRICK CAMPBELL*

*March 27, 2017*

---



126 East 56th Street, Fifth Floor  New York, New York 10022

P:  212-750-6434   F:  212-750-1097

www.ellengrauer.com

*Original File 114368.TXT*

*Min-U-Script® with Word Index*

**Page 1**

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF NEW YORK
   -------------------------------------------------x
3  DERRICK CAMPBELL, for himself and
   on behalf of all others similarly
4  situated,

5                    Plaintiffs,

6     - against -

7  EMPIRE MERCHANTS, LLC,

8                    Defendant.

9  Index No. 16CV 5643
   -------------------------------------------------x
10

11                    250 Park Avenue
                      New York, New York
12
                      March 27, 2017
13                    10:15 a.m.

14

15      DEPOSITION of DERRICK CAMPBELL, before

16  Michele Moskowitz, a shorthand reporter and

17  Notary Public of the State of New York.

18

19

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
24        New York, New York 10022
               212-750-6434
25             REF: 114368

**Page 2**

1  A P P E A R A N C E S :

2

3  THE HARMAN FIRM, LLP

4  Attorney for Plaintiffs

5      220 Fifth Avenue, Suite 900

6      New York, New York  10001

7  BY:  EDGAR M. RIVERA, ESQ.

8      212-425-2600

9      erivera@theharmanfirm.com

10

11  EPSTEIN, BECKER & GREEN

12  Attorneys for Defendant

13      250 Park Avenue

14      New York, New York 10177-1211

15  BY:  ALLEN B. ROBERTS, ESQ.

16         -AND-

17      ADRIANA S. KOSOVYCH, ESQ.

18      212-351-3780

19      aroberts@ebglaw.com

20

21

22

23

24

25

**Page 3**

1  ------------------ I N D E X -------------------

2  WITNESS              EXAMINATION BY        PAGE

3  DERRICK CAMPBELL     MR. ROBERTS           5

4

5

6  --------------- E X H I B I T S ---------------

7  DEFENDANT'S     DESCRIPTION            FOR I.D.

8  Exhibit 1       Complaint                   5

9  Exhibit 2       Plaintiffs' initial

10                 disclosures                 5

11  Exhibit 3      Plaintiffs' Responses to

12                 Defendant's First

13                 Requests for the

14                 Production of Documents      5

15  Exhibit 3A     Earnings statements          5

16  Exhibit 5      Plaintiffs' Responses to

17                 Defendant's First Set of

18                 Interrogatories              5

19  Exhibit 5      Local 917, Empire

20                 Merchants pay practices     22

21  Exhibit 6      Document Bates stamped

22                 EM 172                      23

23  Exhibit 7      Documents Bates stamped

24                 EM 109 through 117          42

25

**Page 4**

1  ----------- E X H I B I T S (Cont'd) -----------

2  DEFENDANT'S     DESCRIPTION            FOR I.D.

3  Exhibit 8       Local 917 collective

4                  bargaining agreement        58

5  Exhibit 9       Local 1D collective

6                  bargaining agreement        59

7

8

9       (EXHIBITS TO BE PRODUCED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1 D E R R I C K  C A M P B E L L ,
2 after having first been duly sworn by a
3 Notary Public of the State of New York,
4 was examined and testified as follows:
5
6     (Complaint was marked Defendant's
7 Exhibit 1 for identification, as of this
8 date.)
9     (Plaintiffs' initial disclosures
10 were marked Defendant's Exhibit 2 for
11 identification, as of this date.)
12     (Plaintiffs' Responses to
13 Defendant's First Requests for the
14 Production of Documents was marked
15 Defendant's Exhibit 3 for identification,
16 as of this date.)
17     (Earnings statements were marked
18 Defendant's Exhibit 3-A for
19 identification, as of this date.)
20     (Plaintiffs' Responses to
21 Defendant's First Set of Interrogatories
22 was marked Plaintiff's Exhibit 4 for
23 identification, as of this date.)
24 EXAMINATION BY
25   **MR. ROBERTS:**

Page 6

1     CAMPBELL
2 Q.  Please state your name for the
3   record.
4 **A.  Derrick Campbell.**
5 Q.  Mr. Campbell, we are here for your
6   deposition in a lawsuit that you have filed
7   against Empire Merchants, LLC, and I'm going to
8   lay some ground about what a deposition is from
9   my perspective, but before I do that, have you
10   ever had a deposition before?
11 **A.  No.**
12 Q.  Have you ever testified in any kind
13   of proceeding before?
14 **A.  No.**
15 Q.  Well, let me explain that.  An oath
16   was just administered to you and you swore that
17   you would tell the truth.  The object of this
18   deposition is for me to ask questions about the
19   lawsuit you've filed against Empire Merchants,
20   LLC, and for you to answer those questions, so
21   if at any time you do not understand the
22   question I've asked, I want you to tell me that
23   because this is really more about you than it
24   is about me.
25 **A.  Okay.**

Page 7

1     CAMPBELL
2 Q.  It's about what you have to say
3   that you think supports the claims that you've
4   made in your lawsuit; do you understand that?
5 **A.  Yes.**
6 Q.  Just to get us started and lay the
7   ground, I'm going to show you a few documents.
8   The first is a document that is the Complaint,
9   it's called a Class Action Complaint in this
10   lawsuit.  That's going to be Exhibit 1.
11     Have you seen that document before
12   today?
13     **MR. RIVERA:** Remember to verbalize
14   all of your answers.
15     **MR. ROBERTS:** Counsel, please.
16 Q.  I'm sorry, have you seen that
17   document before today?
18 **A.  Yes.**
19 Q.  Do you remember when you first saw
20   it?
21 **A.  Yes.**
22 Q.  When?
23 **A.  This morning.**
24 Q.  This morning.  How did you see it
25   this morning?

Page 8

1     CAMPBELL
2 **A.  My lawyer showed it to me.**
3 Q.  I'm going to show you a second
4   document, this is Exhibit 2.  Exhibit 2 is
5   called Plaintiffs' Initial Disclosures.  Have
6   you seen that document before today?  Before I
7   showed it to you today?
8 **A.  Yes, I saw this.**
9 Q.  When did you see it before I showed
10   it to you today?
11 **A.  This morning.**
12 Q.  That's the first time you saw it?
13 **A.  Yes.**
14 Q.  That's the same thing with the
15   Class Action Complaint, that was the first time
16   you saw it, this morning?
17 **A.  Yes.**
18 Q.  I am showing you something marked
19   as Exhibit 3, that is called Plaintiffs'
20   Responses to Defendant's First Requests for the
21   Production of Documents.
22 **A.  I've never seen this one.**
23 Q.  So you've never seen Plaintiffs'
24   Responses to Defendant's First Requests for the
25   Production of Documents?

Page 9

    CAMPBELL
1
2  A.  No.
3  Q.  Until I showed it to you today?
4  A.  Yes.
5  Q.  I am showing you what's been marked
6   as Exhibit 3-A, I'd like you to look through
7   that if you would, please.
8  A.  Yes, I've seen this one.
9  Q.  This is a set of documents, at the
10  bottom right it begins P 00001 and the last
11  page is P 00011.
12  A.  (Indicating.)
13  Q.  At the bottom of the page.
14  A.  Yes.
15  Q.  These are documents that were
16  produced to our law firm by the law firm
17  representing you.  The first of the documents
18  says "earnings statement"; do you see that?
19  The first one?
20  A.  Yes.
21  Q.  Then there are earnings statements
22  through P 0009, do you see that?
23  A.  Yes.
24  Q.  Do you recognize those to be
25  earnings statements that you received from

Page 10

    CAMPBELL
1
2  Empire Merchants LLC?
3  A.  Yes.
4  Q  Are those all the earnings
5   statements you received while you worked at
6  Empire Merchants?
7  A.  Yes, sir.
8  Q.  We will come back to each of these
9  documents at another time.  I am now going to
10  show you what is marked as Exhibit 4, that is
11  Plaintiffs' Responses to Defendant's First Set
12  of Interrogatories.  As with the other
13  documents, I would like you to look at this.
14  A.  So what answer are you looking for
15  on this one?
16  Q.  Had you seen this before I gave it
17  to you today?
18  A.  The front of the page look familiar
19  but -- let me see.  No, doesn't look familiar.
20  Q.  Thank you.
21  A.  You're welcome.
22  Q.  Today is March 27th; is that right?
23  A.  Yes.
24  Q  Would you turn to next to the last
25  page of Exhibit 4.

Page 11

    CAMPBELL
1
2  A.  Yes.
3  Q.  Do you see a signature line and a
4   signature on this page?
5  A.  Yes.
6  Q.  Do you see your name?
7  A.  Yes.
8  Q.  There's a signature above that, is
9   that your signature?
10  A.  Yes.
11  Q.  It says above that "I, Derrick
12  Campbell being duly sworn, depose and say I am
13  a plaintiff in the within action.  I have read
14  the foregoing Plaintiffs' Responses to
15  Defendant's First Set of Interrogatories and I
16  have knowledge of their contents.  The
17  responses are true to the best of my knowledge
18  except as to those responses asserted upon
19  information and belief, and as to those I
20  believe them to be true."
21     That's the text that appears above
22  your signature, isn't it?
23  A.  Yes, but I told you the first page
24  look familiar, but I didn't remember.
25  Q.  You don't remember what?

Page 12

    CAMPBELL
1
2  A.  I didn't remember reading it, but I
3   did.  That's my bad.
4  Q.  I'm sorry?  You did read this?
5  A.  Yes.
6  Q.  Did you read it before March 20?
7   Last Monday?
8  A.  That was the day.
9  Q.  You read it on March 20?
10  A.  Yes.
11  Q.  Where were you when you read it?
12  A.  At the lawyer's office.
13  Q.  What lawyer?
14  A.  Huh?
15  Q.  What lawyer?
16  A.  The lawyer's office.
17  Q.  Mr. Rivera?
18  A.  Mr. Rivera, yeah.
19  Q.  What time were you there?
20  A.  I was about between anywhere 5 to
21   6:00 p.m.
22  Q.  Now, in the documents I've shown
23  you, that's the Complaint, the initial
24  disclosures, the responses to the first set of
25  interrogatories and the responses to requests

Page 13

1    CAMPBELL
2  for the production of documents, is there
3  anything in any of those documents that you
4  know to be not truthful?
5    MR. RIVERA: Objection. You can
6  answer the question.
7  A. Can you repeat again?
8  Q. Is there anything in any of the
9  documents you've seen so far this morning in
10 this deposition that you know to be not
11 truthful?
12 A. Everything is true.
13 Q. Okay. Everything is honest?
14 A. Yeah.
15 Q. Everything is accurate?
16 A. Yes.
17 Q. Everything was true -- well,
18 everything remains true today, correct?
19 A. Yes.
20 Q. Let's look if we could at Exhibit
21 3. In Exhibit 3 on page 2, request No. 2, asks
22 you to produce copies of all documents
23 concerning your application for employment, it
24 says by defendant, that means Empire Merchants,
25 you understand that?

Page 14

1    CAMPBELL
2  A. Yes.
3  Q. And in response to that request you
4  identify documents that are called Bates
5  numbered and you produced -- you refer to two
6  documents, P 00010 and P 00011. So would you
7  look at Exhibit 3-A, please? That's the
8  document that looks like this, 3-A. Turn to
9  the last two pages, if you would. P 00010
10 says, "Employment applications. Open house
11 every Wednesday, 9 a.m. to 11 a.m., 16
12 Bridgewater Street, at the warehouse end of
13 Meeker Avenue" and then it goes on with saying
14 Brooklyn, New York, and the phone number with
15 an extension.
16   It says, "Warehouse workers needed,
17 day and night shifts, and truck helpers making
18 deliveries." All of that is typed and it is
19 typed on letterhead that says Empire Merchants.
20 How did you get this document?
21 A. From the Internet.
22 Q. From the Internet?
23 A. Yes.
24 Q. What did you do to get it from the
25 Internet?

Page 15

1    CAMPBELL
2  A. I downloaded it on the Internet.
3  Q. How did you know to get it from the
4  Internet? What did you do?
5    MR. RIVERA: Objection. You can
6  answer.
7  A. There was -- I have my -- my
8  application online so I'm seeking employment
9  and I found this and so I print it.
10 Q. Did you know -- were you doing an
11 Internet search?
12 A. Internet search?
13 Q. Well, how did you learn about
14 Empire Merchants? I heard you say from the
15 Internet, but my question really goes to how
16 through the Internet you found Empire
17 Merchants.
18 A. There's a job site called Job Case,
19 I think Job Case, one of those job sites and it
20 pop up. Like, it alert me when there is job
21 seeking -- job open.
22 Q. Do you remember approximately when
23 you did that?
24 A. No.
25 Q. If you turn the page P 00010 upside

Page 16

1    CAMPBELL
2  down.
3  A. P 8?
4  Q. No. The page we're looking at, the
5  page that says "Employment applications."
6  A. Turn it upside down?
7  Q. Yes, please. It says at the now
8  top of the page it's a -- it looks like a
9  facsimile marking, it says "Sep," S-E-P, 08
10   16.06:14 P home" and then there is what looks
11 like a phone number, 718-471-6520. Do you know
12 what that marking signifies?
13 A. I download -- I get it from my
14 printer that day.
15 Q. Do you recognize the phone number
16 718-471-6520?
17 A. I think this is my house number,
18 but I don't really use it.
19 Q. But you believe this is your home
20 phone number?
21 A. Yeah.
22 Q. There is handwriting on this page,
23 the employment applications page, and it says
24 "Started 4/30/16" and it looks like it would be
25 a 6 possibly with a 7 written over it, slash

Page 17

        CAMPBELL
 1
 2   or -- well, it looks like a 6 and a 7/22/16.
 3   Do you know whose handwriting that is?
 4   A.  That's me.
 5   Q.  Your handwriting?
 6   A.  Yes.
 7   Q.  What does that signify?
 8   A.  My starting date of employ --
 9   employment.
10   Q.  Do you remember when you wrote that
11   there?
12   A.  A couple of weeks after I was -- I
13   got fired and I faxed it to the lawyer so I put
14   this on it.
15   Q.  Where it says "end," is that a 6 or
16   a 7?
17   A.  It's a 7.
18   Q.  7/22/16?
19   A.  Yes.
20   Q.  You're saying that's your end date?
21   A.  Yes.
22   Q.  The other handwriting says, "Nick
23   EXT 9205"; is that right?
24   A.  Yes.
25   Q.  Who is Nick?

Page 18

        CAMPBELL
 2   A.  Nick is the warehouse shop steward.
 3   Q.  What do you mean by the warehouse
 4   shop steward?
 5   A.  He's a shop steward for the
 6   warehouse, Empire Merchants.
 7   Q.  Do you remember when you wrote
 8   Nick's name here?
 9   A.  The same day I wrote everything.
10   Q.  So after your employment ended?
11   A.  Yes.
12   Q.  Do you know what a shop steward
13   does?
14   A.  Yes.
15   Q.  What does a shop steward do?
16   A.  He spoke on behalf of the
17   employees.
18   Q.  Do you know what union Nick spoke
19   for?
20   A.  I'm not -- I don't quite remember.
21   Q.  Did you come across more than one
22   shop steward during the time you worked at
23   Empire?
24   A.  Nick is the only one I know who's a
25   shop steward.

Page 19

        CAMPBELL
 2   Q.  Do you know his last name?
 3   A.  Not off the top of my head right
 4   now.  If I heard it, I can say it is it.
 5   Q.  How did you get to know Nick?
 6   A.  I collect my check from him
 7   sometimes.
 8   Q.  So Nick would be the guy who handed
 9   out your check to you?
10   A.  Sometimes.  Not all the time.
11   Q.  On what day were checks given out?
12   What day of the week?
13   A.  Wednesday?  Thursday?  Thursdays.
14   Q.  As far as you recall, was there a
15   certain time that checks were given out on
16   Thursdays?
17   A.  Anywhere from midday down.
18   Q.  When you didn't get your check from
19   Nick, do you remember who gave you your check?
20   A.  There was different guys sitting in
21   the office.  Like, you could just give them
22   your ID and you get a check.
23   Q.  When you say sitting in the office,
24   what area?
25   A.  The office that -- it faces the

Page 20

        CAMPBELL
 2   side and it opens to the locker room where we
 3   put -- where we go in the morning.  So it's two
 4   office, one here and one down, one facing in
 5   the warehouse and one facing in the locker
 6   room.
 7   Q.  Did Nick have a regular job in
 8   addition to being, as you believe, the shop
 9   steward?
10   A.  I don't see him doing anything
11   else.  Just sit in the office and talk.
12   Q.  At what times did you see -- as
13   best you recall did you see Nick sitting in the
14   office?
15   A.  As early as I get there, Nick is
16   always there.
17   Q.  He was always there?
18   A.  Yes.
19   Q.  Do you remember anybody else who
20   was with him?
21   A.  Like, specify like.
22   Q.  Yes.  By name do you remember
23   anybody else who would be in the office when
24   you arrived?
25   A.  Maybe two other guys, but not sure

Page 21

1  CAMPBELL
2  of the names.
3  Q.  Do you know what their positions
4  were?
5  **A.  No.**
6  Q.  Do you know if Nick stayed in the
7  office for the whole workday?
8  **A.  I wouldn't know that because I'm**
9  **not there in the office for the whole day.**
10  Q.  Until what time would -- what's the
11  latest you would ever see Nick inside the
12  office?
13  **A.  If I work around the warehouse, if**
14  **I get off like 4 or 5, Nick still over there.**
15  Q.  Still?
16  **A.  Yes.**
17  Q.  How many days in the time you
18  worked at Empire did you work in the warehouse?
19  **A.  I'm not sure.  It varied.**
20  Q.  I'm not asking about the variance.
21  I'm saying all together from the time you
22  started working for Empire until the time your
23  employment with Empire ended, how many of those
24  days were inside the warehouse?
25  **A.  I've never checked.**

Page 22

1  CAMPBELL
2  Q.  Do you think it was more than five
3  days?
4  **A.  Yes.  Sure, more than five days.**
5  Q.  Do you think it was more than ten
6  days?
7  **A.  Yes.**
8  Q.  On days that you didn't work inside
9  the warehouse, do you remember about when you
10  would last see Nick inside what you described
11  as an office area?
12  **A.  Like, if I -- if I go on the truck**
13  **to do delivery, when I come back, if I come**
14  **back late, Nick will still be there because I**
15  **think he responsible for the trucks, the truck**
16  **employees.  That's union guys so he have to be**
17  **there when they come back.**
18  Q.  So is there a difference between,
19  as far as you know, truck employees at Empire
20  and warehouse employees at Empire?
21  **A.  Yes.**
22  Q.  What's the difference?
23  **A.  The truck employee get more money**
24  **than the warehouse guys.**
25  **(Local 917, Empire Merchants pay**

Page 23

1  CAMPBELL
2  **practices were marked Defendant's Exhibit**
3  **5 for identification, as of this date.)**
4  Q.  I'm directing your attention to
5  what's been marked as Exhibit 5.  That is a
6  document on Empire Merchants's letterhead, it
7  says "Local 917, Empire Merchants pay
8  practices."  Do you see your printed name and
9  signature on that document?
10  **A.  Yes.**
11  Q.  Separately I'm showing you Exhibit
12  6.
13  (Document Bates stamped EM 172 was
14  marked Defendant's Exhibit 6 for
15  identification, as of this date.)
16  Q.  That starts off looking the same,
17  it says "Empire Merchants" printed up top and
18  then it says "Local 1 warehouse"?
19  **A.  Yes.**
20  Q.  Do you see your printed name and
21  signature on that document?
22  **A.  Yes.**
23  Q.  And looking at these, is it correct
24  that you signed these documents on March 31,
25  2016?

Page 24

1  CAMPBELL
2  **A.  Yes.**
3  Q.  That's your handwriting?
4  **A.  Yes.**
5  Q.  That's true of Exhibit 5 and 6; is
6  that right?
7  **A.  Yes, sir.**
8  Q.  Looking at these, do you recognize
9  that Local 917 is the union that represented
10  the drivers and helpers?
11  **A.  Yes.**
12  Q.  And Local 1, that's the union that
13  represented the warehouse workers; is that
14  right?
15  **A.  Yes.**
16  Q.  Do you remember which of these
17  unions Nick was the shop steward for?
18  **A.  Yes.**
19  Q.  Which one?
20  **A.  The Local 719 -- 917.  Sorry.**
21  Q.  So that was the drivers and
22  helpers?
23  **A.  Yes.**
24  Q.  When you worked at Empire
25  Merchants, did you sometimes work as a helper

Page 25

```
 1      CAMPBELL
 2  getting the pay that Local 917 employees
 3  received?
 4  A.  Yes.
 5  Q.  Other times did you work in or
 6  around the warehouse getting the $13 an hour
 7  pay that the warehouse workers received?
 8  A.  Yes.
 9  Q.  Was that your choice, which pay or
10  work you would get, or was that somebody
11  else's?
12  A.  No, not my choice.
13  Q.  How was that decided?
14  A.  The supervisor.
15  Q.  Was it always the same supervisor?
16  A.  Yes.  For me the same supervisor.
17  Q.  Do you know that person's name?
18  A.  His name is Mike.
19  Q.  Do you know Mike's last name?
20  A.  I don't quite remember off the top
21  of my head.
22  Q.  When you say Mike was a supervisor,
23  what makes you think that?
24  A.  Because he supervised me.
25  Q.  He supervised you?
```

Page 26

```
 1      CAMPBELL
 2  A.  Yes.
 3  Q.  By doing what?
 4  A.  Giving me my tasks and tell me what
 5  to do.  He's the guy -- when they assign me to
 6  work, they say go to my supervisor, which is
 7  Mike.
 8  Q.  Where was Mike located to do his
 9  work?
10  A.  In the office behind the one from
11  the warehouse.  The one from the locker room.
12  So they have -- the offices face each other.
13  Q.  Did you see Mike during the
14  workday?  During your workday?
15  A.  Yes.  He would come and check up on
16  me.
17  Q.  By doing what?
18  A.  Pass through and ask if I'm okay or
19  give me something else to do or something like
20  that.
21  Q.  Were there other people you
22  remember who gave you instruction during the
23  workday?
24  A.  Like only, like, if the forklift
25  drivers that Mike supervised -- the forklift
```

Page 27

```
 1      CAMPBELL
 2  drivers tell me to do something else or stuff
 3  like that.
 4  Q.  Take a look, if you would, at
 5  Exhibit 4.
 6  A.  What page?
 7  Q.  Turn to page 2 if you would,
 8  please.
 9  A.  Okay.
10  Q.  Interrogatory No. 3 at the bottom
11  of page 2 says, "Describe in detail the basis
12  for and identify persons with knowledge of and
13  documents concerning the allegation in
14  paragraph 11 of the Complaint that defendant,"
15  that's Empire Merchants, "hired plaintiff as a
16  'shape-up employee'" and on the top of page 2
17  it says, "Plaintiff identifies" and it then
18  continues to the next page and on the next page
19  you identify somebody named Jimmy Ching,
20  C-H-I-N-G; do you see that?
21  A.  Yes.
22  Q.  Then it says that Jimmy Ching is
23  the day warehouse manager at defendant.  What
24  is your reason for identifying Jimmy Ching as
25  the day warehouse manager at defendant?
```

Page 28

```
 1      CAMPBELL
 2  A.  Because he's the warehouse manager
 3  in the warehouse too.
 4  Q.  And you knew that on March 20th
 5  when you verified the responses to these
 6  interrogatories as being true to the best of
 7  your knowledge; is that right?
 8  A.  Yes.
 9  Q.  Below Jimmy Ching's name there's
10  the name Mike Meyers, M-E-Y-E-R-S, he is
11  identified as a dispatcher at defendant.  Is
12  Mike Meyers the Mike that you were referring
13  to?
14  A.  Yes.
15  Q.  And do you know what a dispatcher's
16  job is?
17  A.  To supervise.
18  Q.  Well, do you know if a dispatcher
19  is a member of the Teamsters Local 917
20  bargaining unit?
21  A.  917?  No.  I think he's for the
22  warehouse.
23  Q.  I'm sorry, didn't you tell us when
24  you looked at Exhibits 5 and 6 that the
25  warehouse was represented by Local 1?
```

DERRICK CAMPBELL, ET AL. VS.
EMPIRE MERCHANTS, LLC

DERRICK CAMPBELL
March 27, 2017

Page 29

CAMPBELL

1    CAMPBELL
2  A.  Local 1.
3  Q.  And the drivers and helpers are
4  represented by Local 917?
5  A.  Yes.
6  Q.  Do you know that Local 917 is a
7  Teamsters Union?
8  A.  Yes.
9  Q.  And Local 1 is United Food and
10  Commercial Workers; do you know that?
11  A.  For the warehouse?
12  Q.  Warehouse is United Food and
13  Commercial Workers, Local 1 or Local 1-D; did
14  you know that?
15  A.  Yes.
16  Q.  Did you know that the dispatcher is
17  a bargaining unit member of Teamsters Local
18  917?
19  A.  No, I didn't know that.
20  Q.  When did you meet Jimmy Ching?
21  A.  On the first day of employ.  I
22  didn't met him.  I saw him in the office, but I
23  didn't spoke with him.
24  Q.  Was there a time that you did speak
25  to him?

Page 30

1    CAMPBELL
2  A.  Yes.
3  Q.  When did that happen?
4  A.  There was a time -- I don't recall
5  right now, but there was a time that he gave me
6  some documents to go do a drug test.  He gave
7  me an envelope with documents to go do a drug
8  test.
9  Q.  Was that the first time you
10  remember speaking with Jimmy Ching?
11  A.  Yes.
12  Q.  Had you seen him in or around the
13  office or warehouse area before that first time
14  you spoke with him?
15  A.  That I can recall.
16  Q.  Yes or no?
17  A.  I said that I can recall.
18  Q.  You recall that you did?
19  A.  That I recalled the first time I
20  spoke to him.
21  Q.  Do you remember how long you had
22  been working at Empire Merchants before you
23  were told to go take a drug test by Jimmy
24  Ching?
25  A.  I can't recall right now.

Page 31

1    CAMPBELL
2  Q.  After that first time that you
3  spoke with him, were there other times that you
4  spoke to him as well?
5  A.  Yes.
6  Q.  For what purpose or purposes?
7  A.  Asking him for gloves and stuff
8  like that.
9  Q.  If you needed gloves, he would give
10  them to you?
11  A.  Yes.
12  Q.  Do you remember other reasons why
13  you and Jimmy Ching spoke to each other?
14  A.  I can't recall right now.
15  Q.  Do you remember seeing Jimmy Ching
16  during any part of any of the work days that
17  you had at Empire Merchants, even if you didn't
18  speak with him?
19  A.  Yes.
20  Q.  In what areas did you see him?
21  A.  In the office or outside the
22  office.
23  Q.  The office outside of the office
24  that you've described in the beginning; is that
25  right?

Page 32

1    CAMPBELL
2  A.  The supervisor's office or
3  manager's office, he would be like outside but
4  in the warehouse.
5  Q.  So are you saying Jimmy Ching
6  worked from another office, but it was deeper
7  inside the warehouse?
8  A.  No.  The same area.
9  Q.  I see.  Do you remember
10  approximately how many days during the time you
11  worked at Empire you saw Jimmy Ching?
12  A.  Most of the days.
13  Q.  Most days that you worked there?
14  A.  Yes.
15  Q.  If you went out on a truck, you
16  didn't see him while you were on the truck, did
17  you?
18  A.  No.
19  Q.  Do you know if other managers or
20  supervisors reported to Jimmy Ching?
21  A.  I don't know that.
22  Q.  What's the reason for saying as you
23  do that Mike Meyers was a dispatcher?
24  A.  Because he would dispatch me and
25  other workers for tasks.

Page 33

1       CAMPBELL
2  Q.  Did you have other jobs where there
3  were dispatchers?
4  A.  Like in Empire or others?
5  Q.  Other employment.
6  A.  No.
7  Q.  How did you know what the job of a
8  dispatcher was?
9  A.  Just based on common knowledge.
10 Q.  But is it your testimony that you
11 never had a job where the company used
12 dispatchers to send -- give people the -- any
13 kind of work?
14 A.  Oh, sorry.  In the airport.  Sorry.
15 In the airport.
16 Q.  Your jobs at the airport were
17 always inside jobs, weren't they?
18 A.  No.
19 Q.  When you worked for ASIG, didn't
20 you work on the ramp?
21 A.  Yes.
22 Q.  And when you worked for DES North
23 America, didn't you work as a product assistant
24 in the warehouse?
25 A.  Yes.

Page 34

1       CAMPBELL
2  Q.  So in those jobs did you ever see a
3  dispatcher?
4  A.  The warehouse job there wasn't any
5  dispatcher.
6  Q.  Now, DES North America was based at
7  JFK International Airport, right?
8  A.  Yes.
9  Q.  And ASIG was based at JFK
10 International Airport; is that right?
11 A.  Yes.
12 Q.  And you started your work at ASIG
13 in May of 2008; is that right?
14 A.  Yes.
15 Q.  You worked there until about
16 January of 2015; is that right?
17 A.  Yes.
18 Q.  And then in July of 2015 you
19 started working for DES North America, right?
20 A.  DES?
21 Q.  DES or DFS?
22 A.  DFS.
23 Q.  DFS?
24 A.  Yes.
25 Q.  You started working for DFS North

Page 35

1       CAMPBELL
2  America in about July of 2015?
3  A.  Yes.
4  Q.  And that employment ended in
5  December of 2015?
6  A.  Yes.
7  Q.  So between May of 2008 when you
8  started with ASIG and December 10th of 2015
9  when your employment with DFS North America
10 ended, in those jobs you never saw a
11 dispatcher; is that right?
12 A.  I told you that ASIG we have
13 dispatchers.
14 Q.  But did you have a -- did you ever
15 receive any work or indication of the work you
16 would be doing from a dispatcher when you
17 worked for ASIG?
18 A.  Yes.
19 Q.  Was that work inside the warehouse
20 or on a delivery vehicle?
21 A.  In a ramp.
22 Q.  On the ramp?
23 A.  Yes.
24 Q.  What do you mean by the ramp?
25 A.  The ramp is outside where the

Page 36

1       CAMPBELL
2  aircraft's at, not inside.
3  Q.  What sort of activity happened that
4  you were involved with at the ramp?
5  A.  Load the aircraft or unload the
6  aircraft.
7  Q.  Did that work require your
8  interaction with a dispatcher?
9  A.  Yes.
10 Q.  In what way?
11 A.  You would call and tell him the
12 aircraft is landed or it's ready to leave or
13 something like that.
14 Q.  In doing your work at ASIG, did you
15 operate any vehicle?
16 A.  Yes.
17 Q.  What type of vehicle?
18 A.  Van, tugs, high loader, pushbacks,
19 stuff like that.
20 Q.  What was a so-called tug?
21 A.  A small vehicle that pulls a
22 baggage cart and stuff like that.
23 Q.  What distance did the baggage cart
24 travel with the tugs?
25 A.  Huh?

Page 37

```
 1      CAMPBELL
 2  Q.  What areas did the tug with the
 3  baggage carts travel in?
 4  A.  From the baggage room to the
 5  aircraft or from the aircraft to the baggage
 6  room or the dump area.
 7  Q.  Did you say there was a so-called
 8  pushback?
 9  A.  Yes.
10  Q.  What type of vehicle is a pushback?
11  A.  I just know it as a pushback.  It
12  push back the plane or pull in the plane.
13  Q.  You operated those?
14  A.  For a short while.
15  Q.  You described I think a van; is
16  that right?
17  A.  Yes.
18  Q.  What were the vans used for?
19  A.  To pick up or drop off workers.
20  Q.  Between what areas?
21  A.  From like Terminal 4 to Terminal 8.
22  Q.  Was it a hi-lo did you say?
23  A.  What?
24  Q.  A hi-lo or loader did you say?
25  A.  Yes.
```

Page 38

```
 1      CAMPBELL
 2  Q.  What type of vehicle was that?
 3  A.  It's a -- I don't quite remember,
 4  but it's -- it takes the load off the aircraft,
 5  like pallets and load back the pallets.
 6  Q.  Pallets?
 7  A.  Yes.  Take off pallets.  Or cans
 8  with luggage.
 9  Q.  Containers with luggage?
10  A.  Containers, yes.
11  Q.  Now, in interrogatory No. 4 it
12  says -- this is on page 3 "Describe in detail
13  and identify persons with knowledge of and
14  documents concerning plaintiffs" -- your --
15  "employment by any other employer as a shape-up
16  employee from any time prior to the start" --
17  prior to the commencement -- "of your
18  employment by defendant" -- that's Empire --
19  "to the present time."
20      Did you ever work for any other
21  employer as a shape-up employee?
22  A.  No.
23  Q.  When did you first learn about
24  being a so-called shape-up employee?
25  A.  At Empire Merchants the first time.
```

Page 39

```
 1      CAMPBELL
 2  Q.  How did you learn that?
 3  A.  That's what my -- they told me my
 4  job is the shape-up guy.
 5  Q.  Now, in other jobs you've had were
 6  you aware of situations where there was a
 7  regular work force?
 8  A.  Can you describe?
 9  Q.  When you worked at ASIG and DFS,
10  was there a regular work force of employees?
11  Did you tend to see the same people every day?
12  A.  Yes.
13  Q.  And did they have regular hours or
14  shifts of work time?
15  A.  Yes.
16  Q.  Did ASIG and DFS work around the
17  clock, 24 hours a day?
18  A.  No.
19  Q.  Did either one of them work around
20  the clock, 24 hours a day?
21  A.  DFS has an ending period, I think
22  11, 11 to midnight.
23  Q.  I'm sorry, 11 a.m. till 12
24  midnight?
25  A.  No.  Ending.
```

Page 40

```
 1      CAMPBELL
 2  Q.  Ending, okay.
 3  A.  About 11 to 12 midnight.
 4  Q.  Do you know when that shift
 5  started, the one that would end at 11:00 or
 6  midnight?
 7  A.  I think it was -- I'm sorry, but my
 8  shift was the earlier shift.
 9  Q.  So what time did you start?
10  A.  7.
11  Q.  In the morning?
12  A.  Yes.
13  Q.  Was there a time you typically
14  ended your shift?
15  A.  Yes.
16  Q.  What time was that?
17  A.  7 to 2:30 -- 3:30.  And sometimes I
18  go over, like if they need me to go overtime.
19  Q.  Did Empire have people who had
20  regular shifts as far as you recall?
21  A.  Like the truck drivers, I think the
22  first shift, the first set of trucks would go
23  at like 7 and then another set at 8.  I'm there
24  until like -- if I -- at like 9:00, then 9:00 I
25  see another shift, set of trucks start to go
```

DERRICK CAMPBELL, ET AL. VS.
EMPIRE MERCHANTS, LLC

DERRICK CAMPBELL
March 27, 2017

Page 41

1    CAMPBELL
2  out again.
3  Q.  Well, you weren't always there
4  until 9:00, were you?
5  A.  No.
6  Q.  On the days you weren't there until
7    9:00, what did you do?
8  A.  I work.
9  Q.  You were working?
10  A.  Yes.
11  Q.  And if you went out on a truck,
12  what time did you typically go out?
13  A.  8:30, 9.
14  Q.  If you were working in the
15  warehouse, what time did you typically get your
16  warehouse assignment?
17  A.  The same time, 8:30, 9.
18  Q.  At Empire was there a time clock
19  for you to punch when your work time started?
20  A.  Yes.
21  Q.  Did you understand that to get paid
22  you had to punch your time card?
23  A.  Yes.
24  Q.  And did you punch your time card
25  honestly?

Page 42

1    CAMPBELL
2  A.  Yes.
3    MR. ROBERTS:  EM 109 through 117.
4    (Documents Bates stamped EM 109
5  through 117 were marked Defendant's
6  Exhibit 7 for identification, as of this
7  date.)
8  Q.  I'm showing you what's been marked
9  as Exhibit 7.  The first page of Exhibit 7 has
10  your name written up top; do you see that?  The
11  first page.
12  A.  Yes.
13  Q.  And that's marked EM 000109; do you
14  see that at the bottom?
15  A.  Yes.
16  Q.  Whose handwriting is that up top?
17  A.  Mines.
18  Q.  Printed it says, "Pay period
19  ending" and then it says "APR 012016" and it's
20  handwritten "7:30."  Do you know what that
21  signifies?
22  A.  That's the earlier start.
23  Q.  So what -- that means that you were
24  starting work at 7:30 in the morning?
25  A.  Not all the time.  This was not

Page 43

1    CAMPBELL
2  punch-in.  This was us --
3  Q.  Right.
4  A.  That wasn't a punch.
5  Q.  Do you remember starting work at
6    7:30 on your first day at Empire?
7  A.  Yes.
8  Q.  That was a Friday; is that right?
9  A.  Yes.
10  Q.  At the bottom in that third column
11  from the end where it says 7:30, up top it says
12    4:14, that's printed punched, not handwritten.
13  A.  Yes.
14  Q.  Is that when you stopped working?
15  A.  Yes.
16  Q.  And on the side it says "FR," that
17  means Friday; is that right?
18  A.  Yes.
19  Q.  On the next page again there's
20  handwriting up top with your name, is that your
21  handwriting?
22  A.  Yes.
23  Q.  And the first punch is Friday and
24  it says 7:59?
25  A.  Yes.

Page 44

1    CAMPBELL
2  Q.  Is that when you punched in to
3  work?
4  A.  Yes.
5  Q.  Then there's another punch at 12?
6  A.  For lunch, yeah.
7  Q.  That's a punch to go out for lunch?
8  A.  Yes.
9  Q.  And a punch again at 12:55; is that
10  right?
11  A.  Yes.
12  Q.  That's when you returned from
13  lunch?
14  A.  Yes.
15  Q.  Does that mean you were doing
16  warehouse work that day?
17  A.  Yes.
18  Q.  And then there's a punch at 7:30,
19  does that mean 7:30 at night?
20  A.  Yes.
21  Q.  That's when you stopped working?
22  A.  Yes.
23  Q.  If we look at the other card after
24  that, this is now the week of April 29th?
25  A.  Yes.

Page 45

1     CAMPBELL
2  Q.  That's again your handwriting up
3  top?
4  A.  Yes.
5  Q.  And you punch in on Wednesday at
6     8:10, on Thursday at 8, and on Friday at 8:05?
7  A.  Yes.
8  Q.  Those are the times you started
9  working those days?
10 A.  Yes.
11 Q.  And you punched out on Wednesday at
12    4:51, Thursday at 4:55, and Friday at 6:55; is
13 that right?
14 A.  Yes.
15 Q.  And there's no punch in or out for
16 lunch, does that mean you were working on a
17 truck?
18 A.  Yes.
19 Q.  So is it fair to say that in that
20 week of April 29th you wouldn't have seen
21 anybody in the warehouse once you were
22 dispatched?
23 A.  Yeah.
24 Q.  Until you returned at the end of
25 the day?

Page 46

1     CAMPBELL
2  A.  Yes.
3  Q.  And the next card is the pay period
4  ending May 6, 2016?
5  A.  Yes.
6  Q.  Is that your writing up top?
7  A.  Yes.
8  Q.  D. Campbell is your handwriting?
9  A.  Yes.
10 Q.  For that week you punched in at
11    8:11 in the morning on Monday, 7:58 on Tuesday,
12    8:02 on Wednesday, 8:00 on Thursday, and 8:09
13 on Friday; is that right?
14 A.  Yes.
15 Q.  And there are no punch-outs until
16 the end of the day, does that mean that you
17 worked those days on a truck?
18 A.  Yeah.
19 Q.  And on Monday you returned -- you
20 ended your work at 4:57 p.m.; is that right?
21 A.  Yes.
22 Q.  On Tuesday you stopped working at
23    4:58; is that right?
24 A.  Yes.
25 Q.  And you stopped on Wednesday at

Page 47

1     CAMPBELL
2     7:57 p.m.?
3  A.  Yes.
4  Q.  On Thursday you stopped working at
5     5:02 p.m.?
6  A.  Yes.
7  Q.  And on Friday, although it's
8  punched out at 7:28, there's handwriting that
9  your day ended at 7:45 p.m.?
10 A.  Yes.
11 Q.  Do you know why that was changed
12 from 7:28 to 7:45?
13 A.  We didn't get a break.
14 Q.  Okay.
15 A.  Yeah.
16 Q.  What do you mean by not getting a
17 break?
18 A.  There was ten-minute break.
19 Q.  And you worked through the break;
20 is that right?
21 A.  Yes.
22 Q.  Did you tell that to anybody in
23 management or did somebody else?
24 A.  Carlos.
25 Q.  Carlos?

Page 48

1     CAMPBELL
2  A.  Yes.
3  Q.  You said that to Carlos?
4  A.  Yes.
5  Q.  Who is Carlos?
6  A.  He's one of the managers in the
7  warehouse.
8  Q.  If you look at Exhibit 4, on page 4
9  at the very top in the box it says "Carlos
10 (last name unknown)" -- Exhibit 4 looks like
11 this.
12 A.  Page 4?
13 Q.  Of Exhibit 4.  And at the top of
14 page 4 it says "Carlos (last name unknown),
15 warehouse manager at defendant."  You're saying
16 that you were out on the trucks under the --
17 that would be under the Local 917 contract,
18 right?
19 A.  Yes.
20 Q.  And do you know if Carlos was the
21 manager of drivers and helpers or of warehouse
22 workers?
23 A.  I'm not sure, but like when the
24 trucks come back -- when the truck came back
25 from the road, Carlos is the one who would be

Page 49

1    CAMPBELL
2  responsible for take -- check -- make sure all
3  the returns are right, correct.
4  Q.  And do you know if Carlos started
5  his day when you were going out on the trucks
6  or did he start working later than that?
7  A.  I'm not sure what time he start.
8  Q.  When you say he was responsible for
9  checking the trucks when they returned, what
10  were they checking for?
11  A.  Make sure everything is -- the
12  liquor is right when it comes back, things
13  that -- returns from the stores are -- if they
14  don't deliver them, they got to make sure they
15  get back the right amount or any broken one, he
16  put his signature and stuff.
17  Q.  Was he checking -- did he check
18  with the drivers and the helpers or just the
19  drivers or just the helpers?
20  A.  Drivers and the helpers.
21  Q.  Did you ever work as a driver at
22  Empire?
23  A.  No.
24  Q.  When you went out on the truck, did
25  you always work with a driver?

Page 50

1    CAMPBELL
2  A.  Yes.
3  Q.  And did the driver ever talk to you
4  about who was responsible for the merchandise
5  that was on the trucks?
6  A.  No.  We never had that
7  conversation.
8  Q.  Do you know if there was any
9  paperwork that was written that related to the
10  merchandise, the wine and spirits, liquor, if
11  you will, that was loaded on the truck for
12  delivery?
13  A.  Yes.
14  Q.  What sort of paperwork was there?
15  A.  It was papers like this
16  with -- like this and copies.  You have to
17  give -- when you deliver, you give a piece for
18  the guy who received to sign and you get back
19  one to bring back to the warehouse.
20  Q.  And who gets that, the driver or
21  the helper?
22  A.  We both can do it, but it's the
23  driver's responsibility.
24  Q.  Are you saying that -- do you know
25  what an invoice is?

Page 51

1    CAMPBELL
2  A.  Yes.
3  Q.  Was there an invoice for the goods
4  ordered by the store or restaurant or hotel or
5  club?
6  A.  Yes.
7  Q.  And was it your responsibility with
8  the driver to deliver the goods that were on
9  the truck that matched what the paper said
10  about -- what the invoice said about what the
11  account had ordered?
12  A.  Yes.  But that's the driver's
13  responsibility.  He has to take them off and
14  give it to me.  The driver always has to take
15  it off and give it to me and then I push it in
16  the shop.
17  Q.  And then at the end of the day you
18  said there could be breakage; is that right?
19  A.  Yes.
20  Q.  That means something while it was
21  being transported broke?
22  A.  Yes.
23  Q.  And would there sometimes be extra
24  items for some reason that didn't get
25  delivered?

Page 52

1    CAMPBELL
2  A.  Yes.
3  Q.  And that could be for a few
4  reasons, couldn't it?  The account might reject
5  the merchandise?
6  A.  Right.  Yes.
7  Q.  Or it could have been -- was it
8  ever loaded by mistake, as far as you know?
9  A.  I've never had that.  Or we pick up
10  stuff back from the store to bring.
11  Q.  So the store had gotten something
12  delivered on an earlier day and they were
13  returning it, is that what you're saying?
14  A.  Sometimes you gotta pick up --
15  maybe they rejected something or something like
16  that.
17  Q.  That may have been delivered by a
18  different truck driver and helper?
19  A.  Yes.
20  Q.  Staying with Exhibit 7, if you
21  could, we had gotten through the week of May 6,
22  the next pay week is pay period ending May 27;
23  do you see that?
24  A.  Yes.
25  Q.  In that week you didn't punch in

Page 53

```
 1      CAMPBELL
 2   Monday; is that right?
 3   A.  Yeah.
 4   Q.  The first day you punched in was
 5   Tuesday and you did that at 8:01 a.m.?
 6   A.  Yes.
 7   Q.  On Wednesday you punched in at 8:12
 8   a.m.?
 9   A.  Yeah.
10   Q.  Then Thursday you punched in at
11      7:26 a.m.?
12   A.  Mm-hmm.
13   Q.  And Friday you punched in at 8:03
14   a.m.?
15   A.  Yeah.
16   Q.  Do you remember why you punched in
17   at 7:26 a.m. on Thursday?
18   A.  I think that was early for the
19   truck.
20   Q.  And how did you know it was going
21   to be an early start?
22   A.  How do I know?
23   Q.  Yes.
24   A.  I don't know until they tell me.
25   Q.  Do you remember who told you?
```

Page 54

```
 1      CAMPBELL
 2   A.  There was no -- they called my name
 3   and said I'm going with this person on the
 4   truck.
 5   Q.  On Tuesday, the first day in this
 6   payroll period ending May 27, you clocked out
 7   at 11:59 and back in at 1:01, does that mean
 8   you worked in the warehouse?
 9   A.  Yes.
10   Q.  And the other days of that week you
11   didn't clock out during the day until the end
12   of your work, does that mean you worked on
13   trucks?
14   A.  Yes.
15   Q.  The next pay period ending is the
16   next page, that's June 3, 2016; do you see
17   that?
18   A.  Yes.
19   Q.  Again, is that your handwriting up
20   top?
21   A.  Yes.
22   Q.  And it looks like you worked again
23   Tuesday through Friday; is that right?
24   A.  Yes.
25   Q.  And you clocked out midday or
```

Page 55

```
 1      CAMPBELL
 2   during the day on Tuesday and Friday?
 3   A.  Yeah.
 4   Q.  Does that mean you worked in the
 5   warehouse those days?
 6   A.  Yes.
 7   Q.  And on Wednesday you started at
 8      7:05 a.m., do you know how that was arranged?
 9   A.  For truck I believe.
10   Q.  Do you remember who told you that
11   you would be going on the truck at 7:05 a.m.?
12   A.  They announce it through the AP.
13   Q.  What do you mean by that?
14   A.  AP system.  They announce it.  Like
15   they call you and say you're going on with this
16   person on the truck.
17   Q.  What do you mean by AP, what does
18   that stand for?
19   A.  The system, the microphone system,
20   the loudspeaker thing.
21   Q.  Oh, it's a loudspeaker?
22   A.  Yeah.
23   Q.  Whose voice do you hear on the
24   loudspeaker?
25   A.  I can't recall.
```

Page 56

```
 1      CAMPBELL
 2   Q.  The person on the loudspeaker would
 3   announce names?
 4   A.  Yes.
 5   Q.  Do you know how the person on the
 6   loudspeaker knew what names to call?
 7   A.  When I go in to work in the
 8   morning, we write -- I write my name and they
 9   have a list like this on the side, you write
10   your name.
11   Q.  So when you went in to write your
12   name, was your name printed on the list or you
13   had to write your name?
14   A.  No.  You have to write your name.
15   Q.  On the days that you wrote your
16   name, do you remember if other names were
17   already written before yours?
18   A.  Sometimes.
19   Q.  Do you know any of those names?
20   A.  They have the shape-up guys' names.
21   Q.  I'm sorry?
22   A.  Other shape-up guys' names.
23   Q.  These were shape-up guys?
24   A.  Yes.  And union workers.
25   Q.  And you think some of them were
```

Page 57

```
 1      CAMPBELL
 2  union workers as well?
 3  A.  Yes.
 4  Q.  Do you know if the union workers --
 5  when you say union workers, how do you know
 6  they were union workers?
 7  A.  Because their name is there and
 8  they just sign.
 9  Q.  Were they on the same list as your
10  name or did they have another list?
11  A.  Another list.
12  Q.  Were the union workers -- did they
13  have any rights that you didn't have?
14  A.  Yes.
15  Q.  What sort of rights did they have
16  that you didn't have?
17  A.  To serve before, to send out for
18  service.
19  Q.  So they were called to serve or be
20  put to work before you?
21  A.  Yes.
22  Q.  Do you know how they qualified to
23  be union workers?
24  A.  They have to work there for a
25  period of time.
```

Page 58

```
 1      CAMPBELL
 2  Q.  So they had worked for a certain
 3  period of time?
 4  A.  Yes.
 5  Q.  Do you know how much?
 6  A.  I think it's 45 days straight or
 7  something like that.
 8  Q.  Do you know if there are union
 9  contracts or collective bargaining agreements
10  that Empire Merchants had with Local 1 or Local
11  1D and Teamsters Local 917?
12  A.  Supposed to be.
13  Q.  There was supposed to be contracts?
14  A.  Yes.
15  Q.  Do you know if those contracts
16  talked about the rights of union workers as you
17  say who may have worked for 45 days or more?
18  A.  Supposed to.
19  Q.  Have you ever seen either of the
20  union contracts, Local 1 or 1D or Teamsters
21  Local 917?
22  A.  Not really sure.  Not really sure.
23      (Local 917 collective bargaining
24  agreement was marked Defendant's Exhibit 8
25  for identification, as of this date.)
```

Page 59

```
 1      CAMPBELL
 2      MR. RIVERA: In five or ten minutes
 3  or so can we take a bathroom break?
 4      MR. ROBERTS: Sure.
 5  Q.  Exhibit 8 is called Collective
 6  Bargaining Agreement Between Empire Merchants
 7  LLC and Teamsters Local Union No. 917.  Have
 8  you seen that before today?
 9  A.  I don't recall.
10      MR. ROBERTS: This will be 9.
11      (Local 1D collective bargaining
12  agreement was marked Defendant's Exhibit 9
13  for identification, as of this date.)
14  Q.  Exhibit 9 is agreement between
15  Wine, Liquor and Distillery Workers Union Local
16  1-D UFCW, AFL-CIO, CLC, and Empire Merchants
17  LLC.  Have you seen that document before today?
18  A.  No.
19      MR. ROBERTS: You wanted a break.
20      MR. RIVERA: Yes.
21      (A brief recess was taken from
22  11:46 a.m. to 11:52 a.m.)
23  Q.  Staying with Exhibit 7, your time
24  cards, the pay period ending June 10, do you
25  see that?  During that week you worked Monday,
```

Page 60

```
 1      CAMPBELL
 2  Tuesday, Thursday, and Friday; is that right?
 3  A.  Yes.
 4  Q.  And on every one of those days you
 5  punched out during the day and back in during
 6  the day, do you see that?
 7  A.  Yes.
 8  Q.  Does that mean you did warehouse
 9  work?
10  A.  Yes.
11  Q.  Not helper work; is that right?
12  A.  No.
13  Q.  In the next week you worked
14  Tuesday, Wednesday, Thursday, and Friday; do
15  you see that?
16  A.  Yes.
17  Q.  And in that week you also punched
18  in and out during the day; is that right?
19  A.  Yes.
20  Q.  Does that mean you did warehouse
21  work?
22  A.  Yes.
23  Q.  On the week ending June 24th you
24  punched in on Tuesday and Wednesday; do you see
25  that?
```

Page 61

```
 1     CAMPBELL
 2  A.  Yes.
 3  Q.  And on Tuesday you punched out at
 4     12:03 and back in at 1:01 and then there's a
 5     punch at 4:59, does that mean you did warehouse
 6     work?
 7  A.  Yes.
 8  Q.  And on Wednesday was that your last
 9     day of work?  You punched in at 8:01 and out at
10     11:15?
11  A.  Yes.
12  Q.  Yes, it was your last day?
13  A.  Yes.
14  Q.  Is that right?
15  A.  Yeah.
16  Q.  Going, if we could, back to your
17     interrogatory responses, that's Exhibit 4, on
18     page 4 you are asked in interrogatory No. 6 to
19     identify the supervisors and managers alleged
20     in paragraph 20 of your Complaint to have
21     directed defendants -- that's Empire's --
22     day-to-day operations, managed the warehouse,
23     assigned daily duties to you or handled your
24     complaints, and you've identified Meyers, who
25     we earlier saw as Mike Meyers, the dispatcher,
```

Page 62

```
 1     CAMPBELL
 2     you've identified Carlos, who you've earlier
 3     identified as being the warehouse manager who
 4     checked in the trucks when they returned, and
 5     you've identified which I think we know to be
 6     Jimmy Ching, the day warehouse manager; is that
 7     right?
 8  A.  Yes.
 9  Q.  And are there any other names that
10     you know of people who directed the day-to-day
11     operations or managed the warehouse or assigned
12     daily duties to you or handled complaints?
13  A.  Not to my knowledge.
14  Q.  In interrogatory No. 7 you are
15     asked to describe in detail and identify
16     persons with knowledge of and documents
17     concerning the manner in which you were
18     scheduled to work for defendant, that's Empire,
19     and your answer is there that you attest that
20     on nearly each weekday of your employment you
21     arrived between 5:30 a.m. and 6 a.m. at
22     the warehouse to wait for defendant to assign
23     you with responsibilities or dismiss you for
24     the day and when you're asked to identify
25     people with knowledge of that, you identify in
```

Page 63

```
 1     CAMPBELL
 2     addition to yourself you identify Mr. Meyers,
 3     the person named Carlos, and Mr. Ching and you
 4     don't identify anybody else, do you know of
 5     anybody else who would have knowledge
 6     concerning the manner in which you were
 7     scheduled to work?
 8  A.  Another Asian guy, but I don't
 9     remember his name.
10  Q.  Do you know what his position was?
11  A.  I can't tell his title, but I know
12     he's in the office and he's the guy who give me
13     like the forms to fill out and like that.
14  Q.  What sort of forms did he give you
15     to fill out?
16  A.  Like the W-2 and stuff like that.
17     And he's the one who brings the paper to sign,
18     like if you don't work for the day, he gives
19     you the paper to sign.
20  Q.  Would you do that paper that you
21     would sign if you didn't work for the day?
22  A.  Just a sheet like this with -- a
23     regular sheet like this and like shape-up guy
24     didn't work, they sign it also.
25  Q.  Do you know what was done with that
```

Page 64

```
 1     CAMPBELL
 2     paper after it was signed?
 3  A.  The guy once tell me -- because I
 4     asked him what is it good for, he told me it's
 5     for like unemployment records.
 6  Q.  Did you understand what that meant?
 7  A.  Yes.
 8  Q.  What did you understand?
 9  A.  Like if you file for unemployment,
10     you can show that you are searching work or
11     doing tasks, getting there at the job site,
12     stuff like that.
13  Q.  In addition to this person you
14     identified as another Asian guy, is there
15     anybody else who would have information
16     concerning the manner in which you were
17     scheduled to work?
18  A.  Not that I know of.
19  Q.  Do you know if any of these people
20     have information about the time that you
21     arrived at work, arrived -- I'm sorry, you
22     say -- arrived at the warehouse?
23  A.  They're supposed to.
24  Q.  What do you mean by that?
25  A.  Because when you come, you sign
```

Page 65

1      CAMPBELL
2  **your name on the wall, on the sheet, so they**
3  **must know.**
4  Q.  When you sign in, did you put a
5  time when you arrived?
6  **A.  No.**
7  Q.  And you say sometimes there were
8  names ahead of yours?
9  **A.  Yes.**
10 Q.  And do you know if there were ever
11 times when names were below yours?
12 **A.  A lot of times, yes.**
13 Q.  How did you know that?
14 **A.  You can see.  It's plain writing.**
15 **You can see who on top or on the bottom or if**
16 **you're on the bottom, who on top of you.**
17 Q.  Looking at Exhibit 7, there was one
18 day you started work at about 7:00; is that
19 right?  7:04 maybe.  I see 7:05 on -- in the
20 week ending June 3rd; do you see that?
21 **A.  Yes.**
22 Q.  Other than that, almost all the
23 days are around 8:00, maybe a little bit
24 before, a little bit after, except for one 7:26
25 in the week -- on the Thursday of the week

Page 66

1      CAMPBELL
2  ending May 27; do you see that?
3  **A.  Yes.**
4  Q.  Now, these are the times that you
5  punched in; is that right?
6  **A.  Yes.**
7  Q.  And you knew that was when you were
8  going to start getting paid, the time you
9  punched in?
10 **A.  Yes.**
11 Q.  And you knew that you would be paid
12 through the time you punched out; is that
13 right?
14 **A.  Yes.**
15 Q.  And you also know, don't you, that
16 if something happened where you should be paid
17 for a longer time, like when you skipped the
18 break, that that would be changed by the
19 company so you'd get that extra time; isn't
20 that right?
21 **A.  Yes.**
22 Q.  And you said there was a
23 loudspeaker as I remember; is that right?  I
24 think you called it an AP or loudspeaker; is
25 that right?

Page 67

1      CAMPBELL
2  **A.  Yes.**
3  Q.  The person using the loudspeaker,
4  where was he based?
5  **A.  The office.**
6  Q.  Where were the speakers, as far as
7  you recall?
8  **A.  On the roof.**
9  Q.  Outside in the yard too, right?
10 **A.  Yes.**
11 Q.  When you say on the roof, you mean
12 the roof of what?
13 **A.  Inside the warehouse.  In the break**
14 **room.**
15 Q.  You call this a break room?
16 **A.  Yes.**
17 Q.  What do you mean by break room?
18 **A.  There's lockers in there.  That's**
19 **where we sit in the morning.**
20 Q.  When you say we sat there in the
21 morning, who --
22 **A.  All the workers waiting for work,**
23 **for job assignments.**
24 Q.  I see.  The loudspeakers that were
25 outside, where were they?

Page 68

1      CAMPBELL
2  **A.  I'm not sure.**
3  Q.  You described the yard area though.
4  What do you mean by the yard area?
5  **A.  What did I say about the yard area?**
6  Q.  You said the speakers were outside.
7  **A.  No.  I said the speakers inside.**
8  Q.  And there were speakers outside
9  too, right?
10 **A.  I didn't say anything about**
11 **speakers outside.**
12 Q.  No?  Just inside as far as you
13 recall?
14 **A.  Yes.**
15 Q.  While people were waiting, were
16 they allowed to smoke inside in the break room?
17 **A.  No.**
18 Q.  How do you know that?
19 **A.  Because nobody can smoke inside.**
20 Q.  Could they smoke outside?
21 **A.  Yes.**
22 Q.  Do you smoke?
23 **A.  No.**
24 Q.  But you saw people going outside to
25 smoke?

Page 69

```
 1      CAMPBELL
 2 A.  Yes.
 3 Q.  So they'd leave the break room and
 4  go outside if they wanted a smoke; is that
 5  right?
 6 A.  Yes.
 7 Q.  Were people allowed in the break
 8  room to use their cell phones if they wanted
 9  to?
10 A.  Yes.
11 Q.  And did you use your cell phone
12  while you were in the break room?
13 A.  Not all the time.
14 Q.  But sometimes?
15 A.  Sometimes.
16 Q.  Did you use it to make phone calls?
17 A.  Mostly check Facebook and stuff
18  like that.
19 Q.  I'm sorry, to check?
20 A.  Facebook.
21 Q.  Facebook?
22 A.  Yes.
23 Q.  So you would go on your Facebook
24  account or other people's Facebook accounts
25  while you were waiting?
```

Page 70

```
 1      CAMPBELL
 2 A.  No.  Just check if I get a message
 3  or stuff like that.
 4 Q.  Nobody ever said if you're going to
 5  check your Facebook account, you have to go
 6  outside and do that?
 7 A.  No.
 8 Q.  You could do that inside?
 9 A.  Yes.
10 Q.  Did you sometimes get text messages
11  when you were waiting in the break room?
12 A.  A few times.
13 Q.  And sometimes you responded to text
14  messages while you were waiting?
15 A.  Yeah.
16 Q.  Did they permit eating inside the
17  break room?
18 A.  Yes.
19 Q.  So some people would eat while they
20  were waiting?
21 A.  Yes.
22 Q.  And did you ever see anybody be
23  told, "You can't eat in here, you have to go
24  outside if you're going to eat while you're
25  waiting"?
```

Page 71

```
 1      CAMPBELL
 2 A.  No.
 3 Q.  There was a truck outside, wasn't
 4  there?  A coffee truck?
 5 A.  On the street.
 6 Q.  On the street?
 7 A.  Yes.
 8 Q.  Did you see people leaving the
 9  break room to go out to the coffee truck while
10  they were waiting?
11 A.  Most times they get their stuff
12  when they're coming in.
13 Q.  And then could they eat and drink
14  outside the warehouse as well as inside the
15  warehouse?
16 A.  I guess.
17 Q.  Did you ever take your food outside
18  the warehouse?
19 A.  No.  If I buy something, I buy it
20  and I come in.  On my way in and eat it.
21 Q.  You'd eat it while you were
22  waiting; is that right?
23 A.  Yes.
24 Q.  When you say you'd buy it, do you
25  mean you bought it from that coffee truck that
```

Page 72

```
 1      CAMPBELL
 2  was outside the gate?
 3 A.  Yes.
 4 Q.  Do you know what time that coffee
 5  truck got there?
 6 A.  Never really checked it.
 7 Q.  Was it always there when you
 8  arrived?
 9 A.  No.  Sometimes I arrive before the
10  coffee truck and I'll get coffee inside.  They
11  sell coffee inside the break room.  In the
12  office they have coffee in there.  You can buy
13  a cup from them.
14 Q.  Is that from a vending machine
15  or --
16 A.  No.  From the same guys in the
17  warehouse, the office.
18 Q.  So there was a coffee pot?
19 A.  Yes.
20 Q.  And you could buy coffee there?
21 A.  Yes.
22 Q.  Do you know who you gave the money
23  to?
24 A.  Nick.
25 Q.  Nick?
```

DERRICK CAMPBELL, ET AL. VS.
EMPIRE MERCHANTS, LLC

DERRICK CAMPBELL
March 27, 2017

1      CAMPBELL
2  A.  Yes.
3  Q.  The guys sometimes were playing
4   cards, weren't they?
5  A.  Who?
6  Q.  The guys inside the break room were
7   sometimes playing cards?
8  A.  Yes.
9  Q.  Did you ever play cards with the
10   guys in the break room?
11  A.  No.
12  Q.  And they sometimes played dominoes?
13  A.  I've never seen dominoes.
14  Q.  Was it the same guys who always
15   played the same card games?
16  A.  Yes.  The same bunch of guys always
17   play.
18  Q.  Do you know if they were -- you
19   didn't know any of them by name though?
20  A.  No.
21  Q.  Were there more than one card game
22   going on at any one time?
23  A.  No.
24  Q.  Always the same card game?
25  A.  Always the same card game.

1      CAMPBELL
2  Q.  Did they sell newspapers inside the
3   break room?
4  A.  No.  I've never seen it.
5  Q.  But you saw people reading
6   newspapers; is that right?
7  A.  I think so.
8  Q.  Now, on your break time on the days
9   you worked inside the warehouse, I mean, when
10   you'd clock in and out, it was usually an hour;
11   is that right?  For the lunch break?
12  A.  Yes.
13  Q.  On your lunch break did you have a
14   place where you ate your lunch?
15  A.  Yes.  They have a break room
16   upstairs inside the warehouse above the office
17   area.
18  Q.  Could you go back to the other
19   break room, the one where you signed in also?
20  A.  Yes.
21  Q.  And you could eat your lunch there
22   if you wanted?
23  A.  Yes.
24  Q.  In that break room during your
25   lunch time could you check your Facebook

1      CAMPBELL
2   account if you wanted to?
3  A.  Yes.  I guess.
4  Q.  And could you respond to text
5   messages if you wanted in the break room?
6  A.  Yeah.
7  Q.  Could you make or receive cell
8   phone calls if you wanted to in the break room?
9  A.  Yes.
10  Q.  But you and others weren't allowed
11   to smoke in the break room were you?  That had
12   to happen outside?
13  A.  Yes.
14  Q.  And was there a truck that came at
15   lunch time to sell lunches that stayed outside
16   the gate?
17  A.  No.  That truck come inside.
18  Q.  There was a truck that came inside
19   the gate at lunch time?
20  A.  Yeah.  Lunch time, break time truck
21   coming in.
22  Q.  Were people allowed to go out into
23   that area and buy their lunches when they
24   clocked out for lunch?
25  A.  Yes.

1      CAMPBELL
2  Q.  Other than your lunch time, were
3   there other breaks when you worked inside at
4   the warehouse?
5  A.  Yes.  We get a ten-minute break.
6  Q.  One ten-minute break?
7  A.  From in the morning and if you go
8   over like after 12, then -- if you go to 3 --
9   if you go till 3, then you get another break,
10   ten-minute break.
11  Q.  Looking at Exhibit 7, most days
12   when you worked inside the warehouse did you go
13   past 3:00?  You may look.
14  A.  Yes.
15  Q.  So if you worked past 3:00 on any
16   of these days that you were doing warehouse
17   work, you got a second break; is that right?
18  A.  Yes.
19  Q.  And during that break what were you
20   allowed to do?
21  A.  Anything you want to do.  Eat,
22   smoke, drink anything, drink like water, soda.
23  Q.  Were there areas where you could do
24   that?
25  A.  Yes.  Outside.

DERRICK CAMPBELL, ET AL. VS.
EMPIRE MERCHANTS, LLC

DERRICK CAMPBELL
March 27, 2017

Page 77

CAMPBELL

1     CAMPBELL
2 Q. Outside the warehouse?
3 A. Yes.
4 Q. Or in the break room?
5 A. To eat or to smoke you have to go
6 outside.
7 Q. When you were in the break room,
8 whether it was during your lunch or during your
9 breaks, was there any requirement that you not
10 talk with the other people who were waiting?
11 A. Was there any requirement --
12 Q. I'm sorry, was there any
13 requirement that you not talk with the other
14 people who were also in the room at the time?
15 A. No.
16 Q. That was true when you were waiting
17 too, you were allowed to talk to each other?
18 A. Yes.
19 Q. You started in the end of -- I
20 think your first day was April 1st and then
21 your last day was June 22nd. If the weather
22 was nice, did you see people -- they were
23 allowed to go out into the yard during their
24 breaks and before they punched in; is that
25 right?

Page 78

1     CAMPBELL
2 A. Yes.
3 Q. Do you remember there was sometimes
4 people who were playing football or soccer,
5 throwing a ball around or kicking a ball
6 around?
7 A. No.
8 Q. You don't remember seeing that?
9 A. No
10 Q. No. Let's go back, if we could, to
11 Exhibit 4, that's your responses to the
12 interrogatories. In interrogatory No. 10 you
13 say -- the question is, "Describe in detail and
14 identify persons with knowledge of and
15 documents concerning the time you reported to
16 work on each day you were employed by
17 defendant," that's Empire, and there's an
18 objection.
19     In other of your interrogatory
20 responses you said you would have knowledge of
21 that, here there's an objection and you say
22 that it would be unduly burdensome on you if
23 you were forced to describe in detail and
24 identify persons knowing when you arrived.
25 That remains your answer today and it's

Page 79

1     CAMPBELL
2 truthful; is that right?
3 A. Yes.
4 Q. It also refers to being employed
5 for 84 days. Did you actually work every one
6 of 84 days between April 1st and June 22nd?
7 A. Rephrase.
8 Q. If you look at your time cards that
9 you punched, that's not 84 days that you
10 punched in and out, right?
11 A. I never really checked it.
12 Q. Okay. In interrogatory No. 12 it
13 says, "Describe in detail and identify persons
14 with knowledge of and documents concerning your
15 activities during the time you spent waiting to
16 receive a work assignment through defendant's
17 shape-up procedure on each day you reported to
18 work at the warehouse to seek work through the
19 shape-up procedure." Once again you object and
20 you say it would be unduly burdensome on you if
21 you were forced to describe those things in
22 detail for each of the 84 days. Does that
23 remain your answer now too?
24 A. Yes.
25 Q. In interrogatory No. 13 it says,

Page 80

1     CAMPBELL
2 "Describe in detail the basis for and identify
3 persons with knowledge of and documents
4 concerning the allegations in paragraph 35 of
5 your Complaint that after checking in
6 Mr. Campbell could not leave the warehouse or
7 use waiting time for his own purposes" and you
8 say in answer to that that it would damage your
9 reputation, what's your reason for saying that?
10 A. My lawyer can answer for me.
11 Q. I'm sorry?
12 A. My lawyer can answer that question.
13 Q. But you cannot; is that right?
14 A. Yes.
15 Q. Now, were you ever disciplined
16 during the time you were working for Empire --
17 and let's just say before June 22nd -- for the
18 way you performed your work?
19 A. No.
20 Q. Were you ever disciplined for
21 drinking coffee or soda or water while you were
22 working?
23 A. No.
24 Q. Did you ever drink coffee or soda
25 or water while you were working?

Page 81

```
 1       CAMPBELL
 2  A.  No.
 3  Q.  Were you ever disciplined for using
 4   your cell phone while you were working?
 5  A.  No.
 6  Q.  Did you ever use your cell phone
 7   while you were working?
 8  A.  Not in the warehouse.
 9  Q.  Were you ever disciplined for
10   checking your Facebook account while you were
11   working?
12  A.  No.
13  Q.  Did you ever check your Facebook
14   account while you were doing work?
15  A.  No.
16  Q.  Were you ever disciplined for
17   eating while you were working?
18  A.  No.
19  Q.  Did you ever eat during work time?
20  A.  No.
21  Q.  Did you ever see people playing
22   cards during work time?
23  A.  The guys that I saw playing cards,
24   they play cards early and if they call them,
25   they stop playing and go to work.
```

Page 82

```
 1       CAMPBELL
 2  Q.  And you never saw anybody
 3   disciplined for playing cards then; is that
 4   right?
 5  A.  No.
 6  Q.  Did you ever see anybody
 7   disciplined for reading a newspaper during work
 8   time?
 9  A.  Not to my knowledge.
10  Q.  Did you ever see anybody reading a
11   newspaper during work time who you thought
12   should have been disciplined?
13  A.  I've never seen it.
14  Q.  Never saw anybody reading a
15   newspaper during work time?
16  A.  No.
17  Q.  In interrogatory No. 18 that's on
18   page 8, it says, "Describe in detail and
19   identify persons with knowledge of and
20   documents concerning any hours you worked for
21   which you did not receive proper compensation
22   from Empire" and you object that it would be
23   overly burdensome for you to do that.  We saw
24   that there was one day when your punch card,
25   time card was adjusted so you could get
```

Page 83

```
 1       CAMPBELL
 2   correctly paid for skipping a break; is that
 3   right?
 4  A.  Yes.
 5  Q.  Other than that was there any other
 6   day that you were aware of where you wanted a
 7   change in the times you punched in and out?
 8  A.  Not that I recall.
 9  Q.  Well, do you want to look at
10   Exhibit 7 and see if that refreshes your
11   recollection?
12  A.  No.
13  Q.  It doesn't refresh your
14   recollection at all; is that right?
15  A.  Yes.
16  Q.  In interrogatory No. 21 that's on
17   page 9 it says, "Describe in detail and
18   identify persons with knowledge of and
19   documents concerning any documents filed by
20   plaintiff," -- you -- "or on your behalf with
21   any tax, unemployment insurance, social
22   welfare, or other federal, state, or municipal
23   government agency, department, or bureau,
24   showing or referring to or otherwise concerning
25   your employment with Empire."
```

Page 84

```
 1       CAMPBELL
 2   Do you remember filing any
 3   documents with unemployment insurance saying
 4   that you worked for Empire?
 5  A.  No.
 6  Q.  After your employment at Empire
 7   ended, did you apply for unemployment
 8   insurance?
 9  A.  I did, but I didn't get it.
10  Q.  Do you know why you didn't get it?
11  A.  Because I couldn't get -- I
12   couldn't get the documents right, the dates and
13   stuff like that.  They wanted more evidence and
14   I didn't get them at the time.
15  Q.  Did you file any documents with any
16   social or welfare agency that referred to your
17   employment with Empire?
18  A.  No.
19  Q.  Do you remember if there was any
20   other agency or department or bureau of a
21   federal or state or New York government agency
22   that you filed that refer to your employment?
23  A.  Unemployment is the only one.
24  Q.  Okay.
25  A.  No more.
```

Page 85

```
 1      CAMPBELL
 2  Q.  Okay.  And of course taxes, right?
 3  A.  Huh?
 4  Q.  And the Internal Revenue Service
 5  and state tax agencies, you filed with them
 6  too, right?  For tax purposes did you file a
 7  tax return?
 8  A.  Oh, yes.
 9  Q.  That referred to your employment?
10  A.  Yes.
11      MR. ROBERTS: It's 12:30.  Why
12  don't we take -- do you want about a half
13  hour break for lunch?
14      MR. RIVERA: It depends.  How long
15  do you anticipate going this afternoon?
16      MR. ROBERTS: I wouldn't think
17  we're going to go -- probably we should
18  end well before 4.
19      MR. RIVERA: Okay.
20      (A lunch recess was taken from
21      12:32 p.m. to 1:11 p.m.)
22  Q.  Mr. Campbell, your Complaint in
23  this lawsuit, in this action, is Exhibit 1,
24  would you look at that, please.  On page 5 in
25  your Complaint in paragraph 34 the Complaint
```

Page 86

```
 1      CAMPBELL
 2  says, "Empire had three morning shifts for
 3  shape-up employees."  What's your reason for
 4  saying there were three morning shifts for
 5  shape-up employees?
 6  A.  Because one shift started at 7, one
 7  started at 8, and one at 9.
 8  Q.  What do you mean by a shift?
 9  A.  The starting time.
10  Q.  A starting time?
11  A.  Yeah.
12  Q.  A starting time for what?
13  A.  You start when they call you.  They
14  call you and say, "We're going to use you
15  today."
16  Q.  Well, take a look at Exhibit 7.
17  Those are your time cards, right?
18  A.  Yes.
19  Q.  Every day you worked in the
20  warehouse you started at about -- just around
21  8:00, right?
22  A.  Yes.
23  Q.  On most days -- well, the first day
24  you worked, which is April 1st, it looks like
25  you went out on the truck at 7:30?
```

Page 87

```
 1      CAMPBELL
 2  A.  Yes.
 3  Q.  In the week of April 29th you went
 4  out on the truck and that started between 8 and
 5  8:10; is that right?
 6  A.  Yes.
 7  Q.  The next week you went out on the
 8  trucks, it's the week of May 6th, and you went
 9  out between 7:58 and 8:11; is that right?
10  A.  Yes.
11  Q.  In the week of May 27th one day you
12  went out on the truck starting at 7:26; is that
13  right?
14  A.  Yes.
15  Q.  Punching in at 7:26 in the morning?
16  A.  Yes.
17  Q.  Two other days that week, Wednesday
18  and Friday, you went out on a truck and one day
19  you went out at 8:12 and the other you went out
20  at 8:03; is that right?
21  A.  Sure.
22  Q.  One day that week, Tuesday, you
23  worked in the warehouse and you punched in at
24  8:01, right?
25  A.  Yes.
```

Page 88

```
 1      CAMPBELL
 2  Q.  In the week of June 3rd you went
 3  out on the truck two days, one day you went out
 4  at 7:05 and the other at 7:54; do you see that?
 5  A.  Yes.
 6  Q.  And two other days you worked
 7  inside in the warehouse Tuesday and Friday?
 8  A.  Yes.
 9  Q.  One day starting at 8:06 and one
10  day, Friday, starting at 8:15?
11  A.  Yes.
12  Q.  In the next week, June 10th, you
13  worked Monday, Tuesday, Thursday, and Friday
14  and you punched in 7:59 on Thursday, and
15  between 8 and 8:07 the other two days; is that
16  right?
17  A.  Yes.
18  Q.  Incidentally, do you know why you
19  didn't work on Wednesday that week?
20  A.  I think there was no job for me
21  that day.
22  Q.  So you just went home, as far as
23  you recall?
24      MR. RIVERA: Please make sure to
25  verbalize your responses so the court
```

DERRICK CAMPBELL, ET AL. VS.
EMPIRE MERCHANTS, LLC

DERRICK CAMPBELL
March 27, 2017

---

Page 89

```
 1      CAMPBELL
 2   reporter can pick them up.
 3   A.  They said there was no work for me
 4   that day so I signed the paper and they said,
 5   "Go home."
 6   Q.   Did you show up every Monday?
 7   A.   Not regularly because I asked the
 8   same Asian guy and they said Monday -- most
 9   time Mondays are slow days, so if I go on
10   Monday, most time I don't get work.  Sometimes
11   I get work.
12   Q.   So you stopped going on Mondays?
13      MR. RIVERA:  Objection.  You can
14   answer.
15   A.   No.  Some days.
16   Q.   You didn't go on Mondays?
17   A.   Some days.
18   Q.   Now, do you know any other shape-up
19   worker -- I'm sorry, never mind.
20      Looking at Exhibit 2, if you would,
21   please, on the first page it says -- this is
22   what's called Plaintiff's Initial Disclosures.
23   A.   Yes.
24   Q.   On page -- on the first page
25   there's Roman numeral II, potential witnesses;
```

---

Page 90

```
 1      CAMPBELL
 2   do you see that?
 3   A.   Yes.
 4   Q.   And the text there is, "Name and if
 5   known the address and telephone number of each
 6   individual likely to have discoverable
 7   information along with the subjects of that
 8   information that the disclosing party may use
 9   to support its claims or defenses" and on the
10   first page you are identified as witnessing all
11   allegations in the Complaint, the next two
12   people are identified as witnessing what's
13   called alleged sexual harassment and then on
14   the next page, page 2, there are two people who
15   are identified as having the same information
16   and it says "Witnessed shape-up workers wait
17   time and work "schedule"; do you see that?
18   A.   What number are you on?
19   Q.   This is on the top of page 2.  And
20   that continues from what was on the page
21   before.
22   A.   Yes.
23   Q.   So there are -- of the seven people
24   who are listed, you are one on page 1 and then
25   on page 2 the people who you say witnessed
```

---

Page 91

```
 1      CAMPBELL
 2   shape-up workers wait time and work schedule --
 3   you name someone named "Nelson" and then it's
 4   "(last name unknown to plaintiff)" and under
 5   the column title/relationship you identify
 6   Nelson as a shape-up employee at defendant.
 7   Q.   How do you know Nelson as a shape-up employee?
 8   A.   Most times we have the same tasks
 9   and we talk in the break room.
10   Q.   So you talked in the break room,
11   that means you were talking before you were
12   called for a job, is that what you mean?  Or
13   during lunch?  Or what do you mean by talking
14   in the break room?
15   A.   We spoke during work sitting
16   waiting for work and during lunch time we
17   talked.
18   Q.   And you identify somebody named
19   Mike, last name unknown, and you say he's a
20   forklift operator?
21   A.   Yes.
22   Q.   Where did you see Mike at the
23   Empire facility?
24   A.   Mike would dispatch me to -- he
25   gave me the assignment to work with Mike.  The
```

---

Page 92

```
 1      CAMPBELL
 2   supervisor Mike would assign it to the forklift
 3   driver Mike.
 4   Q.   What sort of work did you do with
 5   Mike the forklift operator?
 6   A.   We sort pallets, like broken ones
 7   from good ones, we put them together, the
 8   broken ones with the broken ones and the good
 9   ones with the good ones and Mike would use the
10   forklift and pick them up.
11   Q.   So you would sort pallets and
12   separate the broken and unbroken ones?
13   A.   Yes.
14   Q.   Do you know what time Mike started
15   working on his assignment as a forklift
16   operator?
17   A.   I'm not sure.  But when I'm
18   assigned to work with Mike, he's always there
19   before me so I don't know what time he starts.
20   Q.   Is Mike somebody who you would see
21   in the break room before the shape-up or was he
22   already in the warehouse?
23   A.   No.  In the warehouse.
24   Q.   Take a look at page 3 of this same
25   exhibit, Exhibit 2, if you would.  Close to the
```

---

Page 93

```
 1      CAMPBELL
 2   top of the page it says, "monetary damages"; do
 3   you see that?
 4  A.  Yes.
 5  Q.  And Roman numeral I is wage and
 6   hour damages; do you see that?
 7  A.  Yes.
 8  Q.  Did you have anything to do with
 9   calculating these damages?
10      MR. RIVERA: Objection.  You can
11   answer the question to the extent that you
12   can without revealing any attorney/client
13   communication.
14  A.  Rephrase.
15  Q.  Did you have anything to do with
16   calculating these damages?
17  A.  No.
18      MR. ROBERTS: Off the record for
19   just a little bit.
20      (A brief recess was taken from 1:24
21   p.m. to 1:27 p.m.)
22      MR. ROBERTS: This deposition was
23   authorized by the Court for the purpose of
24   focused discovery and as to that focused
25   discovery, I have no further questions so
```

Page 95

```
 1      CAMPBELL
 2   between 8 and 45.25 hours per week for which he
 3   was paid.  Plaintiff also was engaged to wait
 4   for approximately 3.5 hours per day five days
 5   per week for which he was not paid.
 6  Q.  When you gave these numbers, were
 7   those estimates accurate in your opinion?
 8  A.  Yes.
 9  Q.  Do you still believe they're
10   accurate, those estimates?
11  A.  Yes.
12      MR. RIVERA: That's all I have.
13      MR. ROBERTS: I have nothing
14   further.
15      (Time noted:  1:31 p.m.)
16
17
18
19
20
21
22
23
24
25
```

Page 94

```
 1      CAMPBELL
 2   I can conclude today's deposition.
 3      MR. RIVERA: Okay.  I just have a
 4   couple of questions to ask the witness
 5   just to clarify his last response.
 6  EXAMINATION BY
 7      MR. RIVERA:
 8  Q.  About how much time would pass
 9   between when you arrived at the work site and
10   when you were either assigned work or
11   dismissed?
12  A.  An hour and a half, two hours
13   sometimes.
14  Q.  Is that estimate contained in page
15   3 of Exhibit 2 anywhere?
16  A.  Yes.
17  Q.  Can you read where?
18  A.  (As read) During this employment
19   with defendant between approximately April 4,
20   2016, and June 22, 2016, plaintiff earnings was
21   13 per hour for work performed in different
22   warehouses, location -- location and $14 per
23   hour for work performed on defendant's delivery
24   trucks as described in the Complaint.
25   Plaintiff works various work schedule of
```

Page 96

```
 1      A C K N O W L E D G E M E N T
 2
 3  STATE OF           )
 4    : ss
 5  COUNTY OF          )
 6
 7      I, DERRICK CAMPBELL, hereby
 8   certify that I have read the transcript of my
 9   testimony taken under oath in my deposition;
10   that the transcript is a true, complete and
11   correct record of my testimony, and that the
12   answers on the record as given by me are true
13   and correct.
14
15
16   _____
17      DERRICK CAMPBELL
18
19   Signed and subscribed to before
20   me, this ____ day of _____, _____.
21
22   _____
23
24   Notary Public, State of _____
25
```

Page 97

```
 1              C E R T I F I C A T E

 2

 3   STATE OF NEW YORK  )

 4                      )

 5   COUNTY OF NEW YORK )

 6

 7       I, MICHELE MOSKOWITZ, a Shorthand Reporter

 8   and Notary Public within and for the State of

 9   New York, do hereby certify:

10       That DERRICK CAMPBELL, the witness whose

11   examination is hereinbefore set forth, was duly

12   sworn by me and that this transcript of such

13   examination is a true record of the testimony

14   given by such witness.

15       I further certify that I am not related to

16   any of the parties to this action by blood or

17   marriage and that I am in no way interested in

18   the outcome of this matter.

19       IN WITNESS WHEREOF, I have hereunto set my

20   hand this 6th day of April, 2017.

21

22

23

24   _____

25   MICHELE MOSKOWITZ
```

Page 98

```
 1              ***ERRATA SHEET***

 2        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
 3             New York, New York 10022
                   212-750-6434
 4

 5   NAME OF CASE:  CAMPBELL v. EMPIRE MERCHANTS
     DATE OF DEPOSITION:  MARCH 27, 2017
 6   NAME OF WITNESS:  DERRICK CAMPBELL

 7   PAGE  LINE      FROM     TO        REASON

 8   ____|_____|_____|_____|_____

 9   ____|_____|_____|_____|_____

10   ____|_____|_____|_____|_____

11   ____|_____|_____|_____|_____

12   ____|_____|_____|_____|_____

13   ____|_____|_____|_____|_____

14   ____|_____|_____|_____|_____

15   ____|_____|_____|_____|_____

16   ____|_____|_____|_____|_____

17   ____|_____|_____|_____|_____

18   ____|_____|_____|_____|_____

19   ____|_____|_____|_____|_____

20   ____|_____|_____|_____|_____

21              _____

22   Subscribed and sworn before me

23   this _____ day of _____, 2017.

24   _____    _____

25   Notary Public        My Commission Expires
```

## $

**$13 (1)**
25:6
**$14 (1)**
94:22

## A

**above (4)**
11:8,11,21;74:16
**account (7)**
51:11;52:4;69:24;
70:5;75:2;81:10,14
**accounts (1)**
69:24
**accurate (3)**
13:15;95:7,10
**across (1)**
18:21
**Action (4)**
7:9;8:15;11:13;
85:23
**activities (1)**
79:15
**activity (1)**
36:3
**actually (1)**
79:5
**addition (3)**
20:8;63:2;64:13
**address (1)**
90:5
**adjusted (1)**
82:25
**administered (1)**
6:16
**AFL-CIO (1)**
59:16
**afternoon (1)**
85:15
**again (8)**
13:7;41:2;43:19;
44:9;45:2;54:19,22;
79:19
**against (2)**
6:7,19
**agencies (1)**
85:5
**agency (4)**
83:23;84:16,20,21
**agreement (4)**
58:24;59:6,12,14
**agreements (1)**
58:9
**ahead (1)**
65:8
**aircraft (6)**
36:5,6,12;37:5,5;
38:4
**aircraft's (1)**
36:2

**airport (5)**
33:14,15,16;34:7,
10
**alert (1)**
15:20
**allegation (1)**
27:13
**allegations (2)**
80:4;90:11
**alleged (2)**
61:19;90:13
**allowed (7)**
68:16;69:7;75:10,
22;76:20;77:17,23
**almost (1)**
65:22
**along (1)**
90:7
**although (1)**
47:7
**always (13)**
20:16,17;25:15;
33:17;41:3;49:25;
51:14;72:7;73:14,16,
24,25;92:18
**America (5)**
33:23;34:6,19;35:2,
9
**amount (1)**
49:15
**announce (3)**
55:12,14;56:3
**anticipate (1)**
85:15
**AP (4)**
55:12,14,17;66:24
**appears (1)**
11:21
**application (2)**
13:23;15:8
**applications (3)**
14:10;16:5,23
**apply (1)**
84:7
**approximately (4)**
15:22;32:10;94:19;
95:4
**APR (1)**
42:19
**April (7)**
44:24;45:20;77:20;
79:6;86:24;87:3;
94:19
**area (10)**
19:24;22:11;30:13;
32:8;37:6;68:3,4,5;
74:17;75:23
**areas (4)**
31:20;37:2,20;
76:23
**around (10)**
21:13;25:6;30:12;
39:16,19;62:21;

65:23;78:5,6;86:20
**arranged (1)**
55:8
**arrive (1)**
72:9
**arrived (9)**
20:24;62:21;64:21,
21,22;65:5;72:8;
78:24;94:9
**Asian (3)**
63:8;64:14;89:8
**ASIG (9)**
33:19;34:9,12;35:8,
12,17;36:14;39:9,16
**asserted (1)**
11:18
**assign (3)**
26:5;62:22;92:2
**assigned (4)**
61:23;62:11;92:18;
94:10
**assignment (4)**
41:16;79:16;91:25;
92:15
**assignments (1)**
67:23
**assistant (1)**
33:23
**ate (1)**
74:14
**attention (1)**
23:4
**attest (1)**
62:19
**attorney/client (1)**
93:12
**authorized (1)**
93:23
**Avenue (1)**
14:13
**aware (2)**
39:6;83:6

## B

**back (19)**
10:8;22:13,14,17;
37:12;38:5;48:24,24;
49:12,15;50:18,19;
52:10;54:7;60:5;61:4,
16;74:18;78:10
**bad (1)**
12:3
**baggage (5)**
36:22,23;37:3,4,5
**ball (2)**
78:5,5
**bargaining (6)**
28:20;29:17;58:9,
23;59:6,11
**based (4)**
33:9;34:6,9;67:4
**basis (2)**

27:11;80:2
**Bates (3)**
14:4;23:13;42:4
**bathroom (1)**
59:3
**beginning (1)**
31:24
**begins (1)**
9:10
**behalf (2)**
18:16;83:20
**behind (1)**
26:10
**belief (1)**
11:19
**Below (2)**
28:9;65:11
**best (3)**
11:17;20:13;28:6
**bit (3)**
65:23,24;93:19
**both (1)**
50:22
**bottom (7)**
9:10,13;27:10;
42:14;43:10;65:15,16
**bought (1)**
71:25
**box (1)**
48:9
**break (45)**
47:13,17,18,19;
59:3,19;66:18;67:13,
15,17;68:16;69:3,7,
12;70:11,17;71:9;
72:11;73:6,10;74:3,8,
11,13,15,19,24;75:5,
8,11,20;76:5,6,9,10,
17,19;77:4,7;83:2;
85:13;91:9,10,14;
92:21
**breakage (1)**
51:18
**breaks (3)**
76:3;77:9,24
**Bridgewater (1)**
14:12
**brief (2)**
59:21;93:20
**bring (2)**
50:19;52:10
**brings (1)**
63:17
**broke (1)**
51:21
**broken (5)**
49:15;92:6,8,8,12
**Brooklyn (1)**
14:14
**bunch (1)**
73:16
**burdensome (3)**
78:22;79:20;82:23

**bureau (1)**
83:23;84:20
**buy (6)**
71:19,19,24;72:12,
20;75:23

## C

**calculating (2)**
93:9,16
**call (7)**
36:11;55:15;56:6;
67:15;81:24;86:13,14
**called (12)**
7:9;8:5,19;19:4;
15:18;54:2;57:19;
59:5;66:24;89:22;
90:13;91:12
**calls (2)**
69:16;75:8
**came (3)**
48:24;75:14,18
**CAMPBELL (98)**
6:1,4,5;7:1;8:1;9:1;
10:1;11:1,12;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;8;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1,6;81:1;82:1;
83:1;84:1;85:1,22;
86:1;87:1;88:1;89:1;
90:1;91:1;92:1;93:1;
94:1;95:1;96:7,17
**can (22)**
13:5,7;15:5;19:4;
30:15,17;39:8;50:22;
59:3;64:10;65:14,15;
68:19;72:12;80:10,
12;89:2,13;93:10,12;
94:2,17
**cans (1)**
38:7
**card (10)**
41:22,24;44:23;
46:3;73:15,21,24,25;
82:24,25
**cards (10)**
59:24;73:4,7,9;
79:8;81:22,23,24;

82:3;86:17
**Carlos (11)**
47:24,25;48:3,5,9,
14,20,25;49:4;62:2;
63:3
**cart (2)**
36:22,23
**carts (1)**
37:3
**Case (2)**
15:18,19
**cell (5)**
69:8,11;75:7;81:4,6
**certain (2)**
19:15;58:2
**certify (1)**
96:8
**change (1)**
83:7
**changed (2)**
47:11;66:18
**check (14)**
19:6,9,18,19,22;
26:15;49:2,17;69:17,
19;70:2,5;74:25;
81:13
**checked (4)**
21:25;62:4;72:6;
79:11
**checking (5)**
49:9,10,17;80:5;
81:10
**checks (2)**
19:11,15
**Ching (13)**
27:19,22,24;29:20;
30:10,24;31:13,15;
32:5,11,20;62:6;63:3
**C-H-I-N-G (1)**
27:20
**Ching's (1)**
28:9
**choice (2)**
25:9,12
**claims (2)**
7:3;90:9
**clarify (1)**
94:5
**Class (2)**
7:9;8:15
**CLC (1)**
59:16
**clock (5)**
39:17,20;41:18;
54:11;74:10
**clocked (3)**
54:6,25;75:24
**Close (2)**
92:25
**club (1)**
51:5
**coffee (12)**
71:4,9,25;72:4,10,

10,11,12,18,20;80:21,
24
**collect (1)**
19:6
**collective (4)**
58:9,23;59:5,11
**column (2)**
43:10;91:5
**coming (2)**
71:12;75:21
**commencement (1)**
38:17
**Commercial (2)**
29:10,13
**common (1)**
33:9
**communication (1)**
93:13
**company (2)**
33:11;66:19
**compensation (1)**
82:21
**Complaint (13)**
5:6;7:8,9;8:15;
12:23;27:14;61:20;
80:5;85:22,25,25;
90:11;94:24
**complaints (2)**
61:24;62:12
**complete (1)**
96:10
**concerning (12)**
13:23;27:13;38:14;
62:17;63:6;64:16;
78:15;79:14;80:4;
82:20;83:19,24
**conclude (1)**
94:2
**contained (1)**
94:14
**Containers (2)**
38:9,10
**contents (1)**
11:16
**continues (2)**
27:18;90:20
**contract (1)**
48:17
**contracts (4)**
58:9,13,15,20
**conversation (1)**
50:7
**copies (2)**
13:22;50:16
**correctly (1)**
83:2
**Counsel (1)**
7:15
**COUNTY (1)**
96:5
**couple (2)**
17:12;94:4
**course (1)**

85:2
**court (2)**
88:25;93:23
**cup (1)**
72:13

**D**

**daily (2)**
61:23;62:12
**damage (1)**
80:8
**damages (4)**
93:2,6,9,16
**date (12)**
5:8,11,16,19,23;
17:8,20;23:3,15;42:7;
58:25;59:13
**dates (1)**
84:12
**day (53)**
12:8;14:17;16:14;
18:9;19:11,12;21:9;
27:23,25;29:21;
39:11,17,20;43:6;
44:16;45:25;46:16;
47:9;49:5;51:17;
52:12;53:4;54:5,11;
55:2;60:5,6,18;61:9,
12;62:6,24;63:18,21;
65:18;77:20,21;
78:16;79:17;82:24;
83:6;86:19,23;87:11,
18,22;88:3,9,10,21;
89:4;95:4;96:20
**days (36)**
21:17,24;22:3,4,6,
8;31:16;32:10,12,13;
41:6;45:9;46:17;
54:10;55:5;56:15;
58:6,17;60:4;65:23;
74:8;76:11,16;79:5,6,
9,22;86:23;87:17;
88:3,6,15;89:9,15,17;
95:4
**day-to-day (2)**
61:22;62:10
**December (2)**
35:5,8
**decided (1)**
25:13
**deeper (1)**
32:6
**defendant (12)**
13:24;27:14,23,25;
28:11;38:18;48:15;
62:18,22;78:17;91:6;
94:19
**defendants (1)**
61:21
**Defendant's (17)**
5:6,10,13,15,18,21;
8:20,24;10:11;11:15;

23:2,14;42:5;58:24;
59:12;79:16;94:23
**defenses (1)**
90:9
**deliver (3)**
49:14;50:17;51:8
**delivered (3)**
51:25;52:12,17
**deliveries (1)**
14:18
**delivery (4)**
22:13;35:20;50:12;
94:23
**department (2)**
83:23;84:20
**depends (1)**
85:14
**depose (1)**
11:12
**deposition (8)**
6:6,8,10,18;13:10;
93:22;94:2;96:9
**Derrick (4)**
6:4;11:11;96:7,17
**DES (5)**
33:22;34:6,19,20,
21
**Describe (11)**
27:11;38:12;39:8;
62:15;78:13,23;
79:13,21;80:2;82:18;
83:17
**described (5)**
22:10;31:24;37:15;
68:3;94:24
**detail (10)**
27:11;38:12;62:15;
78:13,23;79:13,22;
80:2;82:18;83:17
**DFS (8)**
34:21,22,23,25;
35:9;39:9,16,21
**difference (2)**
22:18,22
**different (3)**
19:20;52:18;94:21
**directed (2)**
61:21;62:10
**directing (1)**
23:4
**disciplined (8)**
80:15,20;81:3,9,16;
82:3,7,12
**disclosing (1)**
90:8
**disclosures (4)**
5:9;8:5;12:24;
89:22
**discoverable (1)**
90:6
**discovery (3)**
93:24,25
**dismiss (1)**

62:23
**dismissed (1)**
94:11
**dispatch (2)**
32:24;91:24
**dispatched (1)**
45:22
**dispatcher (11)**
28:11,18;29:16;
32:23;33:8;34:3,5;
35:11,16;36:8;61:25
**dispatchers (3)**
33:3,12;35:13
**dispatcher's (1)**
28:15
**distance (1)**
36:23
**Distillery (1)**
59:15
**document (12)**
7:8,11,17;8:4,6;
14:8,20;23:6,9,13,21;
59:17
**Documents (32)**
5:14;7:7;8:21,25;
9:9,15,17;10:9,13;
12:22;13:2,3,9,22;
14:4,6;23:24;27:13;
30:6,7;38:14;42:4;
62:16;78:15;79:14;
80:3;82:20;83:19,19;
84:3,12,15
**dominoes (2)**
73:12,13
**done (1)**
63:25
**down (4)**
16:2,6;19:17;20:4
**download (1)**
16:13
**downloaded (1)**
15:2
**drink (4)**
71:13;76:22,22;
80:24
**drinking (1)**
80:21
**driver (8)**
49:21,25;50:3,20;
51:8,14;52:18;92:3
**drivers (10)**
24:10,21;26:25;
27:2;29:3;40:21;
48:21;49:18,19,20
**driver's (1)**
50:23;51:12
**drop (1)**
37:19
**drug (3)**
30:6,7,23
**duly (2)**
5:2;11:12
**dump (1)**

37:6
**during (28)**
18:22;26:13,14,22;
31:16;32:10;54:11;
55:2;59:25;60:5,5,18;
74:24;76:19;77:8,8,
23;79:15;80:16;
81:19,22;82:7,11,15;
91:13,15,16;94:18
**duties (2)**
61:23;62:12

**E**

**earlier (5)**
40:8;42:22;52:12;
61:25;62:2
**early (4)**
20:15;53:18,21;
81:24
**Earnings (6)**
5:17;9:18,21,25;
10:4;94:20
**eat (10)**
70:19,23,24;71:13,
20,21;74:21;76:21;
77:5;81:19
**eating (2)**
70:16;81:17
**either (3)**
39:19;58:19;94:10
**else (9)**
20:11,19,23;26:19;
27:2;47:23;63:4,5;
64:15
**else's (1)**
25:11
**EM (4)**
23:13;42:3,4,13
**Empire (44)**
6:7,19;10:2,6;
13:24;14:19;15:14,
16;18:6,23;21:18,22,
23;22:19,20,25;23:6,
7,17;24:24;27:15;
30:22;31:17;32:11;
33:4;38:18,25;40:19;
41:18;43:6;49:22;
58:10;59:6,16;62:18;
78:17;80:16;82:22;
83:25;84:4,6,17;86:2;
91:23
**Empire's (1)**
61:21
**employ (2)**
17:8;29:21
**employed (2)**
78:16;79:4
**employee (6)**
22:23;38:16,21,24;
91:6,7
**employee' (1)**
27:16

**employees (8)**
18:17;22:16,19,20;
25:2;39:10;86:3,5
**employer (2)**
38:15,21
**employment (20)**
13:23;14:10;15:8;
16:5,23;17:9;18:10;
21:23;33:5;35:4,9;
38:15,18;62:20;
83:25;84:6,17,22;
85:9;94:18
**end (11)**
14:12;17:15,20;
40:5;43:11;45:24;
46:16;51:17;54:11;
77:19;85:18
**ended (8)**
18:10;21:23;35:4,
10;40:14;46:20;47:9;
84:7
**ending (12)**
39:21,25;40:2;
42:19;46:4;52:22;
54:6,15;59:24;60:23;
65:20;66:2
**engaged (1)**
95:3
**envelope (1)**
30:7
**estimate (1)**
94:14
**estimates (2)**
95:7,10
**even (1)**
31:17
**evidence (1)**
84:13
**EXAMINATION (2)**
5:24;94:6
**examined (1)**
5:4
**except (2)**
11:18;65:24
**Exhibit (44)**
5:7,10,15,18,22;
7:10;8:4,4,19;9:6;
10:10,25;13:20,21;
14:7;23:2,5,11,14;
24:5;27:5;42:6,9,9;
48:8,10,13;52:20;
58:24;59:5,12,14,23;
61:17;65:17;76:11;
78:11;83:10;85:23;
86:16;89:20;92:25,
25;94:15
**Exhibits (1)**
28:24
**explain (1)**
6:15
**EXT (1)**
17:23
**extension (1)**

14:15
**extent (1)**
93:11
**extra (2)**
51:23;66:19

**F**

**face (1)**
26:12
**Facebook (9)**
69:17,20,21,23,24;
70:5;74:25;81:10,13
**faces (1)**
19:25
**facility (1)**
91:23
**facing (2)**
20:4,5
**facsimile (1)**
16:9
**fair (1)**
45:19
**familiar (3)**
10:18,19;11:24
**far (8)**
13:9;19:14;22:19;
40:20;52:8;67:6;
68:12;88:22
**faxed (1)**
17:13
**federal (2)**
83:22;84:21
**few (3)**
7:7;52:3;70:12
**file (3)**
64:9;84:15;85:6
**filed (5)**
6:6,19;83:19;84:22;
85:5
**filing (1)**
84:2
**fill (2)**
63:13,15
**fired (1)**
17:13
**firm (2)**
9:16,16
**first (35)**
5:2,13,21;7:8,19;
8:12,15,20,24;9:17,
19;10:11;11:15,23;
12:24;29:21;30:9,13,
19;31:2;38:23,25;
40:22,22;42:9,11;
43:6,23;53:4;54:5;
77:20;86:23;89:21,
24;90:10
**five (4)**
22:2,4;59:2;95:4
**focused (1)**
93:24,24
**follows (1)**

5:4
**Food (3)**
29:9,12;71:17
**football (1)**
78:4
**force (2)**
39:7,10
**forced (2)**
78:23;79:21
**foregoing (1)**
11:14
**forklift (7)**
26:24,25;91:20;
92:2,5,10,15
**forms (2)**
63:13,14
**found (2)**
15:9,16
**FR (1)**
43:16
**Friday (16)**
43:8,17,23;45:6,12;
46:13;47:7;53:13;
54:23;55:2;60:2,14;
87:18;88:7,10,13
**front (1)**
10:18
**further (2)**
93:25;95:14

**G**

**game (3)**
73:21,24,25
**games (1)**
73:15
**gate (3)**
72:2;75:16,19
**gave (8)**
10:16;19:19;26:22;
30:5,6;72:22;91:25;
95:6
**gets (1)**
50:20
**given (3)**
19:11,15;96:12
**gives (1)**
63:18
**Giving (1)**
26:4
**gloves (2)**
31:7,9
**goes (2)**
14:13;15:15
**good (4)**
64:4;92:7,8,9
**goods (2)**
51:3,8
**gotta (1)**
52:14
**government (2)**
83:23;84:21
**ground (2)**

6:8;7:7
**guess (2)**
71:16;75:3
**guy (10)**
19:8;26:5;39:4;
50:18;63:8,12,23;
64:3,14;89:8
**guys (12)**
19:20;20:25;22:16,
24;56:23;72:16;73:3,
6,10,14,16;81:23
**guys' (2)**
56:20,22

**H**

**half (2)**
85:12;94:12
**handed (1)**
19:8
**handled (2)**
61:23;62:12
**handwriting (12)**
16:22;17:3,5,22;
24:3;42:16;43:20,21;
45:2;46:8;47:8;54:19
**handwritten (2)**
42:20;43:12
**happen (2)**
30:3;75:12
**happened (2)**
36:3;66:16
**harassment (1)**
90:13
**head (2)**
19:3;25:21
**hear (1)**
55:23
**heard (2)**
15:14;19:4
**helper (4)**
24:25;50:21;52:18;
60:11
**helpers (8)**
14:17;24:10,22;
29:3;48:21;49:18,19,
20
**hereby (1)**
96:7
**high (1)**
36:18
**hi-lo (2)**
37:22,24
**hired (1)**
27:15
**home (4)**
16:10,19;88:22;
89:5
**honest (1)**
13:13
**honestly (1)**
41:25
**hotel (1)**

51:4
**hour (7)**
  25:6;74:10;85:13;
  93:6;94:12,21,23
**hours (7)**
  39:13,17,20;82:20;
  94:12;95:2,4
**house (2)**
  14:10;16:17
**Huh (3)**
  12:14;36:25;85:3

## I

**ID (1)**
  19:22
**identification (10)**
  5:7,11,15,19,23;
  23:3,15;42:6;58:25;
  59:13
**identified (9)**
  28:11;61:24;62:2,3,
  5;64:14;90:10,12,15
**identifies (1)**
  27:17
**identify (18)**
  14:4;27:12,19;
  38:13;61:19;62:15,
  24,25;63:2,4;78:14,
  24;79:13;80:2;82:19;
  83:18;91:5,18
**identifying (1)**
  27:24
**II (1)**
  89:25
**Incidentally (1)**
  88:18
**Indicating (1)**
  9:12
**indication (1)**
  35:15
**individual (1)**
  90:6
**information (6)**
  11:19;64:15,20;
  90:7,8,15
**initial (4)**
  5:9;8:5;12:23;
  89:22
**inside (27)**
  21:11,24;22:8,10;
  32:7;33:17;35:19;
  36:2;67:13;68:7,12,
  16,19;70:8,16;71:14;
  72:10,11;73:6;74:2,9,
  16;75:17,18;76:3,12;
  88:7
**instruction (1)**
  26:22
**insurance (3)**
  83:21;84:3,8
**interaction (1)**
  36:8

**Internal (1)**
  85:4
**International (2)**
  34:7,10
**Internet (9)**
  14:21,22,25;15:2,4,
  11,12,15,16
**Interrogatories (6)**
  5:21;10:12;11:15;
  12:25;28:6;78:12
**Interrogatory (11)**
  27:10;38:11;61:17,
  18;62:14;78:12,19;
  79:12,25;82:17;83:16
**into (2)**
  75:22;77:23
**invoice (3)**
  50:25;51:3,10
**involved (1)**
  36:4
**items (1)**
  51:24

## J

**January (1)**
  34:16
**JFK (2)**
  34:7,9
**Jimmy (13)**
  27:19,22,24;28:9;
  29:20;30:10,23;
  31:13,15;32:5,11,20;
  62:6
**job (16)**
  15:18,18,19,19,20,
  21;20:7;28:16;33:7,
  11;34:4;39:4;64:11;
  67:23;88:20;91:12
**jobs (6)**
  33:2,16,17;34:2;
  35:10;39:5
**July (2)**
  34:18;35:2
**June (10)**
  54:16;59:24;60:23;
  65:20;77:21;79:6;
  80:17;88:2,12;94:20

## K

**kicking (1)**
  78:5
**kind (2)**
  6:12;33:13
**knew (4)**
  28:4;56:6;66:7,11
**knowing (1)**
  78:24
**knowledge (17)**
  11:16,17;27:12;
  28:7;33:9;38:13;
  62:13,16,25;63:5;

78:14,20;79:14;80:3;
82:9,19;83:18
**known (1)**
  90:5

## L

**landed (1)**
  36:12
**last (15)**
  9:10;10:24;12:7;
  14:9;19:2;22:10;
  25:19;48:10,14;61:8,
  12;77:21;91:4,19;
  94:5
**late (1)**
  22:14
**later (1)**
  49:6
**latest (1)**
  21:11
**law (2)**
  9:16,16
**lawsuit (5)**
  6:6,19;7:4,10;85:23
**lawyer (6)**
  8:2;12:13,15;17:13;
  80:10,12
**lawyer's (2)**
  12:12,16
**lay (2)**
  6:8;7:6
**learn (3)**
  15:13;38:23;39:2
**leave (3)**
  36:12;69:3;80:6
**leaving (1)**
  71:8
**letterhead (2)**
  14:19;23:6
**likely (1)**
  90:6
**line (1)**
  11:3
**liquor (3)**
  49:12;50:10;59:15
**list (5)**
  56:9,12;57:9,10,11
**listed (1)**
  90:24
**little (3)**
  65:23,24;93:19
**LLC (5)**
  6:7,20;10:2;59:7,17
**Load (3)**
  36:5;38:4,5
**loaded (2)**
  50:11;52:8
**loader (2)**
  36:18;37:24
**Local (26)**
  22:25;23:7,18;24:9,
  12,20;25:2;28:19,25;

29:2,4,6,9,13,13,17;
48:17;58:10,10,11,20,
21,23;59:7,11,15
**located (1)**
  26:8
**location (2)**
  94:22,22
**locker (3)**
  20:2,5;26:11
**lockers (1)**
  67:18
**long (2)**
  30:21;85:14
**longer (1)**
  66:17
**look (16)**
  9:6;10:13,18,19;
  11:24;13:20;14:7;
  27:4;44:23;48:8;
  76:13;79:8;83:9;
  85:24;86:16;92:24
**looked (1)**
  28:24
**looking (8)**
  10:14;16:4;23:16,
  23;24:8;65:17;76:11;
  89:20
**looks (8)**
  14:8;16:8,10,24;
  17:2;48:10;54:22;
  86:24
**lot (1)**
  65:12
**loudspeaker (8)**
  55:20,21,24;56:2,6;
  66:23,24;67:3
**loudspeakers (1)**
  67:24
**luggage (2)**
  38:8,9
**lunch (19)**
  44:6,7,13;45:16;
  74:11,13,14,21,25;
  75:15,19,20,24;76:2;
  77:8;85:13,20;91:13,
  16
**lunches (2)**
  75:15,23

## M

**machine (1)**
  72:14
**makes (1)**
  25:23
**making (1)**
  14:17
**managed (2)**
  61:22;62:11
**management (1)**
  47:23
**manager (7)**
  27:23,25;28:2;

48:15,21;62:3,6
**managers (3)**
  32:19;48:6;61:19
**manager's (1)**
  32:3
**manner (3)**
  62:17;63:6;64:16
**many (3)**
  21:17,23;32:10
**March (5)**
  10:22;12:6,9;23:24;
  28:4
**marked (16)**
  5:6,10,14,17,22;
  8:18;9:5;10:10;23:2,
  5,14;42:5,8,13;58:24;
  59:12
**marking (1)**
  16:9,12
**matched (1)**
  51:9
**May (5)**
  34:13;35:7;46:4;
  52:17,21,22;54:6;
  58:17;66:2;76:13;
  87:8,11;90:8
**Maybe (4)**
  20:25;52:15;65:19,
  23
**mean (24)**
  18:3;35:24;44:15,
  19;45:16;46:16;
  47:16;54:7,12;55:4,
  13,17;60:8,20;61:5;
  64:24;67:11,17;68:4;
  71:25;74:9;86:8;
  91:12,13
**means (5)**
  13:24;42:23;43:17;
  51:20;91:11
**meant (1)**
  64:6
**Meeker (1)**
  14:13
**meet (1)**
  29:20
**member (2)**
  28:19;29:17
**merchandise (3)**
  50:4,10;52:5
**Merchants (20)**
  6:7,19;10:2,6;
  13:24;14:19;15:14,
  17;18:6;22:25;23:7,
  17;24:25;27:15;
  30:22;31:17;38:25;
  58:10;59:6,16
**Merchants's (1)**
  23:6
**message (1)**
  70:2
**messages (3)**
  70:10,14;75:5

met (1)
  29:22
Meyers (6)
  28:10,12;32:23;
  61:24,25;63:2
M-E-Y-E-R-S (1)
  28:10
microphone (1)
  55:19
midday (2)
  19:17;54:25
midnight (4)
  39:22,24;40:3,6
might (1)
  52:4
Mike (22)
  25:18,22;26:7,8,13,
  25;28:10,12,12;
  32:23;61:25;91:19,
  22,24,25;92:2,3,5,9,
  14,18,20
Mike's (1)
  25:19
mind (1)
  89:19
Mines (1)
  42:17
minutes (1)
  59:2
mistake (1)
  52:8
Mm-hmm (1)
  53:12
Monday (9)
  12:7;46:11,19;53:2;
  59:25;88:13;89:6,8,
  10
Mondays (3)
  89:9,12,16
monetary (1)
  93:2
money (2)
  22:23;72:22
more (10)
  6:23;18:21;22:2,4,
  5,23;58:17;73:21;
  84:13,25
morning (17)
  7:23,24,25;8:11,16;
  13:9;20:3;40:11;
  42:24;46:11;56:8;
  67:19,21;76:7;86:2,4;
  87:15
Most (8)
  32:12,13;71:11;
  76:11;86:23;89:8,10;
  91:8
Mostly (1)
  69:17
much (2)
  58:5;94:8
municipal (1)
  83:22

must (1)
  65:3

**N**

name (33)
  6:2;11:6;18:8;19:2;
  20:22;23:8,20;25:17,
  18,19;28:9,10;42:10;
  43:20;48:10,14;54:2;
  56:8,10,12,12,13,14,
  16;57:7,10;63:9;65:2;
  73:19;90:4;91:3,4,19
named (4)
  27:19;63:3;91:3,18
names (10)
  21:2;56:3,6,16,19,
  20,22;62:9;65:8,11
nearly (1)
  62:20
need (1)
  40:18
needed (2)
  14:16;31:9
Nelson (3)
  91:3,6,7
New (3)
  5:3;14:14;84:21
newspaper (1)
  82:7,11,15
newspapers (2)
  74:2,6
next (13)
  10:24;27:18,18;
  43:19;46:3;52:22;
  54:15,16;60:13;87:7;
  88:12;90:11,14
nice (1)
  77:22
Nick (19)
  17:22,25;18:2,18,
  24;19:5,8,19;20:7,13,
  15;21:6,11,14;22:10,
  14;24:17;72:24,25
Nick's (1)
  18:8
night (2)
  14:17;44:19
nobody (2)
  68:19;70:4
North (5)
  33:22;34:6,19,25;
  35:9
Notary (2)
  5:3;96:24
noted (1)
  95:15
number (7)
  14:14;16:11,15,17,
  20;90:5,18
numbered (1)
  14:5
numbers (1)

95:6
numeral (2)
  89:25;93:5

**O**

oath (2)
  6:15;96:9
object (3)
  6:17;79:19;82:22
Objection (6)
  13:5;15:5;78:18,21;
  89:13;93:10
off (10)
  19:3;21:14;23:16;
  25:20;37:19;38:4,7;
  51:13,15;93:18
office (28)
  12:12,16;19:21,23,
  25;20:4,11,14,23;
  21:7,9,12;22:11;
  26:10;29:22;30:13;
  31:21,22,23,23;32:2,
  3,6;63:12;67:5;72:12,
  17;74:16
offices (1)
  26:12
once (3)
  45:21;64:3;79:19
one (41)
  8:22;9:8,19;10:15;
  15:19;18:21,24;20:4,
  4,4,5;24:19;26:10,11;
  39:19;40:5;48:6,25;
  49:15;50:19;60:4;
  63:17;65:17;74:2;
  73:21,22;74:19;76:6;
  79:5;82:24;84:23;
  86:6,6,7;87:11,18,22;
  88:3,9,9;90:24
ones (7)
  92:6,7,8,8,9,9,12
online (1)
  15:8
only (3)
  18:24;26:24;84:23
Open (2)
  14:10;15:21
opens (1)
  20:2
operate (1)
  36:15
operated (1)
  37:13
operations (2)
  61:22;62:11
operator (3)
  91:20;92:5,16
opinion (1)
  95:7
ordered (2)
  51:4,11
others (2)

33:4;75:10
otherwise (1)
  83:24
out (42)
  19:9,11,15;32:15;
  41:2,11,12;44:7;
  45:11,15;47:8;48:16;
  49:5,24;54:6,11,25;
  57:17;60:5,18;61:3,9;
  63:13,15;66:12;71:9;
  74:10;75:22,24;
  77:23;79:10;83:7;
  86:25;87:4,7,9,12,18,
  19,19;88:3,3
outside (23)
  31:21,23;32:3;
  35:25;67:9,25;68:6,8,
  11,20,24;69:4;70:6,
  24;71:3,14,17;72:2;
  75:12,15;76:25;77:2,
  6
over (4)
  16:25;21:14;40:18;
  76:8
overly (1)
  82:23
overtime (1)
  40:18
own (1)
  80:7

**P**

page (44)
  9:11,13;10:18,25;
  11:4,23;13:21;15:25;
  16:4,5,8,22,23;27:6,7,
  11,16,18,18;38:12;
  42:9,11;43:19;48:8,
  12,14;54:16;61:18;
  82:18;83:17;85:24;
  89:21,24,24;90:10,14,
  14,19,20,24,25;92:24;
  93:2;94:14
pages (1)
  14:9
paid (7)
  41:21;66:8,11,16;
  83:2;95:3,5
pallets (6)
  38:5,5,6,7;92:6,11
paper (6)
  51:9;63:17,19,20;
  64:2;89:4
papers (1)
  50:15
paperwork (2)
  50:9,14
paragraph (4)
  27:14;61:20;80:4;
  85:25
part (1)
  31:16

party (1)
  90:8
Pass (2)
  26:18;94:8
past (2)
  76:13,15
pay (11)
  22:25;23:7;25:2,7,
  9;42:18;46:3;52:22,
  22;54:15;59:24
payroll (1)
  54:6
people (23)
  26:21;33:12;39:11;
  40:19;62:10,25;
  64:19;68:15,24;69:7;
  70:19;71:8;74:5;
  75:22;77:10,14,22;
  78:4;81:21;90:12,14,
  23,25
people's (1)
  69:24
per (5)
  94:21,22;95:2,4,5
performed (3)
  80:18;94:21,23
period (9)
  39:21;42:18;46:3;
  52:22;54:6,15;57:25;
  58:3;59:24
permit (1)
  70:16
person (7)
  54:3;55:16;56:2,5;
  63:3;64:13;67:3
persons (9)
  27:12;38:13;62:16;
  78:14,24;79:13;80:3;
  82:19;83:18
person's (1)
  25:17
perspective (1)
  6:9
phone (9)
  14:14;16:11,15,20;
  69:11,16;75:8;81:4,6
phones (1)
  69:8
pick (5)
  37:19;52:9,14;89:2;
  92:10
piece (1)
  50:17
place (1)
  74:14
plain (1)
  65:14
plaintiff (8)
  11:13;27:15,17;
  83:20;91:4;94:20,25;
  95:3
plaintiffs (1)
  38:14

**Plaintiffs' (8)**
5:9,12,20;8:5,19,
23;10:11;11:14
**Plaintiff's (2)**
5:22;89:22
**plane (2)**
37:12,12
**play (3)**
73:9,17;81:24
**played (2)**
73:12,15
**playing (7)**
73:3,7;78:4;81:21,
23,25;82:3
**Please (9)**
6:2;7:15;9:7;14:7;
16:7;27:8;85:24;
88:24;89:21
**pm (10)**
12:21;46:20;47:2,5,
9;85:21,21;93:21,21;
95:15
**pop (1)**
15:20
**position (1)**
63:10
**positions (1)**
21:3
**possibly (1)**
16:25
**pot (1)**
72:18
**potential (1)**
89:25
**practices (2)**
23:2,8
**present (1)**
38:19
**print (1)**
15:9
**printed (6)**
23:8,17,20;42:18;
43:12;56:12
**printer (1)**
16:14
**prior (2)**
38:16,17
**probably (1)**
85:17
**procedure (2)**
79:17,19
**proceeding (1)**
6:13
**produce (1)**
13:22
**produced (2)**
9:16;14:5
**product (1)**
33:23
**Production (4)**
5:14;8:21,25;13:2
**proper (1)**
82:21

**Public (2)**
5:3;96:24
**pull (1)**
37:12
**pulls (1)**
36:21
**punch (14)**
41:19,22,24;43:4,
23;44:5,7,9,18;45:5,
15;52:25;61:5;82:24
**punched (24)**
43:12;44:2;45:11;
46:10;47:8;53:4,7,10,
13,16;60:5,17,24;
61:3,9;66:5,9,12;
77:24;79:9,10;83:7;
87:23;88:14
**punch-in (1)**
43:2
**Punching (1)**
87:15
**punch-outs (1)**
46:15
**purpose (2)**
31:6;93:23
**purposes (3)**
31:6;80:7;85:6
**push (2)**
37:12;51:15
**pushback (3)**
37:8,10,11
**pushbacks (1)**
36:18
**put (6)**
17:13;20:3;49:16;
57:20;65:4;92:7

**Q**

**qualified (1)**
57:22
**quite (3)**
18:20;25:20;38:3

**R**

**ramp (6)**
33:20;35:21,22,24,
25;36:4
**read (8)**
11:13;12:4,6,9,11;
94:17,18;96:8
**reading (5)**
12:2;74:5;82:7,10,
14
**ready (1)**
36:12
**really (7)**
6:23;15:15;16:18;
58:22,22;72:6;79:11
**reason (5)**
27:24;32:22;51:24;
80:9;86:3

**reasons (2)**
31:12;52:4
**recall (15)**
19:14;20:13;30:4,
15,17,18,25;31:14;
40:20;55:25;59:9;
67:7;68:13;83:8;
88:23
**recalled (1)**
30:19
**receive (4)**
35:15;75:7;79:16;
82:21
**received (5)**
9:25;10:5;25:3,7;
50:18
**recess (3)**
59:21;85:20;93:20
**recognize (2)**
9:24;16:15;24:8
**recollection (2)**
83:11,14
**record (4)**
6:3;93:18;96:11,12
**records (1)**
64:5
**refer (2)**
14:5;84:22
**referred (2)**
84:16;85:9
**referring (2)**
28:12;83:24
**refers (1)**
79:4
**refresh (1)**
83:13
**refreshes (1)**
83:10
**regular (6)**
20:7;39:7,10,13;
40:20;63:23
**regularly (1)**
89:7
**reject (1)**
52:4
**rejected (1)**
52:15
**related (1)**
50:9
**remain (1)**
79:23
**remains (2)**
13:18;78:25
**Remember (33)**
7:13,19;11:24,25;
12:2;15:22;17:10;
18:7,20;19:19;20:19,
22;22:9;24:16;25:20;
26:22;30:10,21;
31:12,15;32:9;38:3;
43:5;53:16,25;55:10;
56:16;63:9;66:23;
78:3,8;84:2,19

**repeat (1)**
13:7
**Rephrase (2)**
79:7;93:14
**reported (3)**
32:20;78:15;79:17
**reporter (1)**
89:2
**represented (4)**
24:9,13;28:25;29:4
**representing (1)**
9:17
**reputation (1)**
80:9
**request (2)**
13:21;14:3
**Requests (4)**
5:13;8:20,24;12:25
**require (1)**
36:7
**requirement (1)**
77:9,11,13
**respond (1)**
75:4
**responded (1)**
70:13
**response (2)**
14:3;94:5
**Responses (15)**
5:12,20;8:20,24;
10:11;11:14,17,18;
12:24,25;28:5;61:17;
78:11,20;88:25
**responsibilities (1)**
62:23
**responsibility (3)**
50:23;51:7,13
**responsible (4)**
22:15;49:2,8;50:4
**restaurant (1)**
51:4
**return (1)**
85:7
**returned (5)**
44:12;45:24;46:19;
49:9;62:4
**returning (1)**
52:13
**returns (2)**
49:3,13
**revealing (1)**
93:12
**Revenue (1)**
85:4
**right (71)**
9:10;10:22;17:23;
19:3;24:6,14;28:7;
30:5,25;31:14,25;
34:7,10,13,16,19;
35:11;37:16;43:3,8,
17;44:10;45:13;
46:13,20,23;47:20;
48:18;49:3,12,15;

51:18;52:6;53:2;
54:23;60:2,11,18;
61:14;62:7;65:19;
66:5,13,20,23,25;
67:9;68:9;69:5;71:22;
74:6,11;76:17;77:25;
79:2,10;80:13;82:4;
83:3,14;84:12;85:2,6;
86:17,21;87:5,9,13,
20,24;88:16
**rights (3)**
57:13,15;58:16
**RIVERA (15)**
7:13;12:17,18;13:5;
15:5;59:2,20;85:14,
19;88:24;89:13;
93:10;94:3,7;95:12
**road (1)**
48:25
**ROBERTS (11)**
5:25;7:15;42:3;
59:4,10,19;85:11,16;
93:18,22;95:13
**Roman (2)**
89:25;93:5
**roof (3)**
67:8,11,12
**room (12)**
20:2,6;26:11;37:4,
6;67:14,15,17;68:16;
69:3,8,12;70:11,17;
71:9;72:11;73:6,10;
74:3,15,19,24;75:5,8,
11;77:4,7,14;91:9,10,
14;92:21

**S**

**same (19)**
8:14;18:9;23:16;
25:15,16;32:8;39:11;
41:17;57:9;72:16;
73:14,15,16,24,25;
89:8;90:15;91:8;
92:24
**sat (1)**
67:20
**saw (14)**
7:19;8:8,12,16;
29:22;32:11;35:10;
61:25;68:24;74:5;
81:23;82:2,14,23
**saying (11)**
14:13;17:20;21:21;
32:5,22;48:15;50:24;
52:13;80:9;84:3;86:4
**schedule (3)**
90:17;91:2;94:25
**scheduled (3)**
62:18;63:7;64:17
**search (2)**
15:11,12
**searching (1)**

64:10
**second (2)**
8:3;76:17
**seeing (2)**
31:15;78:8
**seek (1)**
79:18
**seeking (2)**
15:8,21
**sell (3)**
72:11;74:2;75:15
**send (2)**
33:12;57:17
**Sep (1)**
16:9
**S-E-P (1)**
16:9
**separate (1)**
92:12
**Separately (1)**
23:11
**serve (2)**
57:17,19
**service (2)**
57:18;85:4
**Set (8)**
5:21;9:9;10:11;
11:15;12:24;40:22,
23,25
**seven (1)**
90:23
**sexual (1)**
90:13
**shape-up (19)**
27:16;38:15,21,24;
39:4;56:20,22,23;
63:23;79:17,19;86:3,
5;89:18;90:16;91:2,6,
7;92:21
**sheet (3)**
63:22,23;65:2
**shift (8)**
40:4,8,8,14,22,25;
86:6,8
**shifts (5)**
14:17;39:14;40:20;
86:2,4
**shop (10)**
18:2,4,5,12,15,22,
25;20:8;24:17;51:16
**short (1)**
37:14
**show (5)**
7:7;8:3;10:10;
64:10;89:6
**showed (4)**
8:2,7,9;9:3
**showing (5)**
8:18;9:5;23:11;
42:8;83:24
**shown (1)**
12:22
**side (3)**

20:2;43:16;56:9
**sign (8)**
50:18;57:8;63:17,
19,21,24;64:25;65:4
**signature (8)**
11:3,4,8,9,22;23:9,
21;49:16
**signed (5)**
23:24;64:2;74:19;
89:4;96:19
**signifies (2)**
16:12;42:21
**signify (1)**
17:7
**sit (2)**
20:11;67:19
**site (3)**
15:18;64:11;94:9
**sites (1)**
15:19
**sitting (4)**
19:20,23;20:13;
91:15
**situations (1)**
39:6
**skipped (1)**
66:17
**skipping (1)**
83:2
**slash (1)**
16:25
**slow (1)**
89:9
**small (1)**
36:21
**smoke (9)**
68:16,19,20,22,25;
69:4;75:11;76:22;
77:5
**so-called (3)**
36:20;37:7;38:24
**soccer (1)**
78:4
**social (2)**
83:21;84:16
**soda (3)**
76:22;80:21,24
**somebody (5)**
25:10;27:19;47:23;
91:18;92:20
**someone (1)**
91:3
**sometimes (19)**
19:7,10;24:25;
40:17;51:23;52:14;
56:18;65:7;69:14,15;
70:10,13;72:9;73:3,7,
12;78:3;89:10;94:13
**sorry (14)**
7:16;12:4;24:20;
28:23;33:14,14;
39:23;40:7;56:21;
64:21;69:19;77:12;

80:11;89:19
**sort (7)**
36:3;50:14;57:15;
63:14;92:4,6,11
**speak (2)**
29:24;31:18
**speakers (5)**
67:6;68:6,7,8,11
**speaking (1)**
30:10
**specify (1)**
20:21
**spent (1)**
79:15
**spirits (1)**
50:10
**spoke (9)**
18:16,18;29:23;
30:14,20;31:3,4,13;
91:15
**ss (1)**
96:4
**stamped (2)**
23:13;42:4
**stand (1)**
55:18
**start (9)**
38:16;40:9,25;
42:22;49:6,7;53:21;
66:8;86:13
**started (19)**
7:6;16:24;21:22;
34:12,19,25;35:8;
40:5;41:19;45:8;49:4;
55:7;65:18;77:19;
86:6,7,20;87:4;92:14
**starting (9)**
17:8;42:24;43:5;
86:9,10,12;87:12;
88:9,10
**starts (2)**
23:16;92:19
**State (7)**
5:3;6:2;83:22;
84:21;85:5;96:3,24
**statement (1)**
9:18
**statements (4)**
5:17;9:21,25;10:5
**stayed (2)**
21:6;75:15
**Staying (2)**
52:20;59:23
**steward (9)**
18:2,4,5,12,15,22,
25;20:9;24:17
**still (4)**
21:14,15;22:14;
95:9
**stop (1)**
81:25
**stopped (6)**
43:14;44:21;46:22,

25;47:4;89:12
**store (3)**
51:4;52:10,11
**stores (1)**
49:13
**straight (1)**
58:6
**Street (3)**
14:12;71:5,6
**stuff (12)**
27:2;31:7;36:19,22;
49:16;52:10;63:16;
64:12;69:17;70:3;
71:11;84:13
**subjects (1)**
90:7
**subscribed (1)**
96:19
**supervise (1)**
28:17
**supervised (3)**
25:24,25;26:25
**supervisor (6)**
25:14,15,16,22;
26:6;92:2
**supervisors (2)**
32:20;61:19
**supervisor's (1)**
32:2
**support (1)**
90:9
**supports (1)**
7:3
**Supposed (4)**
58:12,13,18;64:23
**sure (15)**
20:25;21:19;22:4;
48:23;49:2,7,11,14;
58:22,22;59:4;68:2;
87:21;88:24;92:17
**swore (1)**
6:16
**sworn (2)**
5:2;11:12
**system (3)**
55:14,19,19

# T

**talk (6)**
20:11;50:3;77:10,
13,17;91:9
**talked (3)**
58:16;91:10,17
**talking (2)**
91:11,13
**tasks (4)**
26:4;32:25;64:11;
91:8
**tax (4)**
83:21;85:5,6,7
**taxes (1)**
85:2

25;47:4;89:12
**store (3)**
51:4;52:10,11
**Teamsters (6)**
28:19;29:7,17;
58:11,20;59:7
**telephone (1)**
90:5
**ten (2)**
22:5;59:2
**tend (1)**
39:11
**ten-minute (4)**
47:18;76:5,6,10
**Terminal (2)**
37:21,21
**test (3)**
30:6,8,23
**testified (2)**
5:4;6:12
**testimony (3)**
33:10;96:9,11
**third (1)**
43:10
**though (2)**
68:3;73:19
**thought (1)**
82:11
**three (2)**
86:2,4
**throwing (1)**
78:5
**Thursday (12)**
19:13;45:6,12;
46:12;47:4;53:10,17;
60:2,14;65:25;88:13,
14
**Thursdays (2)**
19:13,16
**till (2)**
39:23;76:9
**times (12)**
20:12;25:5;31:3;
45:8;65:11,12;66:4;
70:12;71:11;83:7;
91:8
**title (1)**
63:11
**title/relationship (1)**
91:5
**today (13)**
7:12,17;8:6,7,10;
9:3;10:17,22;13:18;
59:8,17;78:25;86:15
**today's (1)**
94:2
**together (2)**
21:21;92:7
**told (3)**
11:23;30:23;35:12;
39:3;53:25;55:10;
64:4;70:23
**top (18)**
16:8;19:3;23:17;
25:20;27:16;42:10,
16;43:11,20;45:3;

46:6;48:9,13;54:20;
65:15,16;90:19;93:2
**transcript (2)**
96:8,10
**transported (1)**
51:21
**travel (2)**
36:24;37:3
**truck (36)**
14:17;22:12,15,19,
23;32:15,16;40:21;
41:11;45:17;46:17;
48:24;49:24;50:11;
51:9;52:18;53:19;
54:4;55:9,11,16;71:3,
4,9,25;72:5,10;75:14,
17,18,20;86:25;87:4,
12,18;88:3
**trucks (12)**
22:15;40:22,25;
48:16,24;49:5,9;50:5;
54:13;62:4;87:8;
94:24
**true (10)**
11:17,20;13:12,17,
18;24:5;28:6;77:16;
96:10,12
**truth (1)**
6:17
**truthful (3)**
13:4,11;79:2
**Tuesday (13)**
46:11,22;53:5;54:5,
23;55:2;60:2,14,24;
61:3;87:22;88:7,13
**tug (2)**
36:20;37:2
**tugs (2)**
36:18,24
**turn (5)**
10:24;14:8;15:25;
16:6;27:7
**two (11)**
14:5,9;20:3,25;
87:17;88:3,6,15;
90:11,14;94:12
**type (3)**
36:17;37:10;38:2
**typed (2)**
14:18,19
**typically (3)**
40:13;41:12,15

**U**

**UFCW (1)**
59:16
**unbroken (1)**
92:12
**under (4)**
48:16,17;91:4;96:9
**unduly (2)**
78:22;79:20

**unemployment (6)**
64:5,9;83:21;84:3,
7,23
**union (17)**
18:18;22:16;24:9,
12;29:7;56:24;57:2,4,
5,6,12,23;58:8,16,20;
59:7,15
**unions (1)**
24:17
**unit (2)**
28:20;29:17
**United (2)**
29:9,12
**unknown (4)**
48:10,14;91:4,19
**unload (1)**
36:5
**up (16)**
15:20;23:17;26:15;
37:19;42:10,16;
43:11,20;45:2;46:6;
52:9,14;54:19;89:2,6;
92:10
**upon (1)**
11:18
**upside (2)**
15:25;16:6
**upstairs (1)**
74:16
**use (9)**
16:18;69:8,11,16;
80:7;81:6;86:14;90:8;
92:9
**used (2)**
33:11;37:18
**using (2)**
67:3;81:3
**usually (1)**
74:10

**V**

**Van (2)**
36:18;37:15
**vans (1)**
37:18
**variance (1)**
21:20
**varied (1)**
21:19
**various (1)**
94:25
**vehicle (6)**
35:20;36:15,17,21;
37:10;38:2
**vending (1)**
72:14
**verbalize (1)**
7:13;88:25
**verified (1)**
28:5
**voice (1)**

55:23

**W**

**W-2 (1)**
63:16
**wage (1)**
93:5
**wait (4)**
62:22;90:16;91:2;
95:3
**waiting (14)**
67:22;68:15;69:25;
70:11,14,20,25;71:10,
22;77:10,16;79:15;
80:7;91:16
**wall (1)**
65:2
**warehouse (69)**
14:12,16;18:2,3,6;
20:5;21:13,18,24;
22:9,20,24;23:18;
24:13;25:6,7;26:11;
27:23,25;28:2,3,22,
25;29:11,12;30:13;
32:4,7;33:24;34:4;
35:19;41:15,16;
44:16;45:21;48:7,15,
21;50:19;54:8;55:5;
60:8,20;61:5,22;62:3,
6,11,22;64:22;67:13;
71:14,15,18;72:17;
74:9,16;76:4,12,16;
77:2;79:18;80:6;81:8;
86:20;87:23;88:7;
92:22,23
**warehouses (1)**
94:22
**water (3)**
76:22;80:21,25
**way (3)**
36:10;71:20;80:18
**weather (1)**
77:21
**Wednesday (13)**
14:11;19:13;45:5,
11;46:12,25;53:7;
55:7;60:14,24;61:8;
87:17;88:19
**week (26)**
19:12;44:24;45:20;
46:10;52:21,22,25;
54:10;59:25;60:13,
17,23;65:20,25,25;
87:3,7,8,11,17,22;
88:2,12,19;95:2,5
**weekday (1)**
62:20
**weeks (1)**
17:12
**welcome (1)**
10:21
**welfare (2)**

83:22;84:16
**weren't (5)**
33:17;41:3,6;73:4;
75:10
**what's (10)**
9:5;21:10;22:22;
23:5;32:22;42:8;80:9;
86:3;89:22;90:12
**whole (2)**
21:7,9
**who's (1)**
18:24
**whose (3)**
17:3;42:16;55:23
**wine (2)**
50:10;59:15
**within (1)**
11:13
**without (1)**
93:12
**witness (1)**
94:4
**Witnessed (2)**
90:16,25
**witnesses (1)**
89:25
**witnessing (2)**
90:10,12
**work (82)**
21:13,18;22:8;
24:25;25:5,10;26:6,9;
31:16;33:13,20,23;
34:12;35:15,15,19;
36:7,14;38:20;39:7,
10,14,16,19;41:8,19;
42:24;43:5;44:3,16;
46:20;49:21,25;
54:12;56:7;57:20,24;
60:9,11,21;61:6,9;
62:18;63:7,18,21,24;
64:10,17,21;65:18;
67:22;76:17;78:16;
79:5,16,18,18;80:18;
81:14,19,22,25;82:7,
11,15;88:19;89:3,10,
11;90:17;91:2,15,16,
25;92:4,18;94:9,10,
21,23,25
**workday (4)**
21:7;26:14,14,23
**worked (33)**
10:5;18:22;21:18;
24:24;32:6,11,13;
33:19,22;34:15;
35:17;39:9;46:17;
47:19;54:8,12,22;
55:4;58:2,17;59:25;
60:13;74:9;76:3,12,
15;82:20;84:4;86:19,
24;87:23;88:6,13
**worker (1)**
89:19
**workers (20)**

14:16;24:13;25:7;
29:10,13;32:25;
37:19;48:22;56:24;
57:2,4,5,6,12,23;
58:16;59:15;67:22;
90:16;91:2
**working (21)**
21:22;30:22;34:19,
25;41:9,14;43:14;
44:21;45:9,16;46:22;
47:4;49:6;80:16,22,
25;81:4,7,11,17;92:15
**works (1)**
94:25
**write (6)**
56:8,8,9,11,13,14
**writing (2)**
46:6;65:14
**written (4)**
16:25;42:10;50:9;
56:17
**wrote (4)**
17:10;18:7,9;56:15

**Y**

**yard (5)**
67:9;68:3,4,5;77:23
**York (3)**
5:3;14:14;84:21

**0**

**00001 (1)**
9:10
**00010 (3)**
14:6;9;15:25
**000109 (1)**
42:13
**00011 (2)**
9:11;14:6
**0009 (1)**
9:22
**012016 (1)**
42:19
**08 (1)**
16:9

**1**

**1 (12)**
5:7;7:10;23:18;
24:12;28:25;29:2,9,
13;58:10,20;85:23;
90:24
**1:01 (2)**
54:7;61:4
**1:11 (1)**
85:21
**1:24 (1)**
93:20
**1:27 (1)**
93:21

DERRICK CAMPBELL, ET AL. VS.
EMPIRE MERCHANTS, LLC

DERRICK CAMPBELL
March 27, 2017

**1:31 (1)**
  95:15
**10 (2)**
  59:24;78:12
**109 (2)**
  42:3,4
**10th (2)**
  35:8;88:12
**11 (6)**
  14:11;27:14;39:22,
  22,23;40:3
**11:00 (1)**
  40:5
**11:15 (1)**
  61:10
**11:46 (1)**
  59:22
**11:52 (1)**
  59:22
**11:59 (1)**
  54:7
**117 (2)**
  42:3,5
**12 (5)**
  39:23;40:3;44:5;
  76:8;79:12
**12:03 (1)**
  61:4
**12:30 (1)**
  85:11
**12:32 (1)**
  85:21
**12:55 (1)**
  44:9
**13 (2)**
  79:25;94:21
**16 (1)**
  14:11
**16.06:14 (1)**
  16:10
**172 (1)**
  23:13
**18 (1)**
  82:17
**1D (3)**
  58:11,20;59:11
**1-D (2)**
  29:13;59:16
**1st (3)**
  77:20;79:6;86:24

**2**

**2 (14)**
  5:10;8:4,4;13:21,
  21;27:7,11,16;89:20;
  90:14,19,25;92:25;
  94:15
**2:30 (1)**
  40:17
**20 (3)**
  12:6,9;61:20
**2008 (2)**

34:13;35:7
**2015 (5)**
  34:16,18;35:2,5,8
**2016 (5)**
  23:25;46:4;54:16;
  94:20,20
**20th (1)**
  28:4
**21 (1)**
  83:16
**22 (1)**
  94:20
**22nd (3)**
  77:21;79:6;80:17
**24 (2)**
  39:17,20
**24th (1)**
  60:23
**27 (3)**
  52:22;54:6;66:2
**27th (2)**
  10:22;87:11
**29th (3)**
  44:24;45:20;87:3

**3**

**3 (11)**
  5:15;8:19;13:21,21;
  27:10;38:12;54:16;
  76:8,9;92:24;94:15
**3.5 (1)**
  95:4
**3:00 (2)**
  76:13,15
**3:30 (1)**
  40:17
**31 (1)**
  23:24
**34 (1)**
  85:25
**35 (1)**
  80:4
**3-A (4)**
  5:18;9:6;14:7,8
**3rd (2)**
  65:20;88:2

**4**

**4 (18)**
  5:22;10:10,25;
  21:14;27:5;37:21;
  38:11;48:8,8,10,12,
  13,14;61:17,18;
  78:11;85:18;94:19
**4/30/16 (1)**
  16:24
**4:14 (1)**
  43:12
**4:51 (1)**
  45:12
**4:55 (1)**

45:12
**4:57 (1)**
  46:20
**4:58 (1)**
  46:23
**4:59 (1)**
  61:5
**45 (2)**
  58:6,17
**45.25 (1)**
  95:2

**5**

**5 (7)**
  12:20;21:14;23:3,5;
  24:5;28:24;85:24
**5:02 (1)**
  47:5
**5:30 (1)**
  62:21

**6**

**6 (11)**
  16:25;17:2,15;
  23:12,14;24:5;28:24;
  46:4;52:21;61:18;
  62:21
**6:00 (1)**
  12:21
**6:55 (1)**
  45:12
**6th (1)**
  87:8

**7**

**7 (17)**
  16:25;17:16,17;
  40:10,17,23;42:6,9,9;
  52:20;59:23;62:14;
  65:17;76:11;83:10;
  86:6,16
**7/22/16 (2)**
  17:2,18
**7:00 (1)**
  65:18
**7:04 (1)**
  65:19
**7:05 (4)**
  55:8,11;65:19;88:4
**7:26 (5)**
  53:11,17;65:24;
  87:12,15
**7:28 (2)**
  47:8,12
**7:30 (7)**
  42:20,24;43:6,11;
  44:18,19;86:25
**7:45 (2)**
  47:9,12
**7:54 (1)**

88:4
**7:57 (1)**
  47:2
**7:58 (2)**
  46:11;87:9
**7:59 (2)**
  43:24;88:14
**718-471-6520 (2)**
  16:11,16
**719 (1)**
  24:20

**8**

**8 (11)**
  16:3;37:21;40:23;
  45:6;58:24;59:5;
  82:18;86:7;87:4;
  88:15;95:2
**8:00 (3)**
  46:12;65:23;86:21
**8:01 (3)**
  53:5;61:9;87:24
**8:02 (1)**
  46:12
**8:03 (2)**
  53:13;87:20
**8:05 (1)**
  45:6
**8:06 (1)**
  88:9
**8:07 (1)**
  88:15
**8:09 (1)**
  46:12
**8:10 (2)**
  45:6;87:5
**8:11 (2)**
  46:11;87:9
**8:12 (2)**
  53:7;87:19
**8:15 (1)**
  88:10
**8:30 (2)**
  41:13,17
**84 (4)**
  79:5,6,9,22

**9**

**9 (8)**
  14:11;41:13,17;
  59:10,12,14;83:17;
  86:7
**9:00 (4)**
  40:24,24;41:4,7
**917 (15)**
  22:25;23:7;24:9,20;
  25:2;28:19,21;29:4,6,
  18;48:17;58:11,21,
  23;59:7
**9205 (1)**
  17:23