**ORIGINAL**

COLLECTIVE BARGAINING AGREEMENT

Between

EMPIRE MERCHANTS, LLC

And

TEAMSTERS LOCAL UNION No. 917

an affiliate of the

INTERNATIONAL BROTHERHOOD OF TEAMSTERS CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA

For the Period

November 1, 2014 to October 31, 2017

FIRM:27599512v3

EM000062

## TABLE OF CONTENTS

| ARTICLE | DESCRIPTION | PAGE |
|---|---|---|

ARTICLE I RECOGNITION ............................................................................................1

ARTICLE II UNION MEMBERSHIP REQUIRED .......................................................1

ARTICLE III WORKING RULES AND CONDITIONS ...............................................2

ARTICLE IV SENIORITY ............................................................................................10

ARTICLE V CHECK-OFF .............................................................................................15

ARTICLE VI WAGES (FOR STEADY'S, EXTRAS AND CASUALS THAT QUALIFY) ......15

ARTICLE VII HOLIDAYS .............................................................................................18

ARTICLE VIII VACATIONS .........................................................................................19

ARTICLE IX DEATH IN FAMILY ...............................................................................22

ARTICLE X — EMPLOYER RULES AND POLICIES ...............................................22

ARTICLE XI — OPERATION OF EQUIPMENT .......................................................24

ARTICLE XII WELFARE AND PENSION FUNDS ....................................................27

ARTICLE XIII DISCHARGE .........................................................................................29

ARTICLE XIV ARBITRATION .....................................................................................31

ARTICLE XV PROTECTIVE CLAUSE ........................................................................32

ARTICLE XVI DURATION ...........................................................................................34

FIRM:27599512v3

EM000063

AGREEMENT made and entered into as of the 1st day of November, 2014, by and between EMPIRE MERCHANTS, LLC, having its place of business at 16 Bridgewater Street, Brooklyn, New York 11222 and hereinafter called the "Employer" and LOCAL 917, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, having its principal office at 24 N. Tyson Avenue, Floral Park, New York 11001 and hereinafter called the "Union," WHEREIN IT IS HEREBY MUTUALLY AGREED AS FOLLOWS:

## ARTICLE I
## RECOGNITION

1.1.    The Employer is engaged in the sale and distribution of wine and liquor to or from rectifying distillery plants, warehouses, winery plants, terminals, retail or wholesale trade and, in connection therewith, necessarily must from its place of business distribute to or pick up from such rectifying, distillery plants, winery plants, warehouses, railroad terminals, steamship piers, retail or wholesale trade. The Employer hereby recognizes the Union as collective bargaining representative for all chauffeurs, helpers, routemen and dispatchers (including also other types of employees, if any) for the performance of such work, and also for all pickup of merchandise from rectifying, distillery plants, winery plants, warehouses, railroad terminals and steamship piers in the State of New Jersey (within a radius of fifty (50) miles from Columbus Circle, New York City), State of New York, and Staten Island, and also for all bonded freight and exports and imports (directly or through broker), and also for any transfer of wine and liquor from one distributor to another. Such work shall be performed by employees employed by each particular house under the terms of this Agreement.

## ARTICLE II
## UNION MEMBERSHIP REQUIRED

2.1.    All present employees who are members of the Local Union on the effective date of this subsection or on the date of execution of this Agreement, whichever is the later, shall remain members of the Local Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereinafter shall become and remain members in good standing of the Union as a condition of employment on and after the 31st day of this Agreement, whichever is the later.

This provision shall be made and become effective as of such time as it may be made and become effective under the provisions of the National Labor Relations Act, but not retroactively.

2.2.    The failure of any person to become a member of the Union at the required time shall obligate the Employer, upon written notice from the Union to such effect and to the further effect that membership was available to such person on the same terms and conditions generally available to other members, to forthwith discharge such person. Further, the failure of any person to maintain his or her Union membership in good standing as required herein shall, upon written notice to the Employer by the Union to such effect, obligate the Employer to discharge such person immediately.

1

FIRM:27599512v3

EM000064

2.3.    In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to receive the maximum union security which may be lawfully permissible.

2.4.    No provision of this Article II shall apply in any state to the extent that it may be prohibited by state law. If, under applicable state law, additional requirements must be met before any such provision may become effective, such additional requirements shall first be met.

2.5.    If any provision of this Article II is invalid under the law of any state wherein this Agreement is executed, such provision shall be modified to comply with the requirements of state law or shall be re-negotiated for the purpose of adequate replacement. If such negotiations shall not result in a mutually satisfactory agreement, the Union shall be permitted all legal or economic recourse.

## ARTICLE III
## WORKING RULES AND CONDITIONS

3.1.    Hours and Workweek.  Time each day is to be computed from the required time of reporting at the garage or warehouse to the time of return to the same garage or warehouse. Steady employees shall be guaranteed a minimum of forty (40) hours work per week, apportioned equally at eight (8) hours per day each day, Monday through Friday, or shall be paid for the same by the Employer.

3.2.    Extra and casual employees assigned to work any day, Monday to Friday inclusive, shall be guaranteed a minimum of eight (8) hours of work or pay per day.

3.3.    Starting time for all employees shall be at the hours of 8:00 a.m., 8:30 a.m. and 9:00 a.m. There shall be no work done before 6:00 a.m., and all work done between 6:00 a.m. and the employee's regular starting time shall be paid at the overtime rate if permitted to work overtime by the Union. Senior employees shall have preference in the selection of one of such starting times and shall be required to keep such starting time for six (6) months. Bids for starting times shall be made on a semi-annual calendar basis. For example, a bidder for the 8:00 a.m. starting time shall have his or her bid take effect on January 1 and terminate on June 30.

3.4.    Shape up time for extra and casual employees shall be from 7:30 a.m. to 9:00 a.m. Once this shape up time is over, there shall be no further hiring of employees or of any outside equipment.

3.5.    Night work shall be scheduled to start from 5:00 p.m. to 10:00 p.m., Monday night through Friday night, and shall be a guaranteed work week, or the Employer must pay for same. Night work shall be bid for a period of six (6) months, except by mutual agreement between the Union and the Employer. The bidding shall be based upon seniority as a steady employee and ability to perform, provided that, if there are no bids, the Employer may assign the most junior employees. Crossover between shifts for premium work is prohibited.

3.6.    There shall be one (1) fifteen (15) minute "coffee break" each morning for all employees covered under this Agreement, to be taken one-half (1/2) hour after leaving the warehouse or garage with truck.

2

EM000065

3.7.    Hours of employment shall run consecutively, excepting that the employee must take one (1) hour for lunch between 12:00 and 1:00 p.m. No employee shall work through his or her lunch hour under any circumstances. The Employer shall not pay the employee for the lunch hour. If it is found that an employee or employees worked during their lunch hour, the Union shall have the right to order a work stoppage of the employees of the Employer and such work stoppage shall not be a breach of this Agreement. Any employee who shall participate in a violation of this Section shall be discharged.

3.8.    No delivery work shall be performed on Saturday under any circumstances. For all other Saturday work, prior notice shall be given to the Union and said work shall be offered to employees in accordance with their shift bid and seniority in job classification.

3.9.    Employees shall work overtime unless prohibited by the Union to assure maximum employment of the employees on the steady seniority list. No overtime work will be permitted on Christmas Eve and New Year's Eve and Yom Kippur. Employees shall not be permitted in any event to work more than two and one half (2 1/2) hours overtime at the end of their working day, calculated from their regular starting time except that the limit after their working day shall be three and one half (3 1/2) hours in the months of July, November and December. The Employer shall not assign overtime work to any employee for any time past the limit, nor shall any employee work past the limit. The Employer shall not pay and no employee shall receive payment for such past limit time without prior approval of the Union. Overtime rates for Monday through Friday shall be one and one-half (11/2) times the regular rate of pay. Sunday and holiday work shall be considered as overtime work and shall be paid for at the overtime rate prescribed for Sunday and holidays worked. Undertime shall be on a voluntary basis only if permitted by the Union. Seniority shall prevail on undertime. Employees electing to refuse undertime shall give the Employer at least two (2) weeks notice and such election to refuse shall be effective for a period of two (2) weeks.

3.10.    The Astoria overtime and undertime configuration shall be effective except that undertime will be given on the geographic routes determined by the Employer, Tuesday through Friday, and that with the exception of November, December and July instead of the first Monday of the month, the Employer shall select the Monday where overtime is offered and the Employer will give the employee one (I) month notice. Furthermore, it is understood that employees will work their full straight time and overtime guarantees unless they finish early. There shall be an extra one half (1/2) hour of pay for routes above Ossining, New York.

3.11.    It shall not be a violation of this Agreement for the Union to prohibit overtime work among employees covered by this Agreement in the business of the Employer anytime where same is required to assure maximum employment of employees on the steady seniority list.

3.12.    Employees who are required to work overtime, unless overtime is prohibited by the Union, shall be granted a twenty (20) minute period in which to eat, such twenty (20) minute period to be counted as overtime worked and paid for as such. This twenty (20) minute period in which to eat shall be between 5:00 p.m. and 5:20 p.m.

FIRM:27599512v3

EM000066

3.13.   Notwithstanding any other provisions of this Agreement, all employees shall report for work one-half hour before their scheduled starting time to make ready for the day's routes or to do such work as may be assigned to them and shall be paid for such time at the overtime rate.

3.14.   It shall not be a violation of this Agreement or cause for discipline for an employee to refuse to work overtime on a particular day or days, provided the employee has given forty-eight (48) hours advance notice to his or her supervisor that he or she will not be available for overtime work on such days. This is intended to permit employees to be excused from overtime for valid, personal and social reasons. Regular and frequent notices or refusals to work overtime shall be deemed to be an abuse of this provision and may subject employees to discipline. The Employer shall have the right to refuse to excuse overtime in the event that less than ninety percent (90%) of the employees on its seniority list are available for overtime work.

3.15.   Whenever there is a layoff of a steady employee or employees during the life of this Agreement, the Union reserves the right to stop all overtime, stop the use of outside truckers and equipment.

3.16.   Whenever there is a layoff of any steady employee during the life of this Agreement, the Union reserves the right to stop all hiring of extra and casual employees.

3.17.   In the weeks in which a holiday occurs, thirty-two (32) hours shall constitute a week in four (4) days, or if two (2) holidays occur in the same week, then twenty-four (24) hours shall constitute a week in three (3) days.

3.18.   Job Classifications and Assignments. Upon signing this Agreement, the Employer shall immediately furnish the Union with a written statement showing the precise number of steady chauffeurs, steady helpers, dispatchers and routemen in its employ.

3.19.   There shall be a routeman and/or dispatcher in the employ of the Employer.

3.20.   The routeman or dispatcher must come from the steady seniority list, if qualified within a ninety (90) day trial period. If no employee on the steady seniority list is qualified for the position or the position is rejected, the Employer shall have the right to fill the position from an outside source.

3.21.   On each truck taken out by a chauffeur for pickups or delivery, there shall be a helper. Except as set forth in Article VI, the helper's time shall be computed as the chauffeur's time with whom the helper worked. The chauffeur and helper on a truck must start and finish work at the same point and during the day's work shall share the workload equally. The Employer may assign one (1) employee to drive palletized and container loads, provided all employees on the steady seniority list are working.

3.22.   Helpers shall not drive trucks except where there is a shortage of chauffeurs and, when none are available, a helper may be required to do so, and he or she shall receive the chauffeur's rate of pay for the entire day, subject to the provisions of Article VI.

4

EM000067

3.23.   In all cases where chauffeurs are needed, helpers on the seniority list shall have preference for such work in the order of their seniority.

3.24.   No chauffeur or helper shall be required to load any vehicle except the one to which he or she is assigned at the beginning of his or her work day. Under no circumstances shall the employee help, assist, aid or be instrumental in the loading or unloading of any other truck.

3.25.   Only employees covered by this Agreement shall load and unload their own trucks at all times and at any place. This shall not apply to night loading.

3.26.   Loose floor loads will continue to be Teamsters jurisdiction. Palletized and slip sheet loads and any work related thereto, shall not be Teamsters 917 jurisdiction.

3.27.   The CDD Program will be modified to a maximum of 350 cases.

3.28.   Under no circumstances shall a member of the Union be permitted to work inside a warehouse if jurisdiction for such work lies with another union or if such work is in fact already covered by an Agreement with another union.

3.29.   With respect to the loading of trucks, where the assigned helper or driver of a truck is unavailable, the driver or helper present shall proceed to load the truck, provided the Employer shall have called and notified the Union. In the event that an assigned driver or helper is fifteen (15) minutes or more late in reporting for duty, he or she may be denied work for that day and the Employer may assign another driver or helper, as the case may be, to that truck.

3.30.   Scope of Agreement.   The handling of all railroad shipments, whether it be piggyback, tractor-trailer, flexi-van, or any other type railroad conveyance, and those of freight consolidators and car loading companies, and freight brought via water or water borne, fishy-back or birdy-back, originating elsewhere and terminating anywhere within Kings County, New York County, Bronx, Queens, Nassau and Suffolk Counties, bounded roughly by a line starting on the North Shore at Port Jefferson and running southward through Coram in the middle and on down to Patchogue on the South Shore, and in Staten Island and within a radius of fifty (50) miles into the State of New Jersey, must be done by employees covered by this Agreement.

3.31.   The unloading, loading and transportation of merchandise at freight depots, domestic and foreign, has been and continues to be unit work within the scope of this Agreement. All freight consigned to wine and whiskey wholesalers, distributors, distillers, rectifiers or other processors or receivers of same, under contract to the Union, shall be handled and hauled from anywhere within the areas mentioned above to the Employer's receiving and shipping premises in accordance with the following stipulations and conditions, provided, however, if the Employer, at its option, assigns at least two (2) employees as regular platform workers, the Employer shall not be required to employ drivers and helpers for each outside vehicle.

3.32.   Merchandise shipped from anywhere within the Continental United States or its Possessions, including Puerto Rico, whether by steamship, steamship container, or steamship van, piggyback, fishy-back, birdy-back, railroad car or van, shall come to rest somewhere within

FIRM:27599512v3

EM000068

the areas mentioned above, there to be handled and transported to the wholesaler by employees covered under this Agreement.

3.33. The Employer shall transport all such merchandise arriving in above named conveyances with its own equipment and with a chauffeur and helper from the seniority list assigned to each truck. The chauffeur must remain with the load he or she has picked up until it is fully unloaded.

3.34. Merchandise in foreign commerce from other countries or commonwealths, arriving at ports in the United States or arriving at foreign ports and subsequently shipped here, whether loaded in vans, containers, tanks or other conveyances and all consignments of wines and liquors, or part thereof, when arriving or conveyed in barrels, casks, hogsheads, pipes, tanks, or other type bulk liquor carrier, whether originating domestically or imported, shall be unloaded and/or transported wholly in the state of its arrival, by chauffeurs and helpers covered under this Agreement. Pier and piggyback pickups may exceed six hundred (600) cases.

3.35. If the Employer's entire steady seniority list is working, the Employer may hire outside trucks for pick-up only, but such trucks shall be staffed by chauffeurs and helpers of the Employer working under the terms and economic conditions of this Agreement.

3.36. Deliveries. All deliveries, pickups or exchanges anywhere within the following eight (8) counties of New York State, namely New York, Bronx, Queens, Kings, Richmond, Westchester, Nassau and Suffolk County - Suffolk County to mean and include all the area west of a line roughly running from Pori Jefferson on the North Shore through Coram in the middle down to Patchogue on the South Shore and within a radius of fifty (50) miles into the State of New Jersey from the Employer's warehouse, must be performed by employees working under this Agreement.

3.37. In addition to the foregoing, Employers maintaining a warehouse or warehouses in Suffolk County, Westchester County or New Jersey shall have all their pick-ups and deliveries within a radius of fifty (50) miles from such warehouse or warehouses made by employees covered by this Agreement.

3.38. Employees covered by this Agreement shall continue to operate trucks in all the areas served by the Employer beyond the areas defined in this Agreement according to past practices.

3.39. All deliveries of merchandise going beyond the stipulated areas mentioned above shall be delivered to the platform of the truckers by employees working under this Agreement.

3.40. The Union reserves the right to ban deliveries or to declare and enforce a curfew for deliveries by its chauffeurs and helpers to any area or neighborhood where disturbances have occurred and where they are deemed likely to happen again. In the application of this provision, the Union agrees it shall not act arbitrarily or unreasonably. In areas designated and named by the Union as dangerous to the physical well being and health of drivers and helpers, all deliveries shall be made immediately at the start of business in the morning. Under no circumstances will deliveries be made elsewhere prior to or in preference to these named danger areas.

6

EM000069

3.41.   Employees covered by this Agreement shall handle only alcoholic beverages unless approval is given by the Union to handle other commodities.

3.42.   All imports or domestic merchandise consigned to a wholesaler and coming from a pier or railroad shall be delivered by employees working under this Agreement.

3.43.   No delivery to any consignee shall be shipped from a pier, railroad or public warehouse except by employees working under this Agreement.

3.44.   Six hundred (600) cases shall be the maximum load to be carried by any truck when making deliveries. However, palletized trailer deliveries over 600 cases to any retail account will be staffed by a driver and helper whom will receive a regular days pay. A senior driver may opt to take the route. On a premium day, seniority will prevail for drivers and helpers. Any employee who is assigned to pick-ups of two hundred and fifty (250) cases or more in one (I) day shall be entitled to receive three dollars ($3.00) per day extra. The maximum weight established by the State shall be the maximum load carried on any truck or pick-ups.

3.45.   No employee shall be held responsible for merchandise picked up in a palletized state, or if a number of cases are bound by strapping.

3.46.   Employers must assign checkers to check the trucks to be loaded, to count by tier, along with the chauffeur and helper, to prevent shortages, overages or other errors. Chauffeurs and helpers shall be responsible for the load after it is so checked and leaves the warehouse.

3.47.   No employee shall accept as proof of delivery anything less than a clear, legible, handwritten signature upon his or her receipt. Employees shall not be held responsible and in no way liable if a customer refuses to give such legible, handwritten signature and merchandise is returned to the warehouse.

3.48.   No chauffeur or helper shall accept c.o.d.'s in any form at any time.

3.49.   The Employer shall designate an authorized person to check all merchandise returned by employees at the end of their day's work. Employees shall be given a receipt for all merchandise brought back and for all delivery receipts turned in.

3.50.   All merchandise delivered in barrels shall be delivered to areas designated by the customer.

3.51.   Unless the Employer obtains the consent of the Union or the Shop Steward, or his or her designee, which consent shall not be unreasonably withheld, no merchandise shall be delivered to or picked up by salespersons or customers in their private cars, station wagons, trucks or other conveyances at any time. No employee shall be required or permitted to make deliveries, pickups or exchanges for any other employer. In the event the Union claims any violation of this Section by the Employer, the Union shall have the right to submit the issue to arbitration. Should the Arbitrator determine that a violation has occurred, the Arbitrator shall be authorized to direct the Employer to pay the full cost of the Arbitrator's fee, plus such other damages as the Arbitrator shall deem appropriate.

FIRM:27599512v3

EM000070

3.52.   Chauffeurs and helpers shall exercise care and caution while loading and unloading trucks and when making deliveries. They will lower tiers of merchandise in their trucks as deliveries deplete loads, to minimize breakage.

3.53.   Chauffeurs and helpers will return all that is salvageable in the event of breakage, instead of only necks of bottles.

3.54.   The Employer will not seek reimbursement for shortages and misappropriations. The Employer recognizes and shall implement the principles of progressive discipline on a consistent and uniform basis to all employees, which shall include warnings, and suspensions prior to discharge where applicable.

3.55.   Routemen or dispatchers shall route delivery receipts and number each one in numerical sequence. Chauffeurs or helpers will not change the order of these receipts under any circumstances and will make deliveries exactly as routed once they leave the warehouse, unless otherwise ordered by management. It shall not be the responsibility of chauffeurs and/or helpers to maintain time sheets and delivery time schedules.

3.56.   Chauffeurs and helpers will not be required to accept keys or other contrivances at any time with which to open store rooms, basements, cellars or other areas that are locked, in order to deliver merchandise.

3.57.   It shall not be a violation of this Agreement for any chauffeur, helper, steady employee or casual employee to refuse to make deliveries to premises where a dog is untied and left loose to roam.

3.58.   Except as provided elsewhere in this Agreement, no employee shall make deliveries to any floor other than the floor where the license of the premises is exhibited. A violation of this provision shall be grounds for the immediate discharge of the employee or employees involved.

3.59.   The Employer will not require employees to make a delivery to a newly licensed account until confirming that a license has been issued by the New York State Liquor Authority.

3.60.   In putting away merchandise for customers, employees shall not stack cases more than five (5) high. Employees will not be allowed to make room for any new merchandise by moving old merchandise on the floor of the customers. A violation of this provision shall be grounds for the immediate discharge of the employee or employees involved.

3.61.   Supervisors. Employees covered by this Agreement shall accept and adhere to orders of only two supervisors to be named for each shift, and the orders of the officials of the Employer who constitute management. The name of such supervisors must be submitted to the Union in writing.

3.62.   The Employer agrees that supervisory personnel shall not ride on trucks at any time.

FIRM:27599512v3

EM000071

3.63.   Supervisory personnel of the Employer who are representatives of the Employer or members of other unions, shall be restricted from performing the work which is recognized as the work of the employees covered under this Agreement.

3.64.   Employees assigned as dispatchers and routemen shall not have the right to hire or fire any employee or to recommend any such hiring or firing effectively. Such employees shall be given no supervisory assignments and shall not be deemed to be supervisors.

3.65.   Miscellaneous. The Employer shall not hire outside regularly licensed detective agencies to trail tracks.

3.66.   Complaints against any employee must be in writing to the Union.

3.67.   Work assignments (routes, loads, deliveries and pick-ups) shall be allocated by the Employer at the Employer's discretion.

3.68.   <u>4 Day Work Week</u> - Holidays fall on a Monday, they take Tuesday off.

    A.    APL Days and vacation days treated as 10 hour days (ex. 80 hours of APL = 8/10 APL days).

    B.    8 APL days — Payment will only be made if less than 10 hrs left at the end of the contract year, we will pay it out.

    C.    4 day employee out for any reason whatsoever will not be replaced (APL, vacation, workers comp, disability, etc.)

    D.    # of 4 day employees — total of 20 employees on days.

    E.    Bid period by seniority for 1 year (to begin in January)

    F.    Day shifts begins at 6:30, under-time, or 7:30, regular start, and finish at 8:30 curfew, and paid until 9:30.

    G.    4 day employees agree to give up their ½ hr under-time on non over time Mondays and the V2 hour under-time and 2 1/2 hrs over-time on overtime Mondays during 9 months of the year.

    H.    The positions of tractor trailer drivers, routemen, and yard jockeys will not be subject to the 4 day work week.

    I.    If any day within a week falls into a non-4 day month, it is considered a 5 day week. 4 day work week is not applicable July, November and December.

    J.    If a 4 day employee goes out with a 5 day employee, the 5 day employee's curfew will apply.

    K.    It is expressly understood that the four (4) day ten (10) hour workday shall be implemented on a trial period. Each year, the employer may discontinue the four (4) day ten (10) hour workday at its sole discretion by notifying the Union on or before November 1.

3.69.   If the caseload is in excess of 35,000 cases per night, the Employer will replace any one of the fourteen (14) loaders who is out at the start of the shift.

FIRM:27599512v3

EM000072

3.70.    The Employer agrees to pay the most senior men on a one-to-one basis when work is assigned outside the scope of seniority for 6:30 a.m. under-time bids. After exhausting the Alternate List, the Employer must use the most senior person on premises.

3.71.    Extra and casual men can shape up days or nights. They may not work double shifts.

## ARTICLE IV
## SENIORITY

4.1.    Seniority shall prevail at all times.

4.2.    Steady List. Effective November 1, 2011, the Employer's steady list shall be two hundred twenty (220) employees, provided each such additional employee had been placed on the Employer's Extra List and possesses a valid CDL Class B license. The Employer's steady list shall be subject to reduction by attrition in the event the Employer loses supplier lines. If the Employer loses a supplier line, attrition shall be in the same proportion as the number of units lost bears to the total number of units prior to such loss. If the steady list has been reduced because of a loss of a supplier line, it shall be subject to increase (to a maximum of two hundred twenty (220)) if a supplier line is gained. The increase in the steady list shall be in the same proportion as the number of units gained bears to the total number of units prior to such gain.

4.3.    The Employer shall not be required to replace any steady employee who is not working due to illness, workers' compensation, disability or jury duty.

4.4.    The Shop Steward shall have super-seniority and the Alternate Shop Steward shall assume super-seniority in the event the Shop Steward is ill, on vacation or absent for any other purpose.

4.5.    The Employer shall compile a seniority list from regular payroll records, subject to the approval of the Union.

4.6.    Within thirty (30) days after the signing of this Agreement, the Employer shall post in a conspicuous place at the Employer's place of business a list of employees arranged according to their seniority. Claims for corrections to such lists must be made within ten (10) days after posting and after such time the lists will be regarded as correct. Any controversy over the seniority standing of an employee on such lists, if raised within such ten (10) day period, shall be submitted to arbitration as established by this Agreement.

4.7.    One steady seniority list, including drivers and helpers, shall be established on each job. Each employee shall be assigned a seniority rank number, based on the date of employment. Those presently employed as steady drivers, however, shall not be disturbed in that work classification but, where openings for drivers occur, those opportunities for driving shall be given to the next senior employee employed as helper, provided he or she possesses a CDL Class B license. Unless he or she gives a good and valid reason, a helper shall not be permitted to refuse a driving assignment. A separate seniority list for extra employees shall be established in keeping with Section 4.21 below.

10

EM000073

4.8. In the event an Employer has more than one branch of operations or warehouse, the Employer shall establish a separate seniority list for each operation and provisions of 4.7 above shall prevail. There shall be no transferring of employees from one facility to another except as provided in Sections 4.25 and 4.26 below.

4.9. If required under Section 4.3 above, when a steady employee leaves for any reason, he or she shall be replaced by the senior extra employee of the facility at which the steady employee was employed.

4.10. Routemen and/or dispatchers retain the employment seniority from which they originated to take on the work of routemen or dispatchers.

4.11. An employee on the seniority list with a CDL Class B license, if requested by the Employer to do so, must attempt in good faith to obtain a CDL Class A license to drive a tractor-trailer. The Employer shall pay the costs and expenses of training for this purpose and any day involved in the training program shall be deemed a day's work under this Agreement.

4.12. Subject to the following conditions, the Employer shall assist a casual or extra employee who does not possess a valid CDL Class B license and requests payment for a certified training program:

    a.    the employee must have been employed by the Employer for at least nine (9) consecutive months;

    b.    the employee must take and successfully pass a substance abuse test as directed by the Employer;

    c.    the employee must have obtained a valid permit for a CDL Class B license; and

    d.    the Employer shall pay for a maximum of ten (10) hours of training for a program approved by the Employer.

4.13. Notwithstanding anything herein contained to the contrary, the choice of work assignments, trucks, runs, loads, overtime, deliveries, pickups and such other working conditions shall not be governed by seniority but shall remain at all times prerogatives of Management.

4.14. In discharging for economic reasons, the Employer shall abide by and follow seniority.

4.15. No outside trucker is to be used until the entire seniority list is working. The outside trucker must conform to the economic provisions of the Local 917 contract and shall be required by the Employer to utilize helpers covered by this Agreement where such helpers are available for work. The Employer shall be responsible for the wages of its helpers when they are used by an outside trucker doing the Employer's work. Such wages paid for these helpers when used by an outside trucker will also include payments toward welfare and pension and be counted toward vacation credit.

4.16. It is agreed that the 17 steady employees (as of November 17, 2008) not able to drive will be grandfathered, unless they obtain medical clearance. It is agreed that the total number of employees (including the 17 grandfathered) shall be capped at 30. The employee who goes from driver to helper shall be allowed to stay in this status for no more than six (6) months.

4.17. Hiring. In the event the Employer requires additional employees after its steady seniority list is exhausted, the Employer may hire extra employees on a day-by-day basis in accordance with the following procedure:

> The Union shall be notified and given the opportunity to refer applicants on a nondiscriminatory basis. Such applicants shall be interviewed and given fair consideration by the Employer. If the Union has reason to believe an applicant has been rejected based on anti-union discrimination or other improper reasons, it shall have the right to take such action under the grievance machinery as it may deem appropriate.

4.18. Except for extra employees employed for a number of continuous days, whenever the Employer hires or rehires an extra employee, the Employer shall notify the Union of the employee's name, address, Social Security number and ledger number, if any.

4.19. In the event the Employer needs additional regular employees, the Employer shall follow the procedure set forth in Sections 4.17 and 4.18 above. In no event may an Employer hire a regular employee without prior notice to the Union, affording a reasonable amount of time for the Union to refer applicants for consideration.

4.20. The Union shall not be responsible for investigating or warranting the competence or integrity of any employees or applicants for employment under this Agreement.

4.21. Casuals. For the purposes of establishing the "Extra Employee" seniority list, casual employees shall be granted and earn seniority for status as an extra employee for purposes of daily hire, and for employment as steady employees when openings exist under this Agreement, as follows:

> Casual employees who possess a CDL Class B license and who have worked forty-five (45) days or more within the last full contract year, excluding, however, July, November and December, with the Employer shall have seniority as an extra employee as of the date the employee worked forty-five (45) days and possessed a CDL Class B license.

4.22. Casual employees possessing a valid CDL Class B license shall have seniority over all other casual employees. Other casual employees who do not possess a valid CDL Class B license and were placed on the Employer's casual seniority list as of October 31, 2005 shall be entitled to preference at shape-up for non-driving work in the order of their seniority. Except as set forth in this Section 4.22, there shall be no shape-up preference for any other casual employee.

12

4.23. Loss of Seniority.

    A.    Seniority shall be broken only by:

        1.    Uncontested discharge or discharge sustained by an arbitrator.

        2.    Voluntary quit.

        3.    Unauthorized leave of absence.

        4.    Failure to report for work for five (5) consecutive days when work is available.

    B.    Any employee who is absent because of proven illness or injury shall maintain his or her seniority,

4.24. No employee shall have seniority with more than one Employer,

4.25. Branches. When a new branch or warehouse is opened in any location within the area covered by this Agreement, the Employer shall offer to all employees covered by this Agreement the opportunity to transfer to the new branch or warehouse in the order of their Employer or payroll seniority. The transferred employees shall, for a period of thirty (30) days following the transfer, have an unqualified right to return to their old place of business or warehouse and carry with them their seniority at that old place of business or warehouse.

4.26. When a branch is closed and the work of the branch is eliminated, an employee who was formerly employed at another branch shall have the right to transfer back and exercise his or her seniority based on the date of hire at the branch into which he or she is transferring. When a branch is closed and the work of the branch is transferred to another branch, an employee employed at the closed down branch shall have the right to transfer to the branch into which the work is transferred, and to exercise his or her seniority on an Employer or payroll basis.

4.27. The provisions of Sections 4.25 and 4.26 above shall not be construed so as to increase the number of employees regularly employed by the Employer. In the event an employee exercises his or her seniority under these provisions in transferring back to a branch, the employee thereby shall replace an employee with lesser seniority.

4.28. Mergers and Acquisitions. When two or more employers merge their operations, then the employees of the respective employers shall all be placed on one seniority roster in the order of the earliest date of hire of each of the employees with their respective employers. The number of employees making up the working unit shall be agreed to between the Employer and the Union.

4.29. When the Employer acquires or purchases control of the business of another employer within the jurisdictional area of the Union, then the employees of the employer so acquired or purchased shall be placed at the bottom of the seniority roster in the order of their

EM000076

payroll or employer seniority for the former employer. The number of employees making up the working unit shall be agreed to between the Employer and the Union.

4.30. Transportation expenses for employees who find it necessary to travel to their new places of business in Nassau, Suffolk or Westchester Counties, or in New Jersey, because of a transfer to a branch of the Employer's business, or if they move with the Employer to a new location, shall be paid by the Employer at the rate of two dollars ($2.00) per day.

4.31. Shop Steward. The Shop Steward, providing he or she is a chauffeur or helper, shall start no later than 8:00 a.m. In the event the Shop Steward is called in prior to 8:00 a.m., the Employer need not call in the other member of the team, whether the chauffeur or helper as the case may be, before 8:00 a.m.

4.32. Where the Shop Steward is called upon to settle grievances, he or she shall do so at the Employer's premises and on Company time.

4.33. The Employer recognizes the right of the Union to designate Shop Stewards and Alternates.

    A. The authority of the Shop Stewards and Alternates so designated by the Union shall be limited to, and shall not exceed, the following duties and activities:

        1. The investigation and presentation of grievances in accordance with the provisions of this Agreement;

        2. The collection of dues when authorized by appropriate Union action;

        3. The transmission of such messages and information which shall originate with, and are authorized by the Union or its officers, provided such messages and information:

            (a) Have been reduced to writing, or

            (b) If not reduced to writing, are of a routine nature and do not involve work stoppages, slowdowns, refusals to handle goods or any other interference with the Employer's business.

    B. The Union reserves the right to remove the Shop Steward and/or Alternate at any time.

    C. Shop Stewards and Alternates have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union.

    D. The Employer recognizes these limitations upon the authority of Shop Stewards and Alternates, and shall not hold the Union liable for any unauthorized acts. The

14

EM000077

Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the Shop Steward or Alternate has taken unauthorized strike action, slowdown or work stoppage in violation of this Agreement.

4.34.   The Shop Steward shall be permitted to remain on the Employer's premises on Monday through Friday of each week, as well as Sunday's and Holiday's worked with Union approval.

### ARTICLE V
### CHECK-OFF

5.1.   The Employer, if authorized by each individual employee, will deduct from the employee's wages a sum equal to such employee's initiation fee and one (1) month's dues in advance to the Union and remit the same to the Union, it being understood that this provision is subject to all the applicable requirements of the Labor-Management Relations Act, 1947, as amended. All check-off authorizations signed prior to midnight, October 24, 1947, will remain in effect after that time as revocable check-off authorizations and may be revoked by the employee at any time. Authorizations signed on or after October 24, 1947 may be revoked following the expiration date of this Agreement or after one (1) year from the date of authorization, whichever date occurs sooner. Dues shall be deducted from an employee's wages at the rate of the total amount due per month and mailed to the Union at the end of each month.

5.2.   In keeping with the authorized check-off system of collection of dues, the Employer must remit these monies to the Union no later than the 10th day of the month following the monthly dues collection. It is mutually agreed that the Union shall have the right to order a work stoppage against the Employer if it fails to maintain the essence of this provision, and it shall not be a breach of this Agreement to call such work stoppage, nor shall this violation on the part of the Employer be subject to Arbitration. All employees shall be paid their wages while such work stoppage is in progress.

### ARTICLE VI
### WAGES (FOR STEADY'S, EXTRAS AND CASUALS THAT QUALIFY)

6.1.   For steady employees, employees hired prior to July 1, 1994 who have not advanced to at least the eighty percent (80%) rate on the wage progression set forth in Section 6.4 and employees entitled to a shape-up preference pursuant to Section 4.22:

effective November 1, 2014 there shall be a wage increase of $40.00 per week;

effective November 1, 2015 there shall be a wage increase of $40.00 per week;

effective November 1, 2016 there shall be a wage increase of $40.00 per week.

|  | **11/1/14** | **11/1/15** | **11/1/16** |
|---|---|---|---|
| Dispatchers | $1322.00 | $1362.00 | $1402.00 |
| Routemen | $1317.00 | $1357.00 | $1397.00 |
| Chauffeurs | $1312.00 | $1352.00 | $1392.00 |

EM000078

| Helpers | $1302.00 | $1342.00 | $1382.00 |
|---|---|---|---|

A steady employee holding a valid CDL Class B license shall receive additional pay of three dollars ($3.00) per day worked, whether or not the employee performs as a driver.

6.2.    In addition to the wages set forth in 6.1 above, all steady employees shall be entitled to receive ten dollars ($10.00) per week as a mandatory cost of living increase for each week in which the employees have accrued wages (accrued on a daily basis), such payments to be paid to employees by separate checks in quarterly installments, commencing with the first payroll dates following January 31, April 30, July 31, October 31 of each year.

6.3.    Extra employees hired prior to November 16, 1987 shall receive cost-of-living increases as set forth in 6.2 above.

6.4.    The Employer shall pay the following wages to employees hired on or after November 16, 1987:

      (1)    Hiring Rate - Seventy-five percent (75%) of the regular rate of pay,

      (2)    After one (1) year from date of hire - eighty percent (80%) of the regular rate of pay if the employee worked at least forty-five (45) days for the Employer in the first year of employment, exclusive of the months of July, November and December and possesses a CDL Class B license,

      (3)    After two (2) years from the date of hire - ninety percent (90%) of the regular rate of pay if qualified as set forth in (2) above, and

      (4)    After three (3) years from the date of hire - one hundred percent (100%) of the regular rate of pay if qualified as set forth in (2) and (3) above.

6.5.    Upon becoming a steady employee, the employee shall receive wages equal to one-hundred percent (100%) of the steady rate then in effect,

6.6.    Employees hired on or after November 16, 1987, who have become extras pursuant to Section 4.21 shall be paid as set forth in either Section 6.4 (if hired prior to July 1, 1994) or Section 6.6 (if hired on or after July 1, 1994) and then receive the COLA, holidays and vacations set forth for extras under this Agreement. Except as set forth in Section 7.10, prior to said qualifying period, employees hired on or after November 16, 1987 shall not receive COLA set forth in Section 6.3 above, one dollar ($1.00) per day premium set forth in Section 6.18 below, holidays and vacations. Employees hired on or after November 16, 1987, who do not become extras shall remain at either seventy-five percent (75%) of the regular rate of pay as set forth in Section 6.4 (if hired prior to July 1, 1994), or the rate determined pursuant to Section 6.6 (if hired on or after July 1, 1994) throughout their employment and they shall not receive any of the following benefits, except as set forth in Section 7.10: COLA, one dollar ($1.00) per day premium, holidays or vacations.

6.7.    Notwithstanding any other provision of this Agreement, the following shall apply with respect to employees hired on or after July 1, 1994:

16

EM000079

a.      Status. An employee shall be considered a new hire if he/she has not worked for the Employer prior to July 1, 1994. Prior employment with any other employer in the industry does not entitle the employee to be classified as other than a new hire or entitle that individual to a higher rate of pay than specified in this Section 6.6 or earlier eligibility for benefits than specified in Section 6.5.

b.      Pay. Commencing November 1, 2014, casual employees shall be paid at the rate of fourteen dollars ($14.00) per hour, except that casual employees hired on or after July 14, 1994 who obtain a CDL Class B license and qualify as "Extra Employees" consistent with Section 4.21 will be paid sixteen dollars and fifty cents ($16.50) per hour and will thereafter receive increases as set forth in Section 6.1.

c.      Pay Guarantee. A new hire shall be entitled to receive a guarantee of the full straight-time hours of a work assignment and the overtime hours actually worked after eight (8) hours per day. There is no guarantee of overtime for the new hire until the employee attains status as an "extra" consistent with Section 4.21. Upon attaining "extra" status, a new hire performing deliveries will be entitled to the same overtime guarantee as a steady employee. A new hire who has attained "extra" status shall receive undertime pay for one-half (1/2) hour when assigned to a route.

6.8.    The Shop Steward shall be paid ten dollars ($10.00) per week above his or her wage scale regardless of job classification for the full duration of this Agreement, and this shall also apply to the Shop Steward's overtime. In the event that the Shop Steward is absent, the Alternate Shop Steward shall receive the additional ten dollars ($10.00) per week, provided he or she has assumed the duties of the Shop Steward for five (5) days of that week, Monday through Friday.

6.9.    All employees presently being paid or receiving conditions higher or better than provided for in this Agreement shall, throughout the term of this Agreement, continue to receive such better terms and conditions in addition to the increases which are called for by this Agreement. This shall include all bonuses, profit-sharing plans or gratuitous premium money and above-scale payments made by the Employer. Any future bonuses, gifts, gratuities or premium money not now provided shall be excluded from better conditions to be continued.

6.10.   All employees covered by this Agreement shall be paid weekly on regular pay days for all time worked.

6.11.   When the regular payday occurs on a holiday, the Employer shall pay the employees on the regular work day immediately preceding the holiday.

6.12.   Employees covered by this Agreement assigned to night work and CDD program, shall receive ten percent (10%) over the applicable wage scale listed above with the overtime rate to be increased accordingly.

6.13.   Chauffeurs driving ten-wheel trucks or tractor-trailers shall receive one dollar ($1.00) per day more than the wage scale listed above with the overtime rate to be increased accordingly.

FIRM:27599512v3

EM000080

6.14.   Legal attachments to salaries, wage assignments, or garnishments: of an employee's earnings shall not be cause for dismissal or layoff.

6.15.   There shall be no deductions from employees' wages for loss of merchandise or any other reason unless same has been approved by the Union. In the event of difference, disagreement or dispute, the Employer may submit the issue to arbitration as hereinafter provided.

6.16.   Breakage, unavoidable or not, inconsistent with normal and usual careful operations by an employee shall not be deducted from said employee's wages, all deductions from the employee's wages shall be subject to the approval of the Union.

6.17.   Employees must be paid their week's wages in the morning of the usual payday, and the Employer shall pay in cash or shall arrange with a local bank to cash checks and allow reasonable time at the Employer's expense in which to cash said checks.

6.18.   Each employee shall be provided with a statement of gross earnings and an itemized statement of all deductions made for any purpose.

6.19.   Chauffeurs and helpers sent on a trip a distance of one hundred (100) miles or more from the place of business of the Employer, shall be paid hotel expenses and meals, plus five dollars ($5.00) per day and/or night above their wage scale, if ordered to stay at a hotel or motel.

6.20.   The overtime hours set forth in Section 3.9 and the undertime hours set forth in Section 3.13 shall be guaranteed to steady and extra employees.

## ARTICLE VII
## HOLIDAYS

7.1.   The Employer agrees to pay its employees, except as set forth in Sections 6.5 and 6.6 above, in the classes herein provided for one day's pay plus a day and one-half's pay for all work done on Sunday, New Year's Day, Martin Luther King, Jr.'s Birthday, Lincoln's Birthday, Washington's Birthday, Good Friday, Memorial Day, Independence Day, Labor Day, Columbus Day, Election Day, Veterans' Day, Thanksgiving Day, the Friday after Thanksgiving Day and Christmas Day. No work shall be permitted under any circumstances on Good Friday, Yom Kippur and the Friday after Thanksgiving Day. All work done on such days beyond said eight (8) hours shall be paid at the rate of triple time and one-half and the same rate shall also apply if the holiday falls on a Saturday. Employees starting their shift on a holiday or Sunday night shall receive pay as described above. There shall be no overtime work permitted on Christmas Eve and New Year's Eve.

7.2.   The employee's birthday shall be a paid holiday. Where the birthday shall fall on another holiday specified in this Agreement, the employee shall be given either the day before or the day after his or her birthday as a paid holiday.

7.3.   In the event two (2) holidays fall on the same day, employees shall be given two (2) days off with pay. If two holidays fall on Monday, employees shall have the preceding Friday

18

EM000081

and the Monday holiday off. In the event two (2) holidays fall on any other day of the week, employees shall be given either the day before or the day after such holiday as a paid holiday in addition to the holiday itself.

7.4.    In the event a holiday falls on a Saturday, employees shall have the preceding Friday off as a paid holiday.

7.5.    Extra steady and casual employees on the seniority list working two (2) days of the week in which a holiday occurs, as set forth in 7.1 above, shall be paid for such holidays.

7.6.    Employees hired on or after November 16, 1987 must work the work day before and the work-day after a holiday to qualify for holiday pay.

7.7.    Yom Kippur shall be a paid, separate, additional holiday, regardless of when it falls, and regardless of when it is observed. The parties recognize the possibility of complications due to the observance of Yom Kippur by religious employees beginning at nightfall on the eve of Yom Kippur and by the fact that some employees work on a night shift and further by reason of the fact that another holiday, Columbus Day, sometimes falls within the same week. It is the intention of the parties that, whenever such complications arise, the result shall be that all employees receive the full benefit of the separate, additional holiday for Yom Kippur and that any questions arising be resolved favorably to the concept of additional holiday and not to limit benefits of any employee. The Employer and the Union will cooperate in dealing with special situations which may arise in connection with this matter. 'Yom Kippur will be treated like Christmas Eve and New Year's Eve, trucks must be in by 5:00 pm. Where the eve of Yom Kippur shall fall on a Friday night, the employees on the night crew, except those who observe the holiday may work upon such terms and conditions as shall be mutually agreed upon between the employees and the Employer. The night crew shall report to work after sundown on Yom Kippur day except where Yom Kippur falls on a Monday in which event the Monday night shall be the holiday for the night crew.

7.8.    All steady employees, except those on leave of absence, shall be guaranteed the holidays enumerated in Sections 73 and 7.2 above, and paid for same, whether they work or not. Steady employees who are sick cannot claim holiday pay beyond a two (2) year period. Employees out on workers' compensation or disability cannot claim holiday pay beyond a two (2) year period.

7.9.    No chauffeur, helper or platform worker shall be allowed to work on Saturdays. Routemen and/or dispatchers, if asked to work on Saturdays, Sundays or holidays, shall receive two and one-half (2 1/2) days' pay for each of those days worked plus overtime accordingly, if overtime is not prohibited by the Union.

## ARTICLE VIII
## VACATIONS

8.1.    All steady employees who have been in the employ of the Employer for a period of one (1) year or more, in accordance with the terms of this Agreement, shall receive two (2) consecutive weeks of vacation with full pay, provided that, if an extra employee becomes a steady employee for any reason, he or she shall receive three (3) weeks' vacation; all steady

EM000082

employees in the employ of the Employer for four (4) years or more, but less than ten (10) years, shall receive three (3) weeks' vacation with full pay; steady employees having ten (10) years or more shall be entitled to four (4) weeks' vacation annually. The vacations for extra and casual employees are set forth in Section 8.14 below.

Such yearly vacations shall be granted during the industry wide shutdown period which shall be as follows:

> Year 2015: The weeks commencing July 20 and July 27
> Year 2016: The weeks commencing July 18 and July 25
> Year 2017: The weeks commencing July 17 and July 24

8.2.    The industry shall also have a shutdown period during the second week in January.   During this shutdown period, employees may utilize a portion of their accrued paid vacation time or all-purpose leave, or unpaid leave, at each employee's option. The industry shutdown shall be: January 12 through 16, 2015; January 11 through 15, 2016; and January 9 through 13, 2017.

8.3.    Employees having eighteen (18) years of service on January 1st shall be entitled to five (5) weeks' vacation with pay. The third, fourth and fifth weeks of vacation shall, at the employee's option, be taken on a weekly basis or on Mondays and Fridays from August through May of the following year, or as may be mutually agreed upon between the Employer and employee.

8.4.    Senior employees shall have preference in choosing vacations.

8.5.    Eligibility date toward vacations for employees covered under this Agreement shall be the date of employment of the employee or the date of the employee's last vacation, whichever shall contribute to a greater vacation period.

8.6.    Employees shall receive an extra day's pay or an extra day of vacation if one of the designated holidays in Sections 7.1 and 7.2 above falls during the employee's vacation period.

8.7.    Steady employees who are sick cannot claim vacation pay beyond a two (2) year period. Steady employees who are out on workers' compensation or disability cannot claim vacation pay beyond a two (2) year period.

8.8.    In case of the death of any employee, the vacation pay due such employee shall be paid to the employee's spouse or nearest of kin.

8.9.    Employees leaving the employ of the Employer for any reason shall be paid vacation money on a pro-rata basis.

8.10.    Any helper working more than fifty percent (50%) of the time as a chauffeur shall be paid at a chauffeur's rate for vacation.

8.11.    No employee shall receive money in lieu of vacation.

20

EM000083

8.12.   All days lost through workers' compensation or disability claims are to be considered days worked.

8.13.   The Employer shall post the vacation schedule no later than June 1st of each year.

8.14.   a.   Except as limited in Sections 6.5 and 6.6 above, extra and casual employees shall receive vacations on the following basis:

| Time Worked Since Last Vacation Date | Vacation |
|---|---|
| 20 days | 1 day |
| 40 days | 2 days |
| 60 days | 3 days |
| 80 days | 4 days |
| 100 days | 5 days |
| 110 days | 6 days |
| 120 days | 7 days |
| 130 days | 8 days |
| 140 days | 9 days |
| 150 days | 10 days |
| 160 days | 11 days |
| 170 days | 12 days |
| 180 days | 13 days |
| 190 days | 14 days |
| 200 days | 15 days |

b.   Casual employees who do not qualify for paid vacation pursuant to Section 6.5 by satisfying the conditions of either Section 4.21 or Section 4.22 will qualify for vacation days at the rate of one (1) paid vacation day for each thirty (30) days worked after qualifying by having worked forty-five (45) days or more, exclusive of July, November and December, following the last vacation shutdown. Such paid vacation days will be applied to the next vacation shutdown period.

8.15.   The Employer will pay vacation pay for periods in excess of one (1) week by separate payroll check.

8.16.   Military Service. An employee entering military service in any branch of the United States Government shall resume seniority with the Employer when discharged from such service. The employee shall not suffer any loss of seniority. The employee shall be paid the maximum vacation pay for the following year.

8.17.   All Purpose Leave. Each contract year, all steady employees covered under this Agreement shall be entitled to ten (10) days of leave for any purpose with pay. Unused leave shall be paid in cash at the start of the employee's next vacation period or, at the employee's option, may be used during the balance of the contract year with the unused portion then paid for at the end of the contract year.

FIRM:27599512v3

EM000084

8.18. It is agreed that extra steady employees shall receive two (2) days of leave for any purpose with pay.

8.19. Effective November 1, 2014, Casual and Extra employees shall accrue paid time off at the rate of one (1) hour for every 30 hours worked up to a maximum of 40 hours of paid time off in a contract year. Time paid under 8.18 shall be credited to this accrual. Based on paid time off accruals in CBA, Union waives application of ESTA to bargaining unit.

8.20. An employee shall give forty-eight (48) hours' notice of intent to utilize a single day of leave and one (1) week's notice of intent to utilize more than a single day of leave, except where leave is necessitated by illness.

8.21. Unless mutually agreed between the Union and Employer, such all-purpose leave shall not be taken immediately before or after the regular vacation period of an employee.

8.22. If a steady employee should retire or die during a contract year, and another employee replaces him or her as a steady employee under the terms of this Agreement, credit shall be given to the Employer for all-purpose days taken by the replaced employee against all-purpose days to which the replacement shall be entitled.

## ARTICLE IX
## DEATH IN FAMILY

9.1. In case of death in an employee's immediate family, the Employer shall grant such an employee five (5) working days off with pay. "Immediate family" shall be the spouse, parents, step-parents, grandparents, sisters, step-sisters, brothers, step-brothers, children, stepchildren, mother-in-law, father-in-law, sister-in-law, brother-in-law, son-in-law, daughter-in-law and grandchildren of the employee.

9.2. Section 9.1 above shall apply to extra employees who would have been assigned to work during the five (5) working days.

9.3. Five (5) days' mourning leave shall not apply to any employee who has not been working due to workers' compensation, disability or leave of absence.

## ARTICLE X— EMPLOYER RULES AND POLICIES

10.1. Employer Rules and Policies. The Employer may establish, and the employees shall abide and follow, such Company rules as the Employer deems necessary or desirable, provided that such rules are not in conflict with the terms and provisions of this Agreement, and further provided that, except for those established Company rules, no further Company rules shall become effective without approval by the Union. Such approval shall not be unreasonably withheld.

10.2. The Employer, at its own expense, may bond employees against the loss or misappropriation of funds, freight or property. However, failure of employees in the Employer's employ on or before November 16, 1987 to meet the qualifications required for bonding shall not be grounds for dismissal.

EM000085

10.3.   Any employee involved in any accident shall immediately report said accident and any physical injury sustained. When required by the Employer, the employee, before going off duty and before starting his or her next shift, shall make out an accident report in writing on forms furnished by the Employer and shall turn in all available names and addresses of witnesses to the accident. Such reports shall be made out on Company time. Failure to comply with this provision shall subject said employee to disciplinary action by the Employer.

10.4.   Time Clocks. The Employer must have time clocks.

10.5.   All records of an employee's time worked shall be computed by time clocks.

10.6.   Employees shall punch in their own time card at the start of the day's work and "punch out" their own time card at the completion of the day's work.

10.7.   Employees shall not start work unless they have "punched in" their own time cards.

10.8.   Illness and Injury.  Employees who are injured during working hours shall be paid for the entire day, providing the injury requires immediate medical examination and treatment. Employees who become sick during their work day shall be paid for all hours actually worked.

10.9.   The Employer shall protect employees with workers' compensation insurance, Social Security and unemployment insurance as required by federal and state law. The Employer may continue its Preferred Provider Organization coverage for workers' compensation purposes.

10.10.  The Employer shall not require or demand that any of its employees submit to or undergo a physical examination at any time, unless ordered by a government agency.

10.11.  In all cases where an employee is hurt on the job and said employee has a workers' compensation case, the Employer shall, after the employee has received workers' compensation for fifteen (15) working days, pay the injured employee his or her regular wages for the first seven (7) working days that the employee has been unable to work. This shall not apply to any of the seven (7) days on which the employee would not have been assigned to work. However, in the event the employee subsequently receives workers' compensation pay on account of his or her first week of unemployment, the employee shall reimburse the Employer in the amount of such first calendar week's workers' compensation payment.

10.12.  Employees who have been off from work due to illness or injury shall be permitted to return to work upon the presentation to the Employer of a certificate from the employee's physician attesting to the employee's physical fitness. The Employer may request an independent medical exam.

10.13.  The Employer agrees that all of its new trucks will be air-conditioned.

10.14.  Black box technology will not be used for disciplinary purposes in any way.

10.15.  Employees have an obligation to report any convictions enumerated under Alcohol Beverage Control Law § 102 occurring after November 1, 2014.

23

EM000086

10.16. Employees will abide by Employer's Anti-Weapon Policy with the exception for hunting season in New York provided the employee notifies Employer that there is a hunting weapon in the employee's vehicle. And such possession and storage is in compliance with Federal, New York State and City Laws and Regulations.

10.17. Doctor's Notes may or may not serve to excuse an otherwise unexcused absence.

### ARTICLE XI— OPERATION OF EQUIPMENT

11.1. Operation of Equipment. Employees shall not operate unsafe vehicles, i.e., vehicles on which the brakes, steering apparatus, horn, lights, directional signals and windshield wipers are not in proper working order as required by the State Motor Vehicle Laws, and vehicles which do not have mirrors attached as required by said laws.

11.2. Employees are not to be held responsible for vehicles not properly equipped to comply with the State Motor Vehicle Laws and shall be compensated for frees and time lost if summoned to court, etc., because of same.

11.3. Each and every truck must have a working heater and defroster that are in good working condition on leaving the garage, or employees shall not be required to work on such truck.

Should either the heater or the defroster fail to perform properly any time after leaving the garage, the chauffeur shall immediately report this condition to the Employer.

11.4. The Employer shall provide sanitary conditions in the garage or warehouse for employees covered by this Agreement.

11.5. No employee shall operate overloaded equipment. In the event an employee shall suffer a revocation of his or her chauffeur's license because of violation of any laws by the Employer, the Employer shall provide suitable and continued employment for such employee at not less than the employee's regular earnings at the time of revocation of license for the entire period of revocation of license and shall reinstate the seniority the employee held prior to revocation of his or her chauffeur's license after the employee's chauffeur's license is restored.

11.6. Participation in Legal Proceedings. The chauffeur and helper involved in the matter, if required by the Employer to appear in court or at the National Labor Relations Board or New York State Labor Relations Board or at any arbitration proceeding in any matter affecting this Agreement, shall be paid in full for such time by the Employer.

11.7. Any employee required to appear and attend his or her compensation case heating shall be paid a full day's pay by the Employer. The employee shall give a copy of the notice to appear immediately upon his or her receipt of that notice and the Employer shall have the right to schedule work that day accordingly.

11.8. When an employee is required to appear in any court for the purpose of testifying because of any accident the employee may have been involved in during working hours, such employee shall be reimbursed in full, by the Employer, for all time lost unless the chauffeur is

FIRM:27599512v3

EM000087

proved to have been under the influence of intoxicating liquors, drugs or narcotics, or where the accident occurred while the employee was off his or her authorized route.

11.9.   Sections 11.6, 11.7 and 11.8 above shall apply only if the case is related to and occurred with the employee's present employer and the present employer is involved.

11.10.   The Employer shall assume all responsibility for all court costs and shall furnish employees who are involved in accidents during working hours with bail bond and legal counsel and shall pay in full for same. Said bail bond and legal counsel shall remain assigned to the employee until all legal action in connection with said accident has concluded and the Employer shall assume all responsibility for all judgments or awards against the employee in connection with said accident which may result through court action against said employee, PROVIDED HOWEVER, that there shall be no liability or responsibility on the part of the Employer with respect to any of these expenses or charges where the employee is charged and convicted of criminal negligence, drunkenness, being under the influence of intoxicating beverages, drugs or narcotics or where the accident occurred where the employee was off his or her duly authorized route. If an employee shall retain his or her own legal counsel, the legal fee incurred shall be paid for in full by the employee without any liability or responsibility on the part of the Employer therefor.

11.11.   Any chauffeur receiving a summons for double parking, parking in bus stops, parking by hydrants or parking in restricted zones in order to make deliveries, pickups or exchanges, shall be reimbursed by the Employer.

11.12.   Any employee who is required to serve on a jury of any type shall be paid by the Employer the difference between the fee paid said employee for such jury duty and the employee's regular wage per day for all such days that the employee shall serve on such jury. This shall not apply to any day on which the employee would not have been assigned to work. Employees serving Jury Duty will be given the overtime guarantee.

11.13.   Leave of Absence. The Employer shall grant leaves of absence consistent with its Family and Medical Leave Act Policy. For all other leaves of absence, any employee desiring a leave of absence from employment shall secure written permission from the Employer. The maximum leave of absence will be for thirty (30) days and may be extended for like period. Permission for extension must be secured in writing from the Employer (with a maximum leave of absence of one (1) year).

11.14.   During the period of a leave of absence, the employee shall not engage in gainful employment in the same industry in classifications covered by this Agreement. Failure to comply with this provision shall result in the complete loss of seniority rights for the employees involved. Inability to work because of proven sickness or injury shall not result in loss of seniority rights. Except in cases of extreme hardship, there shall be only one (1) leave of absence granted during the term of this Agreement. Any employee who has an alcohol or drug problem shall be granted a leave of absence for the purpose of undergoing treatment. Such leave of absence shall be granted on a one time basis and shall be for a maximum of thirty (30) days unless extended by mutual agreement. Upon completion of such treatment, the employee must

25

EM000088

present a letter from a doctor attesting to the fact that the employee has completed treatment and is fit to return to work.

11.15. Leave of absence must be requested prior to the commission of any act subject to disciplinary action. While on such leave, the employee shall not receive any of the benefits provided by this Agreement except the continued accrual of seniority.

11.16. Union Leave. Any employee who is designated by the Union to work for the Union on a full-time basis shall be granted a leave of absence with no loss of seniority for the duration of such full-time employment, provided the employee reports back to the Employer within ninety (90) days after his or her employment with the Union is terminated and does not work for any other employer in the industry during such period.

11.17. The Employer agrees to grant, without pay, the necessary and reasonable time off, without discrimination or loss of seniority rights, to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business, provided forty-eight (48) hours, written notice is given to the Employer by the Union specifying the length of time off.

11.18. Unless otherwise mutually agreed by the Employer and the Union, it shall be a violation of this Agreement for the Employer knowingly to hire persons employed elsewhere (moonlighters), or employees of other employers in the industry who are on vacation, to do any work covered by this Agreement.

11.19. For the purpose of preserving the level of benefits set forth in this Agreement, the Employer agrees to refrain from using the services of any person who does not observe at least the level of wages, hours and economic conditions of employment as established in this Agreement.

11.20. Equal Employment Opportunity. The Employer and the Union agree not to discriminate against an individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, disability, color, religion, sex, sexual orientation, marital status, national origin or age, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of race, disability, color, religion, sex, sexual orientation, marital status, national origin or age. The attached Alternate Dispute Resolution policy will apply to resolve all such disputes.

The Union agrees to the Employer's Alternative Dispute Resolution ("ADR") policy subject to the following conditions:

a.      the ADR policy shall not be part of the Agreement and shall not in any abridge an employee's rights under the Agreement;

b.      the Union shall be notified of any complaints made by one of its members under the ADR policy or any complaints involving the Union's members, and the Union shall be allowed to participate to the extent it so chooses; and

FIRM:27599512v3

EM000089

c.    any determination involving the Union's members shall be nonbinding and shall not preclude the member from seeking redress in another forum.

11.21.  Polygraphs. The Employer shall not require, request, threaten or suggest that an employee take a polygraph or any form of lie detector test. Any employee who submits to a polygraph or any other form of lie detector test at the request, requirement, suggestion or threat of the Employer shall be subject to dismissal at the request of the Union.

11.22.  Substance Abuse Testing. Commencing May 1, 2003, employees not otherwise subject to Department of Transportation, Federal Highway Administration or Federal Motor Carrier Safety Administration Regulations shall be subject to the Employer's substance abuse policy, including testing.

## ARTICLE XII
## WELFARE AND PENSION FUNDS

12.1.  The Employer shall continue, as heretofore, to participate in and make regular contributions to the United Teamsters Fund (the "Welfare Fund") and to the Local 816 Labor and Management Pension Fund (the "Local 816 Pension Fund") as set forth below.

12.2.  Welfare Fund. The Employer's contributions to the Welfare Fund shall be as follows:

a.    Effective November 1, 2014, the Employer will contribute one thousand two hundred ten dollars ($1210.00) per month for all steady employees and extra steadys, seven dollars ($7.00) per hour (to a maximum of fifty-six dollars ($56.00) per day and one thousand two hundred ten dollars ($1210.00) per month).

b.    To the extent certified by the Welfare Fund Trustees as necessary, the Employer's contribution shall increase effective November 1, 2015 to one thousand two hundred seventy dollars and ($1270.00) per month for all steady employees and extra steadys, seven dollars and thirty cents ($7.30) per hour (to a maximum of fifty-eight dollars and eighty cents ($58.80) per day and one thousand two hundred seventy-dollars ($1270.00) per month).

c.    To the extent certified by the Welfare Fund Trustees as necessary, the Employer's contribution shall increase effective November 1, 2016 to one thousand three hundred thirty dollars ($1330.00) per month for all steady employees and extra steadys, seven dollars and seventy cents ($7.70) per hour (to a maximum of sixty-one dollars and sixty cents ($61.60) per day and one thousand three hundred thirty dollars ($1330.00) per month).

d.    Effective November 1, 2014, the Employer will contribute at the rate of two dollars and sixty cents ($2.60) per hour to a maximum of twenty-one dollars ($21.00) per day for benefits in the HIP Plan for casual employees classified as new hires pursuant to Section 6.6 who have not qualified by obtaining a valid CDL Class B license and qualifying as "Extra Employees" consistent with Section 4.21.

27

EM000090

e.     To the extent certified by the Welfare Fund Trustees as necessary, the Employer's contribution to the HIP Plan shall increase to a maximum of two dollars and fifty cents ($2.50) per hour (twenty dollars ($20.00) per day) effective November 1, 2009.

f.     To the extent certified by the Welfare Fund Trustees as necessary, the Employer's contribution to the HIP Plan shall increase to a maximum of two dollars and sixty three cents ($2.63) per hour (twenty one dollars ($21.00) per day) effective November 1, 2010.

g.     The Welfare Fund Medical Plan must meet the requirements of the Affordable Care Act.

12.3.   Failure on the part of the Employer to pay the required contributions into the Welfare Fund for each and all of its employees shall leave the Employer with full responsibility to assume and pay the benefits provided by the Welfare Fund, but shall not relieve the Employer of its obligations to make the payments to the Welfare Fund.

12.4.   Steady employees of the Employer who are not working due to illness or injury shall hold seniority during said illness or injury, and the Employer shall continue to make the agreed contributions monthly into the Welfare Fund for each of said employees for a period to include, but not to exceed, twelve (12) months during their illness or injury. This shall include all employees, unable to work as well as those classified as workers' compensation or disability cases.

12.5.   Local 816 Pension Fund. The Employer's contributions during the term of this Agreement to the Local 816 Pension Fund shall be as follows:

a.     Effective November 1, 2014, the contribution shall be five dollars and thirty-five cents ($5.35) per hour, with a maximum of forty-two dollars and eighty cents ($42.80) per day for the five day men and a maximum of $53.50 per day for the four day men (an increase of 5¢ per hour).

b.     Effective November 2015, the contribution shall be five dollars and forty-five cents ($5.45) per hour, with a maximum of forty-three dollars and sixty cents ($43.60) per day for the five day men and a maximum of $54.50 per day for the four day men (an increase of 10¢ per hour).

c.     Effective November 1, 2016, the contribution shall be five dollars and sixty cents ($5. 60) per hour, with a maximum of forty-four dollars and eighty cents ($44.80) per day for the five day men and a maximum of $56.00 per day for the four day men (an increase of 15¢ per hour).

d.     For new hires, as identified in Section 6.6, who have not attained status as steady employees, the Employer shall contribute to the Local 816 Pension Fund at the rate of one dollar ($1.00) per hour, to a maximum of eight dollars ($8.00) per day for pension benefits to be established by the Trustees.

12.6.   Disability Benefits.  The maximum disability insurance benefit provided by the Employer will be increased to three hundred dollars ($300.00).

28

EM000091

12.7.   The Local 816 Pension Fund shall be for the exclusive purpose of providing pension benefits for employees covered by this Agreement and employees of other employers making similar contributions to the Local 816 Pension Fund, said pension benefits to become effective upon the dates specified and pursuant to the rules and regulations formulated by the Trustees. Payments shall be made for each and every employee whether or not the employee is a member of the Union.

12.8.   The Employer will execute a Trust Agreement in accordance with this Article XII immediately upon request by the Union.

12.9.   If the Employer withdraws from the Local 816 Pension Fund in a complete or partial withdrawal within the meaning of ERISA Sections 4201, 4203 and 4205 then, in that event, the Employer shall pay to the Local 816 Pension Fund an amount equal to the amount by which its withdrawal liability, as calculated by such Fund under ERISA Section 4211, has been reduced under the *de minimis* rule of ERISA Section 4209. The payments provided in this Section 12.9 are contractual in nature and in addition to withdrawal liability, if any, due the Local 816 Pension Fund under ERISA. The amounts due under this Section 12.9 shall be deemed to be a contribution to the Local 816 Pension Fund and the collection of same shall be enforceable in accordance with ERISA Sections 502 and 515. Payment of such amounts shall be in twelve (12) equal monthly installments starting on the first day of the calendar month in which the Employer's first payment of withdrawal liability is due to the Local 8 16 Pension Fund, or would have been due but for the de minimis rule.

12.10.  The Union may also contribute to the welfare and pension funds described in this Article XII for its employees at the above rates and, if it makes such contributions, shall be considered an employer within the meaning of the applicable Trust Agreement.

12.11.  It is agreed between the Employer and the Union that, notwithstanding the provision herein for the arbitration of disputes, should the Employer fail to comply with the terms of this Article XII, that the Union shall have the right to order a work stoppage of the employees of the Employer, and that such a work stoppage shall not be a breach of this Agreement.

## ARTICLE XIII
## DISCHARGE

13.1.   The Employer shall not discharge nor suspend any non-probationary employee without just cause and the written notice of discharge or suspension must set forth the specific reason(s) for such action. In respect to discharge or suspension, the Employer shall give at least one (1) warning notice of the specific complaint against such employee, in writing, and a copy of the same to the Union and the Shop Steward, except that no warning notice need be given to any employee, before he or she is discharged or suspended if the employee is discharged or suspended for any of the causes listed in 13.5 below or suspended for theft of time. The Employer shall not discipline any employee without just cause based upon valid written warning notices sent within the applicable time periods set forth hereinafter. No disciplinary notice shall be considered valid unless it is in writing, has been delivered to the employee, personally or by certified mail to the address given to the Employer by the employee, and to his or her Shop

EM000092

Steward., and sent certified mail to the Union, and sets forth therein in full the specific grounds and circumstances upon which it is based. Warning notices only shall be handed to the employees and not mailed to an employee's home. No warning letter or letter of suspension shall be considered valid unless issued by the Employer within seven (7) days, excluding Saturdays, Sundays and holidays, from the date the Employer knew of or reasonably should have become aware of the specific grounds and circumstances upon which it is based. Failure of an employee or the Union to grieve or protest a warning letter to which no other discipline has been attached, when given, shall in no manner be deemed prejudicial to said employee in a future grievance or arbitration hearing involving said warning letter. An employee shall not be suspended until the Union has been given forty-eight (48) hours' written notice. Saturdays, Sundays and holidays shall be excluded in determining the forty-eight (48) hour period.

13.2.   No disciplinary notice may be introduced in any grievance or arbitration hearing unless such notice has been issued within eighteen (18) months from the date of the disciplinary notice giving rise to the grievance.

13.3.   The Employer shall not conspire to blacklist any employee as a result of an unsatisfactory relationship between the employee and the Employer.

13.4.   The first, forty-five (45) days worked by the employee shall be considered a probationary period during which the employee may be disciplined or discharged without recourse to the grievance and arbitration provisions of this Agreement.

13.5.   The only causes for immediate discharge of an employee shall be for proven theft of money, goods or merchandise during working hours, proven drunkenness, or proof of being under the influence of alcoholic beverages or drugs during working hours, calling an unauthorized strike or walk-out, assault on the Employer or its representative during working hours, failure to report an accident which the employee would normally be aware of, proven recklessness resulting in a serious accident while on duty, or the carrying of unauthorized passengers in the cab of a truck while on duty, engaging in unauthorized transportation of merchandise or goods for personal gain during working hours and punching in or out the time card of another employee. Although theft of time shall not be cause for immediate discharge, it is recognized as an offense for which severe disciplinary measures may be invoked. When an employee is discharged, the Employer shall notify the Union in writing.

13.6.   A discharged or suspended employee must notify the Union in writing within two (2) working days of the employee's desire to appeal the discharge or suspension.

13.7.   The Employer will not discharge any of its employees for Union activities.

13.8.   Upon discharge, the Employer shall pay all money due to the employee. Upon the employee's quitting, the Employer shall pay all money due to the employee on the payday in the week following such quitting. Vacation time shall be included in such payment.

FIRM:27599512v3

EM000093

# ARTICLE XIV
# ARBITRATION

14.1. All complaints, disputes or grievances arising under this Agreement and during its term involving questions of interpretation or application of any provision of this Agreement shall be submitted in writing by the party claiming to be aggrieved to the other party within five (5) working days after the occurrence of the event giving rise to the complaint, dispute or grievance.

14.2. A duly authorized representative of the Employer and a duly authorized representative of the Union shall, in the first instance, jointly investigate such complaint, dispute or grievance and the decision of such representatives shall be binding upon the parties and affected employees.

14.3. In the event that any complaint, dispute or grievance shall not have been satisfactorily adjusted between the parties through the grievance procedures in the manner provided above, then such complaint, dispute or grievance shall be submitted at the request of either party to arbitration before an arbitrator selected by the parties, but failing agreement between the parties as to the selection of an arbitrator, the complaint, dispute or grievance shall be submitted to arbitration pursuant to the Voluntary Labor Arbitration rules then obtaining of the American Arbitration Association.

14.4. No time limitation set forth in this Article XIV shall be deemed waived unless a party has agreed to such waiver in writing, and untimely grievances shall be deemed barred.

14.5. The Arbitrator shall be free, if in his or her discretion the Arbitrator deems it desirable so to do, to attempt to adjust any difference or dispute by mediation before or during the course of any arbitration.

14.6. The arbitration hearing shall take place within one (1) week after being submitted to the Arbitrator, and the Arbitrator must render a decision on the dispute not later than thirty (30) days after the hearing on the dispute is concluded.

14.7. Any employee who loses his or her job because of a decision against the employee by the Arbitrator must be paid his or her earned vacation pay.

14.8. Any employee who is restored to his or her job through a favorable arbitration decision shall be credited with such time lost toward vacation eligibility, unless the Arbitrator specifically rules otherwise.

14.9. The disputes referred to in this Article XIV shall include, but shall not be limited to, disputes concerning the discharge of an employee. The discharged employee shall have the right to be present at the proceedings.

14.10. The Arbitrator shall not have the authority to amend or modify this Agreement or establish new terms or conditions under this Agreement. The Arbitrator shall determine any questions of arbitrability.

31

EM000094

## ARTICLE XV
## PROTECTIVE CLAUSE

15.1.   This Agreement shall be binding upon the parties, their successors and assigns. Any assignment, sale or transfer by the Employer of its business shall be made subject to this Agreement. It shall be the obligation of the Employer to bring this Agreement and this Section 15.1 to the notice of any prospective purchaser, lessee or successor in interest; and to inform the union, in advance thereof, of the name and address of the proposed buyer, assignee or transferee.

15.2.   No employee shall be compelled to assume any proprietary interest in the Employer as a condition of employment.

15.3.   No Strikes or Lockouts. The Union agrees that, during the life of this Agreement, there shall be no strikes, work stoppages, slowdowns, interruptions or delays of work of any nature, for any purpose whatsoever. The Employer agrees that, during the life of this Agreement, there shall be no lockouts.

15.4.   It is agreed that in all cases of an unauthorized strike, walk-out or any other unauthorized cessation of work in violation of this Agreement, the Union shall not be liable for damages resulting from such unauthorized acts of its members.

15.5.   It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a primary labor dispute or refuses to go through or work behind any primary picket line, including the primary picket line of the Union party to this Agreement and including primary lines at the Employer's place or places of business.

15.6.   Transfers and Assignments. The Employer shall not have the right to assign this Agreement or in any other manner to transfer the rights and obligations thereof to any other party. Employees working under this Agreement shall at all times be entitled, acting through the Union as the representative, to hold the Employer directly responsible for the full performance of all the terms and conditions of this Agreement, regardless of what trucking facilities the Employer may utilize. This provision shall not apply to a liquidation, sale, transfer or assignment of the business of the Employer. It is the sole intent of this provision to prevent the Employer from transferring or assigning its trucking operation, that is, the Employer's drivers and helpers, to an outside trucker or separate Corporation, whereby these employees are then added to the bottom of an already established seniority list or required to commence seniority anew.

15.7.   No agent or trucker may sign this Agreement on behalf of the Employer. It is the responsibility and obligation of the Employer party to this Agreement to affix its signature hereto in its own behalf.

15.8.   During the term of this Agreement, the Employer shall not operate, maintain or conduct any establishment or place of business for the purpose of evading the terms of this Agreement.

15.9.   The employees shall remain on the payroll of the Employer and not be assigned to any other payroll regardless of what trucking facilities the Employer may utilize.

FIRM:27599512v3

EM000095

15.10.  Union Visitation and Rights.  Authorized representatives of the Union shall have access to the Employer's establishment during working hours for the purpose of adjusting disputes, investigating working conditions and ascertaining that the Agreement is being adhered to. While upon the premises of the Employer, Union representatives will not cause interruptions or interference with work of employees or otherwise abuse this provision of this Agreement.

15.11.  Whenever a complaint is made concerning the wages of an employee, an authorized representative of the Union shall have the right to inspect the Employer's pay records and the time card of the employee involved.

15.12.  The Employer agrees to the posting within its business premises of notices of Union meetings by the Union.

15.13.  Upon completion of the consolidation, the Employer will not use Agency employees.

15.14.  Separability. In the event that any of the provisions of this Agreement are in conflict with the Taft-Hartley Law, it is understood and agreed that such provisions shall not be operative so long as such conflict exists, but shall become operative immediately upon repeal of said law or upon said law being determined to be unconstitutional or inapplicable. If, for the reason above stated, any provisions here shall be inoperative, the Union shall have the right to submit to arbitration hereunder its demand for such further and additional provisions as may be fair and reasonable under the circumstances, and the decision of the arbitrator shall be final and binding upon the parties.

15.15.  No Other Agreements. The Employer shall not enter into any other written or oral agreement with any employee or group of employees covered by this Agreement which in any way violates the wages, hours or the right to recover from the Employer in its own name and behalf the amount of any wages or other benefits which any employee may waive or assign to the Employer.

15.16.  This document contains the entire Agreement between the parties. It may not be amended or modified except in writing and signed by the signatories to this Agreement or their successors in office. The Employer shall not make any agreement, private or otherwise, with any employee or group of employees which varies the terms and provisions hereof. Any violation of this provision by any employee or any group of employees shall result in the discharge of the violators.

15.17.  The Employer agrees that its management and supervisors will communicate with the employees on Union matters with the Shop Steward.

15.18.  The Employee agrees that it will advise the Union and seek its input before it initiates any incentive plans.

15.19.  Upon authorization from employee, the Employer agrees to make deductions from employee wages to the Teamsters 401(k) plan.

FIRM:27599512v3

EM000096

15.20. Casual employees shall be subject to drug and alcohol testing effective July 1, 2006.

## ARTICLE XVI
## DURATION

16.1.   Except as otherwise set forth herein, the terms of this Agreement shall be effective as of November 1, 2014 and shall continue in full force and effect until midnight, October 31, 2017.

16.2.   Employer Reopener. In the event of legislation having been passed or effective judicial action, the Employer will be affected by changes concerning:

    a.      abolition of price-posting;

    b.      establishment of chain-store licensees;

    c.      permission of licensees to buy as a group;

    d.      change in credit law; and

    e.      the pickup or return of used bottles.

The Employer, upon written notice to the Union not later than ten (10) days following the occurrence of any one or more of these events at any time or times during the term of this Agreement, may reopen this Agreement for the intended purpose of addressing revision of this Agreement as a consequence of any such change. If no agreement has been reached within twenty (20) days after receipt by the Union of such notice, the Employer may terminate this Agreement and the Union shall have the right to strike.

16.3.   In the event that any payments or benefits contained in this Agreement are prevented by economic controls or government action, this Agreement may be terminated at the option of the Union upon thirty (30) calendar days' notice to the Employer or the Employer's bargaining representative not later than thirty (30) calendar clays after its receipt of official notice of government action.

16.4.   In the event any wholesaler having a bargaining relationship with the Union terminates that relationship, but continues to service the market within the jurisdiction of the Union, the Employer shall have the right to reopen this Agreement.

FIRM:27599512v3

EM000097

IN WITNESS WHEREOF, the parties hereto have set their hands and caused then- seals to be affixed the day and year first above written.

EMPIRE MERCHANTS LLC

LOCAL 917, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA

By:_____

By:_____

_____
(title)

_____
(title)

_____
(date)

_____
(date)

35

EM000098

## SCHEDULE E

Empire Merchants, LLC has established a culture that cares about its employees and recognizes that our employees are what truly make the difference in the competitive wine and spirits wholesale distribution industry. But even in the best working relationships, problems can arise. At times, these problems escalate into disputes if options for solving them are limited.

Many employers, including Empire, have been exploring ways to minimize the possibility of an antagonistic and adversarial atmosphere when problems arise in the workplace. That is where the alternate dispute resolution program comes into place. This program, currently available in some of the country's top companies, has proven to be successful in keeping the lines of communication open even under the most difficult of circumstances.

These programs are designed to allow an employee and the company every opportunity to resolve a problem in a method that is reasonable, timely, and most of all, fair. In companies where alternate dispute resolution has been implemented, the employee and company satisfaction level with the program is extremely high.

That is why, after reviewing many different programs, Empire has decided to introduce its own Open Door Policy to resolve all claims of discrimination or sexual harassment. For purposes of the Open Door Policy, only claims alleging race, age, sex, disability, sexual orientation, marital status, national origin, and claims of sexual harassment, as these terms are defined by Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the New York Executive Law and the New York City Administrative Code, shall be included in the definition of discrimination or sexual harassment.

### The Open Door Policy

The Open Door Policy is a program designed for the mutual benefit of Empire and its employees

Empire is committed to finding solutions that are fair for both the employee and the company. Each step of this four-step process is designed to keep the lines of communication open while pursuing all potential avenues to resolve differences. The program is flexible, accessible, and fair to both parties. It will allow all of us to focus more on our business of being the best wine and spirit wholesale distributor in New York.

### Administering the Open Door Policy

To ensure the success of this program and to promote employee awareness and understanding of how it works, the Empire Human Resources Manager will oversee the program and be able to answer questions, process requests, and provide information, as necessary.

### Covered Disputes

Disputes covered by Open Door Policy pertain to all claims of discrimination or sexual harassment, (as defined herein), and other legally protected federal, state and local statutory rights as referred to in the parties' collective bargaining agreement.

FIRM:27599512v3

EM000099

Case 1:16-cv-05643-ENV-SMG   Document 43-1   Filed 12/21/17   Page 39 of 40 PageID #: 548

Disputes not covered under Open Door Policy relate to grievances under the parties' collective bargaining agreement alleging a violation of that collective bargaining agreement, worker's compensation, unemployment benefits, health and welfare and 401 (k) benefits, and claims by Empire for injunctive relief to protect confidential information and all disputes alleging a violation of the Parties' collective bargaining agreement. The Open Door Policy does not supersede any rights under any collective bargaining agreement between Empire and its employees.

While the Open Door Policy program establishes a procedure for resolving your work place discrimination and sexual harassment disputes, nothing in the Open Door Policy program material creates a contract of employment, express or implied, for any period of time and does not alter Empire's at-will employment policy as explained in its employee handbook, except that nothing in this ADR policy alters the parties' just cause termination provision set forth in their collective bargaining agreement.

This material provides an overview of the program. If, after reviewing it, you would like more information about how the program works, contact the Human Resources Department.

The Open Door Policy provides an opportunity for you to resolve your disputes early and informally. Under the Open Door Policy, you are encouraged to bring your concerns to anyone you choose. The policy is designed to ensure that your concerns get the attention they deserve.

Empire will attempt to make sure that this Open Door Policy is observed. The company will not retaliate against any employee in any way for using the Open Door Policy.

**<u>Covered Claims</u>**

You may raise any related discrimination or sexual harassment matter through the Open Door first step. While you are not bound by the outcome of the Open Door Policy, it is important that your management have the opportunity to attempt to resolve your concerns.

To use the Open Door Policy, you must contact any supervisor, manager or your Human Resources Manager, either orally or in writing. Whenever possible, you should try to resolve any problems at work with the person to whom you report, because this person is close to your situation, he/she may already be aware of the problem or be in a position to offer a different perspective or some new facts that may be helpful to you.

You are also encouraged, although not required, to follow the specific levels of management in your department since that is often the most direct way of getting matters resolved. However, as stated above, you have the right to bring your concerns to any supervisor or manager, if you choose.

This Open Door Policy is simply an informal way of resolving problems early, preserving working relationships, and promoting a productive working environment for everyone. The vast majority of issues will be resolved at this level. The Union shall have the right to take part in the policy.

FIRM:27599512v3

EM000100

This policy shall not impact the right to use the Grievance and Arbitration provisions of the Collective Bargaining Agreement.

FIRM:27599512v3

EM000101