

## AGREEMENT

### Between

### Wine, Liquor & Distillery Workers Union Local 1-D,

### (UFCW,AFL-CIO, CLC))

### and

### Empire Merchants, LLC

### November 1, 2014 - October 31, 2017

GCC/IBT 243-C

## TABLE OF CONTENTS

**PAGE**

| | | |
|---|---|---|
| ARTICLE I | UNION RECOGNITION | 1 |
| ARTICLE II | UNION SHOP | 2 |
| ARTICLE III | HIRING OF EMPLOYEES | 3 |
| ARTICLE IV | CHECK-OFF | 4 |
| ARTICLE V | DISCRIMINATION | 4 |
| ARTICLE VI | SENIORITY | 5 |
| ARTICLE VII | PROMOTIONS | 6 |
| ARTICLE VIII | DISCHARGE | 7 |
| ARTICLE IX | WAGES | 7 |
| ARTICLE X | SHIFT DIFFERENTIAL AND PREMIUM PAY | 11 |
| ARTICLE XI | TRANSFER | 11 |
| ARTICLE XII | HOURS | 11 |
| ARTICLE XII | OVERTIME | 13 |
| ARTICLE XIV | EMERGENCY WORK | 16 |
| ARTICLE XV | HOLIDAYS | 16 |
| ARTICLE XVI | VACATIONS | 18 |
| ARTICLE XVII | ALL PURPOSE LEAVE | 21 |
| ARTICLE XVIII | MEMORIAL LEAVE | 23 |
| ARTICLE XIX | MAJOR MEDICAL PLAN | 23 |
| ARTICLE XX | PENSION FUND | 25 |
| ARTICLE XXI | SEVERANCE FUND | 25 |
| ARTICLE XXII | EMPLOYER COMPLIANCE | 26 |
| ARTICLE XXIII | COMPENSATION COVERAGE | 27 |
| ARTICLE XXIV | SHOP STEWARDS | 27 |
| ARTICLE XXV | UNIFORMS AND MATERIALS | 29 |
| ARTICLE XXVI | SAFETY AND HEALTH CONDITIONS | 29 |
| ARTICLE XXVII | ACCIDENTAL BREAKAGE | 30 |
| ARTICLE XXVIII | LONG AND FAITHFUL SERVICE | 30 |
| ARTICLE XXIX | VISITATION | 30 |
| ARTICLE XXX | BULLETIN BOARDS | 30 |
| ARTICLE XXXI | JURY DUTY | 31 |
| ARTICLE XXXII | PRIOR BENEFITS | 31 |
| ARTICLE XXXIII | LEGISLATION | 31 |
| ARTICLE XXXIV | LEAVE OF ABSENCE | 32 |
| ARTICLE XXXV | LEAVE OF ABSENCE FOR MILITARY OR UNION SERVICE | 32 |
| ARTICLE XXXVI | INDIVIDUAL AGREEMENTS | 33 |
| ARTICLE XXXVII | SEPARABILITY | 33 |
| ARTICLE XXXVIII | EMPLOYER PERFORMANCE | 33 |
| ARTICLE XXXIX | RELOCATION OF COMPANY AND TRANSFER OF EMPLOYEES | 34 |
| ARTICLE XL | NO STRIKES OR LOCKOUTS | 34 |
| ARTICLE XLI | ARBITRATION | 34 |
| ARTICLE XLII | NEW WAREHOUSE OPERATION | 36 |
| ARTICLE XL | SUCCESSORS | 37 |
| ARTICLE XLIV | DRUG AND ALCOHOL PROGRAM | 37 |
| ARTICLE XLVI | TERMINATION | 37 |
| | EXHIBIT "A" | 39 |
| | EXHIBIT "B" | 46 |
| | EXHIBIT "C" | 47 |

i

## AGREEMENT

AGREEMENT entered into effective November 1, 2014, by and between EMPIRE MERCHANTS, LLC (hereinafter called the "Employer"), and WINE, LIQUOR & DISTILLERY WORKERS UNION LOCAL 1-D of the States of New York, New Jersey and Connecticut, of the United Food & Commercial Workers International Union of America, affiliated with the AFL-CIO ,CLC (hereinafter called the "Union").

### W I T N E S S E T H:

### ARTICLE I

### UNION RECOGNITION

1.1     The Employer recognizes the Union as the sole collective bargaining agent for all employees engaged by it in the manufacture and distribution of wine and alcoholic beverages, including and without limiting such recognition to the following operations: manufacturing, blending, shipping, loading, unloading, stacking, lift-machine operators, handling, packing receiving, checking, stamping, filtering, bottling, clarifying, maintenance, office and clerical occupations, working foremen and duties incidental thereto, in any establishment operated, or which may hereafter be operated by the Employer, or with which the Employer is now or may hereafter become affiliated.  Consistent with the Brooklyn practices, palletized and slip sheet loads and any work related thereto shall not be Teamsters 917 jurisdiction (as per Teamsters Agreement).  It is understood and agreed that this is Local 1D work, with the exception of loading pallets for customers.

1.2     The Employer may exclude managers of departments, assistant managers, non-working foremen and confidential secretaries, as defined by the National Labor Relations Board,

1

from the bargaining unit, providing these employees voluntarily withdraw from the Union and cease to perform any and all work within the Union's jurisdiction.

## ARTICLE II

## UNION SHOP

2.1     It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain members in good standing and those who are not members on the effective date of this Agreement shall, on the day after the thirtieth (30th) day following the effective date of this Agreement or the execution thereof, whichever is later, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date or the execution thereof, whichever is later, shall on the thirtieth (30th) day of employment following the beginning of such employment become and remain members in good standing in the Union.

2.2     Any employee first hired on a per diem basis after November 1, 1999 shall be deemed a temporary employee and on a trial basis and such employee shall not receive COLA, holidays or vacations until the earlier of the date the employee becomes a regular employee, or the employee has qualified for pay at the rate of eighty percent (80%) of his or her regular rate pursuant to Section 9.3(d)(ii), after which the employee shall then be eligible for COLA (consistent with Section 9.6), holidays (consistent with Article XV) and vacations (consistent with Section 16.10 and the remaining applicable provisions of Article XVI). Such newly hired employee shall not be required to become a member of the Union as a condition of continuing his or her employment until the thirtieth (30th) day following the beginning of his or her employment.

2

EM000004

2.3     Such new employees shall be deemed temporary employees until such time as they have completed sixty (60) continuous working days, at which time they shall become regular employees and added to the seniority list.  However, days worked by them during the months of July, November and December of any contract year shall not be counted in computing the sixty (60) continuous working days' employment. During such probationary period, the Employer shall have the right to terminate a probationary employee without cause.

2.4     The failure of any employee to become a member of the Union within the time required under this Article shall obligate the Employer, upon written notice from the Union to such effect, to forthwith discharge such person.  Also, the failure of any employee to maintain his or her membership in good standing by failing to pay his or her periodic dues and initiation fees shall, upon written notice to the Employer by the Union to such effect, obligate the Employer to discharge such employee immediately.

## ARTICLE III

## HIRING OF EMPLOYEES

3.1     In the event that help is required, the Employer shall immediately notify the Union, and the Union shall have twenty-four (24) hours (exclusive of intervening Saturdays, Sundays, vacation periods or holidays), within which to recommend applicants for such job.

3.2     If, within a period of twenty-four (24) hours, the Union fails to recommend an applicant satisfactory to the Employer, then at the expiration of such twenty-four (24) hour period the Employer shall have the option of hiring help from the open market. In the event employees are hired from the open market, the Union shall be advised within forty-eight (48) hours of the hiring of such employees, and the Employer shall furnish to the Union and to the Shop Steward, in writing, the name, residence, proposed classification and starting salary of said employee.

3

EM000005

3.3     Selection of applicants for referral to jobs by the Union shall be on a non-discriminatory basis and shall not be based on or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions or any other aspect of Union membership, policies or requirements.  Nothing herein contained shall deny the Union the right to select applicants for referral on the basis of experience in the industry, qualifications and skill, or Employer preference.

3.4     The Employer at all times retains the right to reject any job applicant referred by the Union.

3.5     The parties to this Agreement shall keep posted, in places where notices to employees and applicants for employment are customarily posted, copies of the above provisions pertaining to hiring of new employees.

## ARTICLE IV

## CHECK-OFF

4.1     The Employer agrees to deduct periodic Union dues, initiation fees and Union assessments on the first pay day of each month from the wages of each employee for whom the Union files and furnishes an individually written authorization, and forward same to the Union on or before the 10th day of the month in which such deduction is made.

## ARTICLE V

## DISCRIMINATION

5.1     The Employer and the Union agree that there will be no discrimination against any employees or prospective employees because of race, color, religion, sex, national origin, physical or mental disability or handicap, or age pursuant to Federal or State Law. A word used in the masculine gender in this Agreement shall also apply to the feminine gender and vice-versa.

4

EM000006

## ARTICLE VI

## SENIORITY

6.1     Lay-off shall be on the basis of plant seniority, wherever employees are qualified to do available work. Seniority is considered the length of service from the first day of continuous employment in the plant in years, months and days.

6.2     Whenever a reduction in the force is necessary, the Employer shall give two (2) days' notice of such lay-off to the Union and regular employees, excluding the week-end, and said notice may be given no later than the end of the workday on Wednesday.

6.3     The Employer will prepare and submit to the Union a seniority list annually, at the end of the calendar year, based upon the length of service record of the employees.

6.4     Any employee who voluntarily quits his or her job, is discharged for cause or takes a withdrawal card from the Union shall forfeit all previously accumulated seniority.

6.5     In computing the total length of service, time lost as a result of the following shall be considered as time served: an interval of unemployment resulting from any lay-off or leave of absence for a period not in excess of one (1) year, wherein the employee is absent from work for a continuous period not in excess of one (1) year.

6.6     Notice of rehiring shall be given by the Employer to the employees and the Union in order of their seniority as they were laid off twenty-four (24) hours in advance of such rehiring.

     a.     Notice of rehiring shall be given by writing, telegram or telephone to the employee, directed to his or her last known address, and to the office of the Union.

     b.     Any such employee who does not report for work within twenty-four (24) hours, not including Saturdays or Sundays, after the date required to report, shall forfeit employment in that particular rehiring; but he or she shall be given the same consideration at the

5

EM000007

time of the next rehiring.  However, after the second recall, any employee who does not report for work forfeits his or her seniority.

### ARTICLE VII

### PROMOTIONS

7.1     Promotions to higher rated jobs shall be based upon seniority as well as competence and ability.  The Union shall be notified.

7.2     Whenever a promotion is offered to a member of the Union bargaining unit and such promotion is refused, then in that event said employee forfeits all rights to said promotion. However, should a subsequent promotion arise, then said employee must again be offered the promotion. After the second refusal, then in that event said employee shall forfeit all rights to said promotion for the duration of this Agreement.

7.3     In the event an employee accepts a promotion under this Article and thereafter requests voluntary transfer to his or her former classification, said employee will be deemed to have waived any claim to the job classification he or she has forfeited.

7.4     Notwithstanding anything herein contained to the contrary, the employee to fill the position of either console operator or checker, which both shall continue to be Union work performed by a member of the Union bargaining unit, shall be designated by and in the sole discretion of the Employer.

6

RL1 961351V1  11/07/11

## ARTICLE VIII

### DISCIPLNE/DISCHARGE

8.1     No non-probationary employee shall be discharged without good or just cause.

8.2     If the Employer decides to discharge any non-probationary employee for just cause, the employee shall be released immediately.  The Union, if it disputes the discharge, shall have the right to proceed to arbitration.

8.3     A doctor's note may or may not serve to excuse and otherwise unexcused absence.

8.4     Employees have the obligation to report any misdemeanors and/ or felony convictions which fall under the Alcohol Beverage Control Law 102, that take place after November 1, 2014.

## ARTICLE IX

### WAGES

9.1     Except as set forth in Section 9.3c. and d., warehouse employees covered by this Agreement shall receive general wage increases as follows:

> Effective November 1, 2014 - $40.00 per week
> Effective November 1, 2015 - $40.00 per week
> Effective November 1, 2016 - $40.00 per week.

9.2     General office or clerical employees covered by this Agreement shall receive general wage increases as follows:

> Effective November 1, 2014 - $40.00 per week
> Effective November 1, 2015 - $40.00 per week
> Effective November 1, 2016 - $40.00 per week.

9.3     Effective as of the date hereinafter set forth, the minimum classification rates for employees covered by this Agreement shall be as follows:

RL1  961351V1  11/07/11

EM000009

**RATES EFFECTIVE 11/01/14**:

| CLASSIFICATION | 11/1/14 | 11/01/15 | 11/01/16 |
|---|---|---|---|
| a.  Warehouse: | | | |
| 1.  Foreman (working) | $ 1,295.20 | $ 1,335.20 | $ 1,375.20 |
| 2.  Console Operators | $ 1,295.20 | $ 1,335.20 | $ 1,375.20 |
| 3.  Checkers, Shipping & Receiving Clerks | $ 1,295.20 | $ 1,335.20 | $ 1,375.20 |
| 4.  Hi-Lo Operators/Cherry Picker | $ 1,290.20 | $ 1,330.20 | $ 1,370.20 |
| 5.  Maintenance Employees | $ 1,285.20 | $ 1,325.20 | $ 1,365.20 |
| 6.  General Employees | $ 1,285.20 | $ 1,325.20 | $ 1,365.20 |
| 7.  Porters | $ 500.00 | $ 500.00 | $ 500.00 |
| b.  General Office or Clerical Employees | $ 525.00 | $ 525.00 | $ 525.00 |

c.  The classification rates set forth in Section 9.3.a and b. for Porters and General Office or Clerical Employees shall govern after the application of any applicable general wage increases under Sections 9.1 and 9.2.

d.  Warehouse employees first hired by the Employer on or after November 1, 1999, irrespective of per diem or regular employee status, shall be paid as follows:

(i)  From the employee's date of hire or for Per Diems, from the date that Per Diem seniority is achieved under paragraph 9.5 (c) -- 75% of the top rate of Seven Hundred Twenty Dollars ($720.00) weekly.

(ii)  Effective the employee's first anniversary of date of hire or date of achieving Per Diem seniority, an employee who has worked forty-five (45) days in the preceding twelve (12) months, exclusive of July, November and December, shall qualify to receive 80% of the top rate of Seven Hundred Twenty Dollars ($720.00) weekly.

8

(iii)    After two (2) years from the date of hire or date of achieving Per

Diem seniority – 90% of the top rate of Seven Hundred Twenty

Dollars ($720.00) weekly, if qualified as set forth in subsection (ii),

above.

(iv)    After three (3) years from the date of hire or date of achieving Per

Diem seniority Seven Hundred Twenty Dollars ($720.00), effective

his or her third anniversary, if qualified as set forth in subsection (iii),

above.

(v)    Following an employee's reaching the top rate of Seven Hundred

Twenty Dollars ($720.00) per week, he/she shall receive the general

wage increase in accordance with Section 9.1.

(vi)    Only upon reaching such top rate of Seven Hundred Twenty Dollars

($720.00) per week shall such employees be entitled to receive the

contractual two and one-half (2 1/2) hours per week of overtime. Prior

thereto, such employees will receive such other benefits as are set

forth in this Agreement for newly-hired employees.

(vii)    Effective November 1, 2014 upon reaching the top rate of $720/week,

the employees shall receive, each November 1, an increase of $2/hour

additional pay until the employee's pay is equal to that of a General

Employee as set forth in Section 9.3(a)(6).The final increase shall not

exceed the rate.

9.4    It is agreed that any employee may perform work in a lower or higher classification,

provided that while performing such work he or she shall receive the higher rate of pay.

9

EM000011

9.5     Temporary employees may be hired on a per diem basis, with pay pro-rated. However, in the event of a layoff, no per diem employees shall be hired.

      a.     Should the Employer, from time to time, in its sole discretion desire to employ temporary employees on a per diem basis when its full seniority list is working, then such per diem employees shall be entitled to any five (5) days' work spread over a two (2) consecutive week period.

      b.     The Employer may, in its discretion, replace with a temporary employee, on a per diem basis, any regular employee who may be temporarily absent for any reason whatsoever or on vacation. However, this provision shall not apply where the regular employee is absent by reason of extended illness or leave of absence.

      c.     A per diem employee can establish seniority, for hiring purposes only, after having worked for the Employer for a period of forty-five (45) working days, exclusive of July, November and December.

9.6     In addition to the wages set forth above, all employees first employed prior to November 16, 1987 and all other employees who qualify consistent with Section 2.2 shall be entitled to receive Ten Dollars ($10.00) per week for a forty (40) hour week, as a mandatory cost-of-living increase for each week in which the employees have accrued wages (accrued on a daily basis), such payments to be paid to the employees by separate checks in quarterly installments, commencing with the first payroll dates following January 31, April 30, July 31 and October 31 of each year.

RL1  961351V1  11/07/11

EM000012

## ARTICLE X

### SHIFT DIFFERENTIAL AND PREMIUM PAY

10.1    Employees required to report for work on other than the regular day-time shift, shall receive a wage premium of 10% of their gross weekly wage.

### ARTICLE XI

### TRANSFER

11.1    Any and all transfers from one shift to another shall be with the consent of the Union. In the event of an open assignment, senior employees shall have preference and choice concerning such transfers.

11.2    Whenever a transfer is offered to a member of the Union bargaining unit employee and such transfer is refused, then in that event said employee forfeits all rights to said transfer. However, should a subsequent transfer arise, then said employee must again be offered the transfer. However, after the second refusal, the employee shall forfeit all rights to any transfer under this Article for the duration of this Agreement.

### ARTICLE XII

### HOURS

12.1    A week's work for warehouse employees shall consist of forty (40) hours per week, divided into eight (8) hours per day, from Monday to Friday, inclusive.

12.2    A week's work for office employees shall consist of thirty-five (35) hours per week, divided into seven (7) hours per day, from Monday to Friday, inclusive.

12.3    Any past practice of the Employer presently in effect at any of its facilities as to the starting time for the day and/or night shifts shall be permitted to continue without change.

11

EM000013

12.4    The work day shall exclude one (1) hour for lunch or supper to be given after one-half (1/2) of the day or night shift shall have been worked.

12.5    The day shift shall commence no earlier than 8:00 A.M. and no later than 9:00 A.M. for the entire warehouse.

12.6    The day shift shall commence no earlier than 8:00 A.M. and no later than 9:00 A.M. for the entire office. The Employer may start all or any of its office crew during the day shift at 8:00 A.M., 8:30 A.M. or 9:00 A.M.

12.7    The night shift for warehouse employees shall consist of forty (40) hours per week, divided into eight (8) hours per night, from Monday to Friday, inclusive.

12.8 The night shift for office employees shall consist of thirty-five (35) hours per week, divided into seven (7) hours per night, from Monday to Friday, inclusive. Any past practice of the Employer presently in effect as to the starting time of this shift shall be permitted to continue without change.

12.9    The night shift for both warehouse and office employees shall commence immediately following the termination of the day shift, or any other time no later than 10:00 P.M. The night shift may be divided into two (2) separate and distinct work groups with different regular starting times.  Seniority shall not be applied in this instance.  Any changes to the starting time will be kept for a six (6) month period.  The Employee will be given thirty (30) days advanced notice of any change in the starting time.

12.10   Employees shall be allowed five (5) minutes at the start of the work day or night, to prepare for work, and five (5) minutes wash up time, at the end of the work day or night, and said time shall be considered as time worked.

12

EM000014

12.11   The Employer will have the option to hire up to five (5) part time clerical employees to be used in the customer service and order departments only. They may be used on a daily basis and their hours of employment shall commence no earlier than 1:00 P.M. and end no later than 5:00 P.M.

These employees will not replace or substitute for any full time clerical employee. Their hourly wage will be a minimum of Nine Dollars and twenty-eight cents ($9.28) per hour and they shall not be entitled to any general increase as a condition of their part time status.

A separate part time seniority list will be established for hiring purposes only.

Part time employees should be given first consideration for full time employment.

As a condition of this part time status, said employees will be deemed probationary until such time as they have completed ninety (90) working days exclusive of July, November and December.

During such probationary period, the Employer shall have the right to terminate a Part Time Probationary employee without cause.

The Employer shall contribute to the Major Medical and Pension Plans for this group of employees, however these employees will not be entitled to any other benefits of any nature either expressed or implied within this Agreement.

## ARTICLE XIII

## OVERTIME

13.1   Overtime work shall be such work performed in excess of eight (8) hours in any one (1) day or night by warehouse employees, as hereinbefore provided.

13.2   Overtime work for office employees shall be such work performed in excess of seven (7) hours in any one (1) day or night, as hereinbefore provided.

13

EM000015

13.3    Two and one-half (2 1/2) hours per week of guaranteed working overtime (Monday through Friday) shall be made available to each eligible warehouse employee.

13.4    Upon completion by an office employee of thirty-five (35) hours of work plus five (5) hours of overtime, the Employer must make available to such office employee an additional two and one-half (2 1/2) hours of guaranteed working overtime for that week, to be given that week or in the following week.

13.5    Once the two and one-half (2 1/2) hours guaranteed weekly overtime is scheduled, subject to conditions and necessities of business operations which may require deviation, such schedule shall be established for a period of six (6) months, unless the employee and the Employer mutually agree otherwise.

13.6    Whenever overtime of one-half (1/2) hour or more is offered and made available to an employee, and the employee does not work the offered overtime or is absent, then the Employer on such occasion will deduct a maximum of one (1) hour from the employee's two and one-half (2 1/2) hours guaranteed weekly overtime.

13.7    All work performed before and after the regular starting time and all work in excess of eight (8) hours in any one (1) day or night or more than forty (40) hours in any one (1) week by warehouse employees as hereinafter provided shall be considered overtime work.  All work performed before and after the regular starting time and all work in excess of seven (7) hours in any one day or night or more than thirty-five (35) hours in one (1) week by office employees as hereinafter provided shall be considered overtime work.

13.8    All overtime work shall be shared equally as far as practicable among all employees.

13.9    Any warehouse employee who refuses his or her turn to work overtime when offered to him or her must thereupon forfeit his or her overtime until the complete cycle has been fulfilled.

14

EM000016

13.10   Any and all work performed on Saturday shall be paid at the rate of time and one-half the regular rate of pay. This means that the employee shall receive a total of one and one-half (1 1/2) days' pay for working on a Saturday, whether work is available or not. There shall be no work on any Saturday whatsoever without the consent of the Union.

13.11   Any and all work performed on Sunday shall be paid at the rate of one (1) regular day's pay plus one and one-half (1 1/2) times the regular rate of pay. This means that the employee shall receive a total of two and one-half (2 1/2) days' pay for working on a Sunday, whether work is available or not. There shall be no work performed on any Sunday without the consent of the Union.

13.12   All work performed before and after the normal schedule day or night shift shall be paid for at the rate of time and one-half.

13.13   Any and all work performed on Sundays and Holidays shall be paid for at the rate of two and one-half (2 1/2) times the regular rate of pay.

13.14   Employees are to receive a paid fifteen (15) minute break after two (2) hours of work in the first part of their regular shift and a like paid fifteen (15) minute break after two (2) hours of work in the second part of their regular shift. The schedule for such breaks shall be agreed upon between the Employer and the Union and shall be as close as practicable to the middle of an employee's work period.  A fifteen (15) minute break at the beginning of an overtime period shall be granted to an employee who is scheduled to work one (1) hour of overtime, with a further fifteen (15) minute break for each two (2) hours of overtime after the initial break.

13.15   In the absence of a layoff the Employer may request its warehouse employees and office employees to work a reasonable amount of overtime per day, but all other overtime shall require the consent of the Union, which consent shall not be unreasonably withheld. Except in

RL1  961351V1  11/07/11

EM000017

emergencies, employees shall be given a reasonable notice of overtime work. "Reasonable" for this

purpose shall be construed to mean at least three (3) hours' notice.

## ARTICLE XIV

## EMERGENCY WORK

14.1    In the event of an emergency or such other condition which results in breakdown of

the means for transportation to the Employer's premises, an employee who does not appear at the

Employer's premises need not be paid for that day.

## ARTICLE XV

## HOLIDAYS

15.1    All regular employees, except those on leave of absence, shall be guaranteed one (1)

day's pay for the following holidays and paid for same, whether they work or not, subject however,

to Section 15.8.  A regular employee out sick or on compensation cannot claim holiday pay beyond

a one (1) year period. Employees who receive holiday pay for any period which they are eligible for

benefits under Workers Compensation or  Disability Insurance shall receive payment under this

section from the company only. The Company shall notify the appropriate carrier and shall apply

for reimbursement for such payments.

| | |
|---|---|
| New Year's Day | Yom Kippur |
| Martin Luther King, Jr.'s Birthday | Columbus Day |
| Lincoln's Birthday | Election Day |
| Washington's Birthday | Veterans' Day |
| Good Friday | Thanksgiving Day |
| Memorial Day | Friday following |
| Independence Day | Thanksgiving Day |
| Labor Day | Christmas Day |

16

EM000018

15.2    Where any of the above holidays falls on a Saturday, it shall be celebrated on the preceding Friday.

15.3    Any employee who is not a regular employee shall qualify for holiday pay if he or she (i) was first hired prior to November 16, 1987 or qualifies consistent with Section 2.2 and (ii) works two (2) days during any calendar week in which a holiday occurs, whether or not said two (2) days are worked prior to or after the holiday.

15.4    Where the eve of Yom Kippur shall fall on Friday night, the employees on the night crew, except for those who observe this holiday, may work upon such terms and conditions as shall be mutually agreed upon between the employees and the Employer.

15.5    The night crew shall report for work after sundown on Yom Kippur Day except where Yom Kippur falls on a Monday, in which event that Monday night shall be the holiday for the night crew.

15.6    No work shall be performed on Good Friday or (beyond 4:00 P.M. -- Kol Nidre) on Yom Kippur.

15.7    Any and all work performed on any of the above mentioned holidays herein shall be paid at the rate of one (1) regular day's pay plus one and one-half (1 1/2) times the regular rate of pay.  This means that the employee shall receive a total of two and one-half (2 1/2) days' pay for working on said holidays.

15.8    All employees shall receive their holiday pay even though the holiday may fall on a non-working day, including the period of an employee's vacation.  However, an employee shall not be entitled to holiday pay when the holiday falls on an All Purpose Leave Day, or during a Leave of Absence.

RL1  961351V1  11/07/11

EM000019

15.9    All regular employees who have been in the employ of the Employer for one (1) year, continuously or accumulated, shall be guaranteed a day's pay and shall not be required to perform any work on their Birthday. In the event that the employee does not utilize said day off they will be granted permission to use that day off within one year. The date to be determined by mutual agreement.

15.10   In the event an employee's Birthday shall fall on a Saturday, Sunday or during the employee's vacation, said employee shall receive an additional day off or an additional day's pay in lieu thereof

15.11   Where two (2) of the above-mentioned holidays shall fall on the same day, if on a Monday, that Monday and the preceding Friday shall be celebrated as paid holidays. If the two (2) holidays shall both fall on any other day of the work week, that day and either the preceding or following day of the holiday shall be celebrated as paid holidays.

## ARTICLE XVI

## VACATIONS

16.1    All employees who have been in the employ of the Employer for one (1) year or more and qualify in accordance with the terms of this Agreement shall receive two (2) consecutive weeks' vacation annually with full pay at their regular rate.

16.2    All employees in the employ of the Employer for five (5) years or more shall receive three (3) weeks' vacation with full pay annually at their regular rate.

16.3    All employees in the employ of the Employer for ten (10) years or more shall receive four (4) weeks' vacation with full pay annually at their regular rate.

16.4    All employees in the employ of the Employer for seventeen (17) years or more shall receive five (5) weeks' vacation annually with full pay at their regular rate.

EM000020

16.5     Vacations shall be granted during the industry-wide shutdown periods, which shall be as follows:

> 2015 Vacation Period - Two consecutive weeks commencing July 20 and July 27.
>
> 2016 Vacation Period - Two consecutive weeks commencing July 18 and July 25.
>
> 2017 Vacation Period - Two consecutive weeks commencing July 17 and July 24.

16.6     Employees shall receive such yearly vacation as set forth hereinabove, if they have completed their length of service on or before September 30th of the vacation year. All employees who have completed the necessary length of service to be eligible for vacation on or before September 30th of the vacation year, but subsequent to the vacation period, if not granted vacation during the vacation period, shall receive such vacation at any time during the months of June, July, August and September.

16.7     Employees receiving three (3), four (4), and five (5) weeks' vacation with pay shall receive their vacations during the periods between:

> 2014 Vacation Period - Between August 1, 2014 and May 31, 2015.
>
> 2015 Vacation Period - Between August 1, 2015 and May 31, 2016.
>
> 2016 Vacation Period - Between August 1, 2016 and May 31, 2017.

16.8     Employees eligible for a third, fourth and fifth week of vacation shall receive same, whenever practical, consecutively. In the event the third, fourth and fifth week of vacation cannot be granted consecutively, such third, fourth and fifth weeks of vacation shall be scheduled pursuant to agreement made between the Employer, the employee and the Union. In the event the third, fourth and fifth weeks of vacation cannot be scheduled consecutively, the third week of vacation shall be scheduled in accordance with Section 16.7 and the fourth and fifth week of vacation may be compensated for by scheduling extended weekend leaves for the eligible employees.

RL1  961351V1  11/07/11

EM000021

16.9    Employees shall receive such yearly vacation period with full pay when employed by the Employer for a period of one (1) year, in accordance with the terms hereof.

16.10   Such employee shall be entitled to the said yearly vacation annually, whether he or she shall have worked for the Employer one (1) year continuously, or one (1) year accumulated time within any three (3) year period, regardless of whether the employee shall have received previous vacations.

16.11   Whether an employee has worked for the said Employer for one (1) year continuously or one (1) year accumulated time, as hereinbefore provided, and is laid off or otherwise terminated prior to the commencement of the period during which yearly vacations are to be taken or given, then and in that event, such employee, so laid off or otherwise terminated, shall receive the said yearly vacation with full pay, irrespective of the fact that he or she has been laid off or otherwise terminated, prior to the commencement of the yearly vacation period. Employees when leaving the employ of the Employer for any reason, shall be paid vacation money according to their earned vacation, calculated as of the eligibility date, September 30th.

16.12   It is agreed that in regard to Sections 16.9 and 16.10 that where a temporary or regular employee has received a vacation for one (1) year's employment or one (1) year's accumulated employment, as hereinbefore provided, before being entitled to a full vacation in the following year or years, he or she must have completed, within that year, sixteen (16) weeks' work for the Employer between the last vacation date and September 30th. If the temporary or regular employee shall have completed at least eight (8) weeks but less than sixteen (16) weeks for the Employer, between the last vacation date and September 30th, then he or she shall be entitled to one-half (1/2) of his or her vacation. A temporary or regular employee shall not receive any

20

vacation if he or she shall not have completed at least eight (8) weeks' work for the Employer during the period described.

16.13   Should any of the holidays mentioned hereinabove occur during the vacation period of any employee, said employee shall receive an additional day's vacation or an additional day's pay in lieu thereof

16.14   All compensation days shall be counted as days worked for vacation credits. Employees who receive vacation pay from any period during which they are eligible for benefits under Workers Compensation or Disability Insurance shall receive payment under this section from the company only. The Company shall so notify the appropriate carrier and shall apply for reimbursement for such payments.  Employees out on compensation cannot claim vacation pay beyond a one (1) year period.

16.15   SHUT-DOWN PERIOD: There will be a shut-down period in January as follows:

2015 – Week of January 12th.

2016 –Week of January 11th.

2017 – Week of January 9th .

16.16   Employees first hired after November 15, 1987 shall not qualify to begin accruing vacation pay until they have become regular employees or they have qualified in accordance with Section 2.2 and related provisions of this Agreement.

## ARTICLE XVII

## ALL PURPOSE LEAVE

17.1   All regular employees covered by this Agreement and in the employ of the Employer who shall have had one (1) full year of employment or more, shall be granted ten (10) paid All Purpose Leave Days during each contract year.  The employee shall give at least forty-eight (48)

21

hours' advance notice to the Employer of intent to utilize any day of leave, except where leave is necessitated by illness, and permission shall be granted for the leave subject to only business requirements.  All per diem employees in the Company's employ for one (1) year, shall be entitled to five (5) paid All Purpose Leave Days during each contract year. Effective November 1, 2014 perdiem/clerical employed for less than one (1) year shall accrue all purpose days at the rate of one (1) hour for every thirty (30) hours worked up to a maximum of forty (40) hours in that year. Thereafter the foregoing benefit applies.

     17.2   Unused All Purpose Leave Days may, at the end of the contract year, be taken as additional wages or used as additional vacation time by the employee, by mutual agreement.

     17.3   Based on the time off accruals under this agreement the union waives application of ESTA to the bargaining unit.

22

EM000024

## ARTICLE XVIII

## MEMORIAL LEAVE

18.1    In case of death in an employee's immediate family, the employee shall be granted five (5) working days off with pay. "Immediate family" shall be the individual with a current relationship to the employee of spouse, parents, step-parents, grandparents, sisters, step-sisters, brothers, step-brothers, children, step-children, mother-in-law, father-in-law, sister-in-law, brother-in-law, son-in-law, daughter-in-law and grandchildren.

18.2    If a death in the employee's "immediate family" as defined in Section 18.1 shall occur when the employee is not actually scheduled to work, excepting vacation and holidays, the employee shall not receive five (5) days' pay as Memorial Leave.

## ARTICLE XIX

## MAJOR MEDICAL PLAN

19.1    Effective November 1, 2014, the Employer agrees to contribute to the Local 1-D Major Medical Plan the sum of Nine Hundred Sixty Dollars ($960.00) per month per employee, consistent with the terms of the Agreement and Declaration of Trust. Effective November 1, 2015, such contribution will increase to a maximum of Nine Hundred Eighty Dollars ($980.00), if needed, per month per employee. Effective November 1, 2016, such contribution will increase to a maximum of One Thousand Dollars ($1,000.00), if needed, per month per employee.  Weekly loss-of-time benefits will be provided by the Employer through an outside carrier at the maximum rate of Three Hundred Dollars ($300.00) per week. The Major Medical Plan must meet the requirements of the Affordable Care Act ("ACA").

19.2    All employees of the Employer who are not working due to illness or injury shall hold seniority during said illness or injury, and the Employer shall continue to make the agreed

23

EM000025

contributions monthly to the Local 1-D Major Medical Plan for each of said employees for a period

not to exceed eleven (11) months.  All employees hired after November 1, 2011, shall maintain

seniority for illness or injury for a period of two (2) years.

19.3    If an employee has been discharged, the Employer shall continue to make

contributions to the Local 1-D Major Medical Plan provided herein until the earlier of the date of

the arbitrator's decision or two (2) months from the date of the employee's discharge.

19.4    This Article shall be construed to be a material part of this Agreement, and also the

essence of the relationship between the parties; and the Employer assures full responsibility for

coverage for all employees in the event of any loss sustained by an employee or his or her family

resulting from the negligence or failure of the Employer to make regular contributions to the Fund,

and the Employer shall become personally liable for any such loss. Payments shall be made no later

than the 10th day of the following month.

19.5    Social and Welfare benefits provided for in this Article shall cover any Social and

Welfare payments required by present and future State and Federal Law as an obligation to the

Employer together with any additional benefit that such Social and Welfare Insurance Plan may,

from time to time arrange.

24

EM000026

## ARTICLE XX

## PENSION FUND

20.1     Effective November 1, 2014, the Employer agrees to contribute to the Local 1-D Pension Fund the sum of Two Hundred Ninety Dollars ($290.00) per month per employee, consistent with the terms of the Agreement and Declaration of Trust. Effective November 1, 2015, the Employer agrees to contribute to the Local 1-D Pension Fund the sum of Three Hundred Ten Dollars ($310.00) per month per employee.  Effective November 1, 2016, the Employer agrees to contribute to the Local 1-D Pension Fund the sum of Three Hundred Thirty Dollars ($330.00) per month per employee.

20.2     The obligation of the Employer to make the contribution as above provided is conditioned upon and subject to a ruling by the Internal Revenue Service that the Pension Fund qualifies as a tax free plan under the Internal Revenue Code.

20.3     The Employer agrees to continue contributions to the Local 1-D Pension Fund on behalf of covered employees who are absent from their jobs due to illness or injury for a period not to exceed six (6) months.

## ARTICLE XXI

## SEVERANCE FUND

21.1     There shall be a moratorium on Employer contributions to Wine, Liquor and Distillery Workers Union Local 1-D Severance Trust Fund ("Severance Fund") for the duration of this Agreement, unless an actuary shall certify to the Severance Fund and the Employer that a resumption of contributions is necessary to the soundness of the Fund. Should there be such an actuarial certification, Employer contributions of not more than Five Dollars ($5.00) per month

25

EM000027

shall resume commencing such date following the certification and continuing for such period as the actuary shall certify is necessary.

21.2    All employees of the Employer who are not working due to illness or injury, shall hold seniority during said illness or injury and the Employer shall continue to make the agreed contributions monthly to the Severance Trust Fund consistent with Section 21.1 for each of said employees for a period not to exceed six (6) months.

## ARTICLE XXII

## EMPLOYER COMPLIANCE

22.1    The Employer agrees that the Trust Agreements establishing the aforementioned Local 1-D Major Medical Plan, Local 1-D Pension Fund and Local 1-D Severance Trust Fund, shall be deemed fully set forth herein, and the terms thereof shall be deemed binding upon it as a signatory to the respective Trust Agreements.

22.2    In the event the Employer defaults in payment of contributions as required for each of the above referred to Funds, and such default continues for ten (10) working days after notice of default has been served upon the Employer by ordinary mail, the "no-strike and lockout" provisions of this Agreement shall be deemed waived and a strike or stoppage called by the Union shall not be considered a breach of this Agreement.

22.3    For the purpose of this Agreement, the Union may be considered a contributing Employer to the Local 1-D Major Medical Plan, the Local 1-D Pension Fund and the Wine, Liquor and Distillery Workers Union Local 1-D Severance Trust Fund on behalf of officials and employees of the Union.

RL1  961351V1  11/07/11

EM000028

## ARTICLE XXIII

## COMPENSATION COVERAGE

23.1     Whenever any employee injured on the job is out on compensation for fifteen (15) working days, the Employer shall pay his or her first seven (7) days' wages. In the event the employee receives a settlement which includes his or her first seven (7) days' wages, then such employee must reimburse the Employer for the first week's compensation pay received from the Workers' Compensation Board.

23.2     The Union agrees to the continuation of the Preferred Provider Organization arrangement consistent with the New York Workers' Compensation Law and applicable regulations, and it will execute appropriate documents in furtherance thereof.

## ARTICLE XXIV

## SHOP STEWARDS

24.1     The Employer recognizes the right of the Union to designate Shop Stewards and Assistants.

24.2     An employee covered by this Agreement shall be designated as Shop Steward. There may be a Shop Steward for the warehouse and a Shop Steward for the office.

24.3     The Shop Steward shall at all times maintain preferred seniority over any and all other employees, irrespective of the term of their employment.

24.4     The said Shop Steward is authorized to meet with the Employer for the purpose of aiding in the settlement of any disputes arising between the Employer and its employees. The Shop Steward shall be in the plant at all times, whenever practicable.

RL1  961351V1  11/07/11

EM000029

24.5   It is agreed, however, that with respect to office work, the Shop Steward need not be present if only a part of the office force is working on the type of work to which he or she is not normally assigned.

24.6   Where the Shop Steward is called upon for the purpose of settling a grievance, he or she shall do so at the Employer's premises and on Employer time.

24.7   In the event that such parties fail to settle such dispute, a Union representative shall negotiate with the Employer to aid in the settlement of any such dispute.

24.8   The Union reserves the right to remove the Shop Steward and/or Assistant at any time.

    a.   Shop Stewards and Assistants have no authority to take strike action or any other action interrupting the Employer's business, except as authorized by official action of the Union.

    b.   The Employer recognizes these limitations upon the authority of Shop Stewards and their Assistants, and shall not hold the Union liable for any unauthorized acts. The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the Shop Steward has taken unauthorized strike action, slowdown, or work stoppage, in violation of this Agreement.

24.9   Shop Stewards shall receive Ten Dollars ($10.00) above their classification rate of pay to take care of expenses and additional time in processing and discussing grievances with the Employer.

RL1  961351V1  11/07/11

EM000030

## ARTICLE XXV

## UNIFORMS AND MATERIALS

25.1    The Employer agrees that, where it requires its employees to wear uniforms, it will furnish and launder such uniforms, as may be necessary from time to time, without any charge or cost to employees. The Employer also agrees to furnish tools, gloves, safety equipment if required for any work to be performed.

25.2    Where safety rules are required by the Employer, the employees must comply.

## ARTICLE XXVI

## SAFETY AND HEALTH CONDITIONS

26.1    The Employer agrees to maintain healthful, safe, properly lighted and well heated places for the performance of all work, so far as the character of the work done will permit.

26.2    The Employer shall supply to all employees proper and appropriate space and/or lockers for dressing purposes.

26.3    An employee who has been off from work due to illness or injury shall be permitted to return to work upon the presentation to the Employer of a certificate from the employee's physician attesting to the employee's physical fitness.

26.4    Employees will abide by the employers Anti-Weapon Policy with the exception for hunting season in N.Y. Provided that the employee notifies the employer that there is a hunting weapon in the employees vehicle and such possession is in compliance with Federal, New York State and City laws and regulations attached under Exhibit "B".

RL1  961351V1  11/07/11

EM000031

## ARTICLE XXVII

### ACCIDENTAL BREAKAGE

27.1    The Employer agrees not to charge its employees for any accidental breakage.

## ARTICLE XXVIII

### LONG AND FAITHFUL SERVICE

28.1    Employees who have been in the employ of the Employer for ten (10) or more years, and who have become unable to handle heavy work to advantage, will be given light work in and around the plant if such light work is available.

28.2    If a dispute shall arise as to the employee's ability to perform a normal day's work, the same shall be submitted to arbitration as provided for in this Agreement.

## ARTICLE XXIX

### VISITATION

29.1    It is agreed by the Employer that the Union representatives will have access to the plant during working hours to ascertain whether this Agreement is being properly observed, providing there is no interruption of the normal course of the operation in the plant.

## ARTICLE XXX

### BULLETIN BOARDS

30.1    The Employer shall provide in its establishment bulletin boards upon which notices concerning the official Union business may be posted, or otherwise as the Union may direct.

RL1  961351V1  11/07/11

EM000032

## ARTICLE XXXI

### JURY DUTY

31.1    Any regular employee who is required to serve on a jury of any type shall be paid, by the Employer, the difference between the fee paid said employee for such jury duty and the employee's regular wage per day for all such days that the employee shall serve on such jury. Employees shall not solicit any jury duty; they shall notify the Employer of the service of a jury notice upon them within forty-eight (48) hours of its service; they shall permit the Employer to request in their behalf a change in the time of service stated in the jury notice, and they shall not be required to report to work during the period of jury service.

## ARTICLE XXXII

### PRIOR BENEFITS

32.1    It is understood and agreed that this Agreement shall not in any way alter, change or deprive any of the employees of working conditions they are now enjoying, or working under, which are better than those specified in this Agreement, and they shall continue to receive such better conditions during the life of this Agreement.

## ARTICLE XXXIII

### LEGISLATION

33.1    In the event that legislation, Federal or State, should be enacted, reducing the work week below that specified in this Agreement, in this particular industry or in this State, such reduction of the work week shall be put into effect with no reduction in wages.

31

EM000033

## ARTICLE XXXIV

## LEAVE OF ABSENCE

34.1    The Employer shall grant leaves of absence consistent with its Family and Medical Leave Act Policy. For all other leaves of absence, any employee requesting for reasonable cause a leave of absence shall be granted such leave of absence, without pay, for a limited time with the privilege of renewing same, provided that he or she first discusses the request with the Union and the Employer, in order that they may agree upon a mutually convenient time in which to take such leave.

34.2    Any employee on leave of absence who without the consent of the Employer and the Union shall engage in other employment shall be considered as having resigned without notice.

34.3 Any employee on leave of absence who shall fail to report for work on or before the expiration of his or her leave of absence shall be considered as having resigned without notice.

## ARTICLE XXXV

## LEAVE OF ABSENCE FOR MILITARY OR UNION SERVICE

35.1    In the event any employee now or hereafter shall be or become engaged in military service of the United States for the purpose of training or otherwise, the employee shall be given a leave of absence for such period of service without prejudice to his or her seniority rights. At the termination of his or her service, the employee shall be re-employed within ninety (90) days from the time of his or her discharge from the military service and given the same job that the employee had at the time he or she left for the service, and shall be paid fully in accordance with the provisions of this Agreement or the Agreement in effect at the time of the employee's resumption of service with the Employer.

RL1  961351V1  11/07/11

EM000034

35.2    Any employee who is designated or elected by the Union to work for the Union on a full-time basis shall be granted a leave of absence with no loss of seniority for the duration of his or her full-time employment, provided the employee reports back to the Employer within ninety (90) days after his or her employment with the Union is terminated and does not work for any other employer in the industry during such period.

## ARTICLE XXXVI

## INDIVIDUAL AGREEMENTS

36.1    The Employer and employees will not enter into any individual agreements which may in any way modify or alter the terms of this Agreement.

## ARTICLE XXXVII

## SEPARABILITY

37.1    It is the intention of the parties that this Agreement conform to all existing and future Federal and State legislation. If any modification is necessary to effect such compliance, this Agreement is deemed to be automatically modified in such respects. All other provisions of this Agreement are to remain unaltered.

## ARTICLE XXXVIII

## EMPLOYER PERFORMANCE

38.1    During the term of this Agreement, the Employer shall not operate, maintain or conduct any establishment or place of business similar to the one now maintained, operated or conducted by it for the purpose of evading this Agreement.

38.2    It is agreed that the Employer will not store any merchandise in any warehouse or place of storage as a subterfuge to defeat this Agreement.

33

EM000035

## ARTICLE XXXIX

## RELOCATION OF COMPANY AND TRANSFER OF EMPLOYEES

39.1     Whenever an employee is transferred to a new plant or new company location outside the present area where the plant is now located, the Employer shall pay additional traveling costs and/or expenses as may be agreed upon with the Union to those employees who are adversely affected by such transfer or plant removal. The Union and the Employer shall agree as to the determination of the employees who are to be considered as being "adversely affected."

## ARTICLE XL

## NO STRIKES OR LOCKOUTS

40.1     There shall be no strikes or lockouts during the term of this Agreement.

40.2     No employee may be discharged or otherwise disciplined for refusing to cross a legal picket line.

40.3     Employees may participate in all Union activities, strikes, and boycotts, as may be permitted by existing legislation, or any other decisions or amendments.

## ARTICLE XLI

## ARBITRATION

A.     GRIEVANCE PROCEDURE

41.1     Step 1:  The Shop Steward shall be given reasonable time, with the consent of the designated Employer supervisor, to informally investigate any differences arising under this Agreement.

41.2     Step 2:  If the matter cannot be resolved as set forth at Step 1, any complaint, dispute or grievance arising under this Agreement and during its term involving questions of interpretation or application of any provision of this Agreement shall be submitted in writing by the party

EM000036

claiming to be aggrieved to the other party within five (5) working days after the occurrence of the event giving rise to the complaint, dispute or grievance. If the grievant is an employee, the grievance must be signed by both the Shop Steward and the grievant and accepted in writing by a designated Employer representative. The Employer shall answer the grievance in writing within five (5) working days, and if it does not, the grievance shall be considered denied and shall proceed to the next step.

41.3    Step 3:  The Shop Steward will then have five (5) working days to appeal the Employer's decision to the Employer's designated Manager and an officer of the Union. The parties will arrange to meet jointly within ten (10) working days. The Employer shall render a final decision in writing within five (5) working days after such meeting. Failure by either party to meet the time limits set forth at this Step 3 shall result in the grievance proceeding to the next step.

41.4    Step 4:  If the matter remains unresolved at Step 3, either party may initiate arbitration within five (5) working days, as set forth below.

B.    ARBITRATION

41.5    The grievance shall be submitted at the request of either party to arbitration before an arbitrator selected by the parties. In the event the parties cannot agree on an arbitrator, the Labor Arbitration Rules of the American Arbitration Association ("AAA"), will be used for the selection of an arbitrator. The Employer agrees to pay the AAA's required administrative filing fees for each of the first eight (8) total arbitrations filed against or by the Employer on and after November 1, 2011.

41.6    The Shop Steward and grievant shall be entitled to be present at each step of the grievance and arbitration procedures set forth in this Article.

RL1 961351V1  11/07/11

EM000037

41.7    No time limitation set forth in this Article shall be deemed waived unless both parties have agreed to such waiver in writing, and untimely grievances shall be deemed barred.

## ARTICLE XLII

## NEW WAREHOUSE OPERATION

42.1    Subject to a National Labor Relations Board determination, the Union shall have jurisdiction over any newly acquired plant which may be owned, operated and controlled by the Employer or any new wholesale operation that the Employer may open within the jurisdictional area of this Union namely (the States of New York, New Jersey and Connecticut). The Union and the Employer agree to negotiate the terms and conditions of employment, relative to the newly acquired plant or new wholesale operation.

RL1   961351V1   11/07/11

EM000038

## ARTICLE XLIII

## SUCCESSORS

43.1    This Agreement shall be binding upon the Union and the Employer herein, and their respective successors, heirs, executors, administrators, assignees, receivers, receivers in bankruptcy, receivers in equity, trustees, or such other equivalent designee whether voluntary or pursuant to a Court decree.

43.2    In the event the Employer acquires or merges with another company, there shall be an integrated seniority list based upon employment with either company; such seniority to carry over as to any benefits or conditions which are applicable after the required number of years of service.

## ARTICLE XLIV

## DRUG AND ALCOHOL PROGRAM

44.1    Effective January 1, 2015 all employees covered under this agreement shall be subject to the Drug and Alcohol Program attached under Exhibit "A".

## ARTICLE XLV

## TERMINATION

45.1    This Agreement shall be in effect as of the 1st day of November, 2014, and shall terminate on the 31st day of October 2017.

45.2    In the event of legislation having been passed or effective judicial action concerning:

     a.     abolition of price-posting;

     b.     establishment of chain-store licensees;

     c.     permission of licensees to buy as a group;

     d.     change in credit law; or

37

EM000039

e.      the pickup or return of used bottles.

45.3    The Employer, upon written notice to the Union not later than ten (10) days following the occurrence of any one or more of the listed events at any time or times during the term of this Agreement, may reopen this Agreement for the intended purpose of addressing revision of this Agreement as a consequence of any such change.

45.4    If no Agreement has been reached within twenty (20) days after receipt by the Union of such notice, the Employer may terminate this Agreement and the Union shall have the right to strike.

SIGNED FOR EMPIRE MERCHANTS, LLC:

_____

By:_____

SIGNED FOR THE UNION:

WINE, LIQUOR & DISTILLERY
WORKERS UNION LOCAL l-D, AFL-CIO,CLC
8402 18TH AVENUE
BROOKLYN, NEW YORK 11214

George J. Orlando, President
Frank Cognetta, Secretary Treasurer

By:_____

By:_____

RL1  961351V1  11/07/11

EM000040

## EXHIBIT "A"

## DRUG AND ALCOHOL TESTING PROGRAM

I.   POLICY

The Company is concerned about the use of alcohol and controlled substances in or affecting the work environment.  Use, and particularly abuse, of alcohol and/or controlled substances on the job adversely affects an employee's efficiency, safety and health, and therefore impairs his/her value as an employee.  In addition, it constitutes a potential danger to the welfare of other employees, and exposes the company to risks of property loss/damage, or injury to other persons.

Therefore, it is the policy of the Company that no employee will be allowed to work who misuses prescription drugs or who possesses, distributes, sells, offers to sell or distribute, uses or who has a forensically acceptable positive quantum of proof (as set forth herein) of any drug, controlled substance or alcohol in his or her body.  Any employee who violates this policy is subject to immediate discharge.

This policy is applicable to all employees of the Company.  The requirements of this procedure will also be applied to all employees reporting a potential or actual industrial injury, any employee who contributed to or directly caused an occupational accident, or any employee suspected of being under the influence of controlled substances or alcohol while working.

II.  DEFINITIONS

A.   For purposes of this policy, an employee shall be considered "on the premises" whenever he/she is:

(1)  On Company property, including parking lots.

(2)  At a job site

(3)  Driving or riding as passenger in a Company vehicle or a private conveyance for which the Company has authorized reimbursement.

B.   "Drug" or "controlled substance"—any substance or medication that will modify one or more of the normal body functions when administered to any individual (i.e., coordination, reflexes, vision, mental capacity or judgment, etc.).

C.   "Alcohol"—an intoxicant from fermented or distilled liquors.

39

EM000041

III.   PROCEDURE

In order to eliminate the safety risks, which result from being under the influence of alcohol or drugs, the parties have agreed to the following procedures:

In cases in which an employee is acting in an abnormal manner and the Employer has "probable suspicion" to believe that the employee is under the influence of controlled substances and/or alcohol, the Employer may require the employee (in the presence of a Union Shop Steward, if possible) to go to an on-site or off-site medical clinic, medical office or dispensary to provide a urine specimen for laboratory testing.  Probable suspicion means suspicion based on specific personal observations that the Employer representative can describe concerning the appearance, behavior, speech, or breath odor of the employee.  Employer agrees that management personnel shall undergo a program to educate them as to the signs and/or symptoms of abnormal behavior by employees.  An employee's involvement in an industrial accident or injury constitutes probable suspicion, regardless of whether reported at the time of the injury or thereafter.  Except for suspicion based on an industrial accident, suspicion is not probable and thus not a basis for testing if it is based solely on third-party observation and reports. If requested, the employee will sign a consent form authorizing the clinic, office or dispensary to collect a urine/blood specimen and release the results of the laboratory testing to his/her Employer.

When an employee is asked to submit to a drug test, and/or alcohol test, he/she shall be informed of the reasons he/she is being asked to submit to the test and, the Employer shall document the employee's conduct on the form attached hereto.  The employee shall be informed that refusal to submit to the testing will constitute a presumption of controlled substance use and/or alcohol intoxication and subject the employee to discipline up to and including discharge.  It is understood that said presumption will be raised if the employee refuses testing and if the Company had reasonable grounds for testing in the first place.

If the employee consents to testing, he/she shall sign a form of consent authorizing the withdrawal of a specimen of urine and/or blood and/or breath samples and a release of the results of the laboratory testing to the Employer, but this shall not constitute a waiver of any claim or cause of action under the law.

In some cases, the employee may be unable to provide a urine sample.  After a reasonable waiting period (not to exceed one hour), the Employer and/or the clinic and/or laboratory and/or physician may proceed with drawing and testing a blood sample.

IV.   CHAIN OF POSSESSION PROCEDURES

At the time a specimen is collected, the employee shall be given a copy of the specimen collection procedures.  The specimen must be immediately sealed, labeled, and initialed by the employee to ensure that the specimen testing by the laboratory is that of the employee.  The required procedure is as follows:

40

EM000042

1. Urine specimen shall be collected, in a tamper-resistant urine container. Alternatively, the urine specimen may be collected at the employee's option. In a wide-mouthed clinic specimen container which shall remain in full view of the employee until transferred to, sealed and initialed in a tamper-resistant urine container.

2. Immediately after the specimen is collected, the urine container shall, in the presence of the employee, be labeled and then initialed by the employee. If the sample is collected at a clinic that does not perform the actual testing of the sample, the specimen shall be placed in a transportation container. The container shall be sealed in the employee's presence and the employee will be asked to initial or sign the container. The container shall be sent to the testing laboratory on the earliest business day by the fastest available method, with chain of custody documentation maintained. The same procedure shall apply to blood testing and breath testing.

The parties recognize that the key to chain of possession integrity is the immediate labeling and initialing of the specimen in the presence of the tested employee. If each container is received at the laboratory in an undamaged condition with properly sealed, labeled and initialed specimens, as certified by that laboratory, the Employer may take disciplinary action based upon properly obtained laboratory results.

V.    DISCIPLINARY ACTION

The Employer may take disciplinary action based on the test results as follows:

A. If the test results show a forensically acceptable positive quantum of proof of cocaine, heroin, PCP, LSD, barbiturates, amphetamines, or any other controlled substance (excluding marijuana) or the presence of a forensically acceptable amount of metabolites of the above-mentioned substances, said results shall constitute just cause for immediate discharge.

B. If the initial test results meet or exceeds 50 nanograms cannabinoids and/or total cross-reactive cannabinoids or the equivalent depending on the methodology used by the laboratory and of the metabolites measured, and is confirmed with a second test using a different methodology, said results shall constitute just cause for immediate discharge.

C. If the probable suspicion test results of blood specimens by gas chromatography/mass spectrometry show marijuana concentrations as follows.

The employee shall be subject to discharge:

a. The blood/serum contains at least 2 and up to 5 nanograms THC/ml, at least 10 nanograms THC metabolites/ml;

b. The blood/serum contains at least 5 or more nanograms THC/ml, regardless of the THC metabolite concentration; or

41

EM000043

    c.  The blood/serum contains 20 or more nanograms THC metabolites/ml regardless of THC concentration.

D.    If the test results show a concentration in the person's urine and/or breath equal to or above the equivalent of .05 percent by weight of alcohol in blood, said results shall constitute just cause for immediate discharge, subject to the provision of the Rehabilitation Section herein.

E.    If an employee is convicted of driving under the influence of alcohol while operating a Company vehicle, said conviction shall constitute just cause for disciplinary action, up to an including immediate discharge.

## VI.    LABORATORY REQUIREMENTS

### A. URINE TESTING

1. Cannabinoids (marijuana) - - initial screening test approved by the laboratory followed by a confirmatory test using a different methodology if threshold results of the initial screening test show a positive presence of cannabinoids.

2. Microchemical exclusion screening for alcohol, ethchlorvynol, phenothiazines, bromide, and salicylamide, the latter two containing depressants.

3. Immunochemical screening for benzodiazepines, cocaine metabolite, and opiates.

4. Thin layer chromatography, high performance thin layer chromatography, absorption spectrophotometry, fluorescence spectrophotometry, TDX, gas chromatography, and gas chromatography/mass spectrometry for synthetic morphine (opiate and non-opiate) substitutes, barbiturates, methaqualone, glutethimide and other fixed depressants, cocaine, methamphetamine, amphetamine and related stimulant excitants, phencyclidine, mescaline, procyclidine, ketamine, related hallucinogens and LSD.

If threshold results indicate positive findings, the same specimen will be utilized for further testing by confirmatory methodologies such as internally standardized headspace gas chromatography, high performance liquid chromatography, and gas chromatography/mass spectrometry as appropriate.

### B.    Blood Testing

Where blood specimens alone are obtained, the blood/serum must be analyzed using appropriate methodology such as gas chromatography/gas spectrometry.

### C.    Breath Testing

Where breath testing is obtained, the breath samples must be analyzed using appropriate methodology.

RL1  961351V1  11/07/11

EM000044

D.   Specimen Retention

   All specimens deemed positive by the laboratory according to the prescribed guidelines must be retained at the laboratory for a period of six (6) months.

E.   Approved Testing Laboratories

   The laboratories used must be able to perform all the required testing procedures for probable suspicion under one roof to maintain chain of possession integrity.  The parties agree to mutually establish a list of approved laboratories.  The parties also agree to retain the right to audit and inspect the individual laboratories to determine conformity with the laboratory requirements as established herein.

VII.   LABORATORY TESTING METHODOLOGY

A.   Cannabinoids (Marijuana)

   For testing the presence of cannabinoids, the urine specimen shall be analyzed using an initial screening test.  If this test gives a result which corresponds to less than fifty (50) nanograms of cannabinoids and/or total cross-reactive cannabinoids/ml urine or the equivalent depending on the methodology of the test and the metabolites measured, then the report shall be "negative".  If the test meets or exceeds fifty (50) nanograms of cannabinoids and/or total cross-reactive cannabinoids/ml urine or the equivalent depending on the methodology of the test and the metabolites measured, then a second confirmatory test using a different methodology shall be performed.

   A "positive" finding for cannabinoids will be forensically reported under any of the following results obtained after testing blood specimens by gas chromatography/mass spectrometry:

   1. The blood/serum contains at least 2 and up to 5 nanograms THC/ml and at least 10 nanograms THC metabolites/ml;

   2. The blood/serum contains at least 5 or more nanograms THC/ml,  regardless of THC  metabolite concentration; or

   3. The blood/serum contains 20 or more nanograms THC metabolites/ml, regardless of THC concentration.

   If none of the blood marijuana finding results are obtained, a "negative" finding shall be reported.

B.   Other Psychoactive Substance

   The laboratory shall report all positive as well as negative findings for alcohol and other psychoactive drugs describe more completely in Section VI, "Laboratory Requirements".

43

C.    Prescription and Non-Prescription Medications

The employee shall note, on a form furnished by the Employer and/or clinic and/or laboratory and/or physician, the use of any prescription or nonprescription medications before any test is given.  The Employer may require the employee to provide evidence that a prescription medication has been lawfully prescribed by a physician.  Through the use of the above described laboratory procedures, the laboratory will report significant presence of all prescription and nonprescription medications.  If an employee is taking a prescription or non prescription medication in the appropriate described manner and has noted such use, as provided above, he/she will not be disciplined for such.  Medications prescribed for another individual, not the employee, or prescribed for the employee but not used in the manner as prescribed, shall be considered to be illegally used and subject the employee to discipline.

VII.   CONFIDENTIALITY

There will be up to two (2) persons in the personnel department of each plant who will be designated to receive testing results.  They will notify medical and other Company managers strictly on a need –to-know-basis.

No laboratory report or test results shall appear in an employee's personnel folder.  Information of this nature will be included in the medical file.  The inside cover of the personnel folder will contain a marker to show that this information is contained elsewhere.

IX.   REHABILITATION

A.    An employee found to be under the influence of controlled substances and/or alcohol at work will be permitted the opportunity to enter a rehabilitation program for treatment of such abuse.  Provided however, that no such opportunity will be extended to an employee who has been charged (which charge is upheld by arbitration or other appropriate mechanism) with sales or distribution of such controlled substances and/or alcohol.

B.    Employees shall be allowed only one (1) opportunity to enter into a treatment program, provided that if within ninety (90) days following the conclusion of the initial period of treatment the employee voluntarily requests an opportunity for a second course of treatment because the first one was unsuccessful, and the employee is a that time not under investigation for being under the influence of alcohol and/or drugs at work, the employee shall be allowed to submit himself for a second course of treatment.

C.    To be eligible for return to work, the employee must complete the program, to the full satisfaction of the rehabilitation clinic or counselor, and continue with all post-program follow-up care, therapy, meetings, consultations, tests and evaluation.

D.    Each rehabilitation program must be a certified and bona fide program listed by the Union for the employee to be validly enrolled therein.

RL1  961351V1   11/07/11

EM000046

E.     Upon complying with the conditions set forth in Paragraphs D and E above, the employee shall be eligible to return to work under the conditions outlined in this Paragraph.

1.     The employee shall be placed on a probationary period of one (1) year.  The employee agrees to submit to such random drug and alcohol testing as may be required or requested by the rehabilitation program, counselor or clinic, and up to six (6) random tests as requested by the Company at any time during the employee's one-year probationary period.  The employee is subject to discharge without recourse to the grievance procedure in the event of any violation of the Drug and Alcohol Testing Program, including failure to test appropriately on any of the random sampling tests.

2.     The employee further agrees to sign a separate waiver of the right to bring any action against the Employer before any administrative agency or court arising out of a discharge as described herein.

3.     The employee may be reassigned from his/her position to an equal or lower classification (at the employee's current rate of pay) where in the discretion of the Company, the continuation of the employee in his former position presents a potential danger of injury to the employee involved or other employees who work with or in the area of the employee, or the risk of damage to Company property, facilities or equipment.

F.     The foregoing agreement to permit employees to enroll in a rehabilitation program is inapplicable to any employee who is discovered to be, selling, offering to sell or distribute, distributing or in possession of alcohol or illegal drugs.  This agreement to submit employees to rehabilitation is not applicable to any employee who, while under the influence of alcohol or illegal drugs, is involved in an accident involving injury to any person, including the employee, or damage to property.  Finally this agreement to submit employees to rehabilitation is not applicable to any employee determined by the rehabilitation program, clinic or counselor not to have a problem or habit with alcohol or drugs or who is deemed not to be able to benefit from a rehabilitation program.

G.     Employees who are not eligible for rehabilitation but found to have violated Section 1, POLICY, shall be subject to discharge in accordance with the provisions of the Drug and Alcohol Testing Program.  Employees who do not successfully complete the program or violate the provision of follow-up-care are subject to discharge.

45

EM000047

## EXHIBIT B

**ANTI-WEAPONS POLICY**

Associates and any visitors while on Company property shall not possess, store, maintain or use any weapon either in their motor vehicles, locker  or on their person.  Prohibited weapons include, but are not limited to, guns, tasers, batons, brass knuckles, nunchucks, knives or swords with blades over four inches in length, explosives, and any chemicals whose purpose is to cause harm to another person.   Further, all knives and/or box cutters used in the course and scope of Associate's job functions must be preapproved by the associate's supervisor and maintained when not used in a protective case.  Please understand that the above list of prohibited weapons is not exhaustive and there may be other weapons that are prohibited but not named here.

Regardless of whether an associate possesses a concealed weapons permit or is allowed by law to possess a weapon, weapons are strictly prohibited while on Company property.

Possession of a weapon may be authorize by the Company's President to allow security personnel or a trained associate to have a weapon on Company property when this possession is determined necessary to secure the safety and security of Company associates, or any materials or products thereon or to secure the Company premises.  Only the President, or his designee, may authorize the carrying of or use of a weapon and this is the only exception.

Associates who violate this policy shall be subject to disciplinary or corrective action, up to and including immediate employment termination at the President's sole discretion.

46

## EXHIBIT "C"

### Alternate Dispute Resolution Program

Empire Merchants, LLC has established a culture that cares about its employees and recognizes that our employees are what truly make the difference in the competitive wine and spirits wholesale distribution industry. But even in the best working relationships, problems can arise. At times, these problems escalate into disputes if options for solving them are limited.

Many employers, including Empire, have been exploring ways to minimize the possibility of an antagonistic and adversarial atmosphere when problems arise in the workplace. That is where the alternate dispute resolution program comes into place. This program, currently available in some of the country's top companies, has proven to be successful in keeping the lines of communication open even under the most difficult of circumstances.

These programs are designed to allow an employee and the company every opportunity to resolve a problem in a method that is reasonable, timely, and most of all, fair. In companies where alternate dispute resolution has been implemented, the employee and company satisfaction level with the program is extremely high.

That is why, after reviewing many different programs, Empire has decided to introduce its own alternate dispute resolution program, called "ADR," to resolve all claims of discrimination or sexual harassment. For purposes of the ADP program, only claims alleging race, age, sex disability, sexual orientation, marital status, national origin, and claims of sexual harassment, as these terms are defined by Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the New York Executive Law and the New York City Administrative Code, shall be included in the definition of discrimination or sexual harassment.

### The ADR Program

ADR is a program designed for the mutual benefit of Empire and its employees and builds on our current "open door" policy that exists today.

There are four (4) steps to our ADR program:

> Open Door
> Executive Review
> Mediation
> Non-Binding Arbitration

Empire is committed to finding solutions that are fair for both the employee and the company. Each step of this four-step process is designed to keep the lines of communication open while pursuing all potential avenues to resolve differences. The program is flexible, accessible, and fair to both parties. It will allow all of us to focus more on our business of being the best wine and spirit wholesale distributor in New York.

RL1  961351V1  11/07/11

EM000049

### Administering ADR

To ensure the success of this program and to promote employee awareness and understanding of how it works, the Empire Human Resources Manager will oversee the program and be able to answer questions, process requests, and provide information, as necessary.

### Who Is Covered by ADR

ADR applies to all Empire employees.

### Effective Date of ADR

The ADR program will become effective on November 17, 20081999. Beginning on that date, ADR will become the exclusive, mandatory procedure for resolving workplace disputes for you and the Company, including disputes for legally protected rights, such as freedom from discrimination, retaliation, or harassment.

### Covered Disputes

Disputes covered by ADR pertain to all claims of discrimination or sexual harassment, (as defined herein), and other legally protected federal, state and local statutory rights as referred to in the parties' collective bargaining agreement.

Disputes not covered under ADR relate to grievances under the parties' collective bargaining agreement alleging a violation of that collective bargaining agreement, worker's compensation, unemployment benefits, health and welfare and 401 (k) benefits, and claims by Empire for injunctive relief to protect confidential information and all disputes alleging a violation of the Parties' collective bargaining agreement. The ADR policy does not supersede any rights under any collective bargaining agreement between Empire and its employees.

While the ADR program establishes a procedure for resolving your work place discrimination and sexual harassment disputes, nothing in the ADR program material creates a contract of employment, express or implied, for any period of time and does not alter Empire's at-will employment policy as explained in its employee handbook, except that nothing in this ADR policy alters the parties' just cause termination provision set forth in their collective bargaining agreement.

This material provides an overview of the program. If, after reviewing it, you would like more information about how the program works, contact the Human Resources Department.

### STEP ONE - OPEN DOOR POLICY

The "Open Door" Policy is the first step in Empire's ADR program and provides an opportunity for you to resolve your disputes early and informally. Under the Open Door Policy, you are encouraged to bring your concerns to anyone you choose. The policy is designed to ensure that your concerns get the attention they deserve.

RL1 961351V1 11/07/11

EM000050

Empire will attempt to make sure that this Open Door Policy is observed. The company will not retaliate against any employee in any way for using the Open Door Policy.

**Covered Claims**

You may raise any related discrimination or sexual harassment matter: through the Open Door first step. In fact, to use the additional steps of the ADR program, you must have first used this critical beginning step in the process. While you are not bound by the outcome of this first step, it is important that your management have the opportunity to attempt to resolve your concerns prior to moving into the additional steps of the ADR program.

To use the Open Door first step, you must contact any supervisor, manager or your Human Resources Manager, either orally or in writing. Whenever possible, you should try to resolve any problems at work with the person to whom you report, because this person is close to your situation, he/she may already be aware of the problem or be in a position to offer a different perspective or some new facts that may be helpful to you.

You are also encouraged, although not required, to follow the specific levels of management in your department since that is often the most direct way of getting matters resolved. However, as stated above, you have the right to bring your concerns to any supervisor or manager, if you choose.

This Open Door first step is simply an informal way of resolving problems early, preserving working relationships, and promoting a productive working environment for everyone. The vast majority of issues will be resolved at this level. However, if you are still not satisfied after using this first step, you may seek further help by moving to the second step of the ADR process. The Company will notify an employee's union representative in the event an employee exercises his or her rights under the ADR policy. The Union shall have the right to take part in each step of the ADR policy.

**STEP TWO - EXECUTIVE REVIEW**

The second step in the ADR program is what we refer to as an executive review. If you have not been able to resolve your issue with the open door policy, you may request a meeting with the Director of Operations to discuss your concerns. You must request this meeting within one year of the date when the dispute or issue first arose. At that time, you will need to be prepared to explain your viewpoints and reasons why you believe that the step one solution was not satisfactory. At this meeting, you will be allowed to present any evidence or documentation and bring any employee witnesses that you feel will further explain your concerns. Also attending will be the Human Resources Manager and other members of management, if appropriate. This vital second step is a means to resolve our differences in an open and fair manner. Again, the company will not retaliate against any employee in any way for using the Executive Review step of our program.

RL1   961351V1   11/07/11

EM000051

## STEP THREE - MEDIATION

The third step in the ADR program consists of mediation. Mediation is a meeting at which an outside, neutral third party, called a mediator, helps you and the company find a solution that is mutually acceptable. The mediator will not impose his or her will or judgment on the parties, but helps them decide for themselves whether to settle and on what terms. The mediator acts as a catalyst for the process, helping parties reach agreement by identifying issues, exploring possible bases for agreement, and attempting to reach a solution that is satisfactory to both parties. If you and the company reach an agreement, it will be reduced to writing and signed, at which time both parties will be bound by its terms.

### Covered Claims

At the mediation step, you may raise disputes involving claims of discrimination or sexual harassment that affect your employment as well as all legally protected statutory rights that you have as an employee. Moreover, in order to raise your concerns at arbitration, the fourth ADR step, you must have attempted to resolve your dispute by using the mediation process. While you are not bound by the outcome of the mediation step, it is still a required part of the program to advance your claim onto the fourth and final arbitration step.

### How Do I Start

To request mediation, you submit a Mediation/Arbitration Request Form to the company's Human Resources Manager within thirty days after the date you receive notification that the executive review step failed to resolve your dispute or issue. That's all there is to it.

### Legal Representation

Since mediation is simpler and more straightforward than litigation, you may not feel the need for legal representation, nor is it required. However, if you do decide to bring an attorney to mediation, then the company may bring one as well.

Empire will pay the full cost of the mediator's time. However, if you decide to use an attorney, you are responsible for your own legal fees.

### Selecting a Mediator

You have a lot of input over the selection of the mediator. You and the company will mutually agree upon the organization from which the mediator will be chosen and will attempt to agree upon the particular individual who will consider your dispute. When you are evaluating specific mediator candidates, you have the right to request biographical information, such as education, years of experience, prior cases, and references.
If a mutually acceptable mediator cannot be identified, the outside organization will have the authority to make the selection.

RL1   961351V1   11/07/11

EM000052

### The Mediation

The mediation is confidential; meaning that, as allowed by law, no statements made in the process of trying to resolve your dispute may be used in any later proceeding for any purposes. The mediation will take place at a location that is convenient to you and the company. At the mediation, the mediator normally begins the meeting at which both parties are present to allow them to state their positions and better understand the situation. The mediator then may meet separately with each side to probe issues and find a solution acceptable to all, moving back and forth between the parties until the case is settled or until the parties determine that the case cannot be settled. If you and the company agree on an acceptable solution, all parties will enter into a written settlement agreement.

### STEP FOUR - ARBITRATION

The fourth and final step is non-binding arbitration. Similar to mediation, arbitration is a process that involves an outside, neutral third party. Unlike mediation, your employment dispute is presented to an arbitrator, who renders a decision on both parties. However, while the employee is required to pursue arbitration, it is non-binding and at the conclusion of the arbitration, the employee may pursue other legal remedies if he/she is not satisfied with the arbitrator's decision.

Although arbitration is usually less formal and quicker than court litigation, it is an orderly proceeding, conducted in accordance with established rules of procedure and legal principles. If the arbitrator decides in your favor, you can be awarded any remedy you might seek through a court of law, including back pay, reinstatement, attorneys' fees, and punitive damages. Nevertheless, even if the award is in your favor, it is non-binding on you and the Company.

Upon completion of Step Four, an employee may seek redress in a legal or administrative forum in the event the employee is dissatisfied with the results of the non-binding arbitration award.

### Covered Claims

Arbitration is the option for the employee after the mediation step has been utilized unsuccessfully. You may raise at the arbitration step, any claim concerning a legally protected statutory right involving discrimination or sexual harassment.

### How It Begins

To request Arbitration, you must submit a Mediation/Arbitration Request Form to your Human Resources Manager within thirty days after the date you receive notification that mediation failed to resolve your dispute or issue. Within ten calendar days, Empire will respond to the request with a written answer.

The arbitrator shall be selected from a list provided by the American Arbitration Association from its state arbitration panel. Once the list of these arbitrators is obtained, you may request biographical information, such as education, years of experience, references, and their involvement

RL1  961351V1  11/07/11

EM000053

in prior cases.  You and the Company will mutually agree on the choice of an arbitrator from this list.  If a mutually acceptable candidate cannot be selected, then two of the arbitrators on the list, one selected by the Company and one selected by the employee, will mutually select a third arbitrator who becomes the arbitrator.  The arbitrator's decision will become final and binding on all parties involved.

**Legal Representation**

Empire will pay the entire cost of the arbitration, except for: 1) a filing fee of fifty ($50) dollars to be paid by the employee and, 2) the costs associated with depositions which you initiate.  However, as with mediation, you are responsible for your own attorney's fees and expenses, if you decide to retain legal counsel.  As with mediation, if you decide to have your attorney present at arbitration, Empire may have one there also.

**Discovery**

You and the Company shall cooperate to the fullest extent practicable in the voluntary exchange of documents and information to expedite the arbitration.

After the appointment of the arbitrator, you and the company shall have the right to take depositions and to obtain discovery regarding the subject matter of the arbitration as provided in the Federal Rules of Civil Procedure.

The arbitrator shall have the power, in addition to the power of determining the merits of the arbitration, to enforce the rights, remedies, procedures, duties, liabilities, and obligations of discovery by the imposition of the same terms, conditions and penalties as may be imposed in like circumstances in a civil action by a state or federal court, except the power to order the arrest or imprisonment of a person.

The arbitrator may consider, determine, and make such orders imposing such terms, conditions, consequences, liabilities, sanctions, and penalties, whenever necessary or appropriate at any time or stage in the course of the arbitration, and such orders shall be as conclusive, final, and enforceable as an arbitration award on the merits.

All discovery must be completed thirty (30) days prior to the date set for hearing of the matter.

**The Arbitration**

As with mediation, a hearing date at a neutral location will be arranged.  The arbitrator runs the proceedings, which are held privately in an informal setting - a setting where testimony is given, evidence presented, and witnesses are questioned and cross-examined by either the parties themselves or their lawyers.  At the commencement of the arbitration, the arbitrator shall state the issue(s).  The arbitrator issues a written non-binding final decision.

RL1  961351V1  11/07/11

EM000054

The employee shall have the burden of proving each element of his/her claims, as required by law; Empire shall have the burden of proving any affirmative defense. The arbitrator shall have only those powers authorized by statute or listed below:

1. Rule on motions regarding the request form, the answer, and discovery. The arbitrator shall have the power to enforce subpoenas.

2. Issue protective orders on the motion of either you or the company.

3. Determine only the dispute submitted to him or her. The dispute shall be identified from the Arbitration Request Form and the answer. Any dispute not identified from those pleadings is outside the scope of the arbitrator's jurisdiction and any award invoking such disputes is subject to a motion to vacate; provided, however, that the arbitrator shall have exclusive authority to resolve any dispute relating to the validity, interpretation, and enforcement of these procedures, including determining whether the arbitration is to be governed by formal rules of evidence, and any post-hearing procedures.

All testimony at the arbitration shall be under oath and the hearing shall be recorded and transcribed verbatim by a certified shorthand reporter. You shall present your evidence prior to Empire presenting its evidence. At the conclusion of all testimony, you and the company shall have the right to present closing arguments.

RL1 961351V1 11/07/11

EM000055

### Mediation/Arbitration Request Form

**Send to:**

Human Resource Manager

**From:**

Employee Name:_____

Social Security Number:_____

Work Location:_____   Position: _____

Home Address:_____

City:_____   Zip Code: _____

Home Phone:_____

Indicate where you would like notifications sent:_____ to home  _____ to work

Mediation/Arbitration Checklist:

1.      Indicate the dispute resolution procedure being requested:

_____ Mediation  _____ Arbitration

2.      Describe the nature and details of your issues.  Please include the date(s) of the actions taken for which you seek mediation or arbitration.  You may attach additional pages, separate statements or relevant supporting documents.

_____
_____
_____
_____
_____
_____
_____
_____
_____

RL1  961351V1  11/07/11

EM000056

3.    Indicate the type of relief you seek:

_____

_____

_____

_____

_____

_____

_____


Date:_____        Employee Signature: _____

55

EM000057

**SIDE LETTER TO THE COLLECTIVE BARGAINING AGREEMENT
BETWEEN UFCW LOCAL 1-D AND EMPIRE MERCHANTS LLC
COVERING THE PERIOD NOVEMBER 1, 2014 THROUGH OCTOBER 31, 2017**

Effective November 1, 2014 three (3) per diem employees shall be made steady, and effective November 1, 2015 an additional two (2) per diems shall be made steady.

Effective November 1, 2014,  employees hired who have not achieved Per Diem seniority status under Paragraph 9.5(c) shall be paid $13.00 per hour.

ACCEPTED AND AGREED:

SIGNED FOR EMPIRE MERCHANTS, LLC:

By: _____

SIGNED FOR THE UNION:
WINE, LIQUOR & DISTILLERY
WORKERS UNION LOCAL 1-D, AFL-CIO,CLC
8402 18TH AVENUE
BROOKLYN, NEW YORK 11214
George J. Orlando, President
Frank Cognetta, Secretary-Treasurer

By: _____

By: _____

56

EM000058

# NOTES

EM000059

# NOTES

RL1  961351V1  11/07/11

EM000060