UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DERRICK CAMPBELL, for himself and     :
on behalf of all others similarly situated,     :
    :
                Plaintiff,     :
    :    16 Civ. 5643 (ENV)(SMG)
    :
        - against -     :
    :
EMPIRE MERCHANTS, LLC,     :
    :
               Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT


Date of Service:  September 18, 2017


EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500


Of Counsel:
      Allen B. Roberts
      Adriana S. Kosovych

Firm:44029984

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................iv

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ..............................................................................................2

   A.     The Parties ........................................................................................................2

   B.     Empire's Business Operations ...........................................................................3

   C.     Empire's Shape-Up Procedure ..........................................................................3

       1.   Applicants Must Be Deemed Initially and Preliminary
           Eligible to Begin to Seek Work Through the Shape-Up....................................4

       2.   Empire Advises Applicants That Work
           Through the Shape-Up Is Not Guaranteed..........................................................5

       3.   Empire Supplements Its Regular Workforce with Workers
           Who Receive Assignments at a Shape-Up Conducted Daily. ..............................5

       4.   Empire Does Not Require Individuals to Report to the Shape-Up
           Procedure, and Individuals Are Free to Use Their Time Waiting
           for a Potential Work Assignment on Their Own Terms. ......................................7

       5.   Because of Variations in Empire's Operational Needs
           and Other Factors, a Shape-Up Worker Has No Assurance
           of a Work Assignment on Any Given Day..........................................................9

       6.   Empire Follows a Sequential Selection Process Set by the
           Teamsters Local 917 CBA and the UFCW Local 1-D CBA
           for Assigning Work Through the Shape-Up Procedure......................................10

       7.   Names of Individuals Selected for Shape-Up Assignments Are Announced.......12

       8.   Individuals May Receive Work Assignments
            Through the Shape-up Procedure in the Warehouse
           or as Helpers on Empire's Delivery Trucks......................................................13

   D.     Plaintiff's Employment as a Shape-Up Worker.....................................................13

       1.   After Plaintiff Was Selected for a Work Assignment,
           He Worked Variously on Empire's Delivery Trucks
           and in the Warehouse for a Total of 28 Days. ....................................................14

       2.   Plaintiff Was Paid Well in Excess of the New York State
           Minimum Wage  and Received All Required Wage Notices. ..............................15

SUMMARY JUDGMENT STANDARD ................................................................................15

ARGUMENT.......................................................................................................................16

   POINT I  EMPIRE IS ENTITLED TO SUMMARY JUDGMENT
          DISMISSAL OF PLAINTIFF'S FLSA AND NYLL
          UNPAID WAGE AND OVERTIME CLAIMS ....................................................16

Firm:44029984

A.      PLAINTIFF'S TIME SPENT VOLUNTARILY WAITING FOR
        A POTENTIAL WORK ASSIGNMENT IS NOT COMPENSABLE
        AS A MATTER OF LAW AND THERE IS NO MERIT TO HIS
        CLAIMS FOR UNPAID WAGES AND OVERTIME. ................................. 16

1.  Plaintiff's Waiting Time Was Neither Requested Nor Required......................... 18

2.  Plaintiff Was Free to Use Time Waiting to See If He
    Would Receive an Assignment as He Wished, or to Not Wait at All. ................. 19

3.  The Time Plaintiff Spent Waiting for a Potential
    Work Assignment Was for Plaintiff's Benefit...................................................... 21

POINT II  PLAINTIFF WAS PROPERLY PAID FOR ALL HOURS
          WORKED AND RECEIVED OVERTIME COMPENSATION
          FOR ALL HOURS WORKED IN EXCESS OF FORTY HOURS
          PER WEEK, AS REQUIRED BY THE NYLL ...................................... 22

POINT III PLAINTIFF IS NOT ENTITLED TO SPREAD-OF-HOURS PAY..................... 23

POINT IV PLAINTIFF RECEIVED ALL NYLL WAGE NOTICES
         AND THERE IS NO PRIVATE RIGHT OF ACTION FOR WAGE NOTICE OR
         RECORDKEEPING CLAIMS ............................................................... 24

CONCLUSION.................................................................................................... 24

Firm:44029984

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................................15

*Armour & Co. v. Wantock*,
323 U.S. 126 (1944)..................................................................................................17

*Birdwell v. City of Gadsden*,
970 F.2d 802 (11th Cir. 1992) ............................................................................17, 21

*Carter v. Tuttnaeur USA Co.*,
78 F. Supp. 3d 564 (E.D.N.Y. 2015) ......................................................................24

*Centro de la Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
No. 15-2914-cv, 2017 U.S. App. LEXIS 15935 (2d Cir. Aug. 22, 2017) ..............19

*Holzapfel v. Town of Newburgh*,
145 F.3d 516 (2d Cir.1998)................................................................................16, 19

*Irwin v. Clark*,
400 F.2d 882 (9th Cir. 1968) ..............................................................................17, 21

*Katz v. Goodyear Tire & Rubber Co.*,
737 F.2d 238 (2d Cir. 1984)....................................................................................15

*Malena v. Victoria's Secret Direct, LLC*,
886 F. Supp. 2d 349 (S.D.N.Y. 2012)....................................................................23

*Morel v. Manhattan Beer Distribs.*,
No. 13-CV-2296 (VSB), slip op. (E.D.N.Y. Sept. 18, 2015) .................................23

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010)....................................................................................22

*NLRB v. News Syndicate Co.*,
279 F.2d 323 (2d Cir. 1960)....................................................................................18

*Perez-White v. Advanced Dermatology of N.Y. P.C.*,
No. 15 Civ. 4858, 2016 U.S. Dist. LEXIS 120642 (S.D.N.Y. Sep. 6, 2016) .........22

*Reich v. Southern New Eng. Telcomms. Corp.*,
121 F.3d 58 (2d Cir. 1997)......................................................................................17

iv

*Sacco v. Pataki*,
    114 F. Supp. 2d 264 (S.D.N.Y. 2000)........................................................................18

*Sampson v. MediSys Health Network, Inc.*,
    No. 10-CV-1342, 2012 U.S. Dist. LEXIS 103052 (E.D.N.Y. July 24, 2012)........................22

*Singh v. City of New York*,
    524 F.3d 361 (2d Cir. 2008)........................................................................17

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)........................................................................17, 19

*Sutera v. Schering Corp.*,
    73 F.3d 13 (2d Cir. 1995)........................................................................15

*Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*,
    321 U.S. 590 (1944)........................................................................16

*Vega ex rel. Trevino v. Gasper*,
    36 F.3d 417 (5th Cir. 1994) ........................................................................17, 19

*Williams v. Tri-State Biodiesel, LLC*,
    No. 13 Civ. 5041, 2015 U.S. Dist. LEXIS 7926 (S.D.N.Y. Jan. 23, 2015)........................23

*Zhong v. Zijun Mo*,
    No. 10-CV-0806, 2012 U.S. Dist. LEXIS 99966 (E.D.N.Y. July 18, 2012)....................17, 21

**Rules and Statutes**

29 C.F.R. § 785.14........................................................................17, 19

29 C.F.R. § 785.15........................................................................17

29 C.F.R. § 785.16........................................................................17, 21

29 U.S.C. § 206........................................................................16

29 U.S.C. § 207(a)(1)........................................................................16

29 U.S.C. § 254(a) ........................................................................17

Fed. R. Civ. P. 56(a)........................................................................15

N.Y. Comp. Codes R. & Regs. tit 12, § 142-2........................................................................16, 23

NYLL § 191.1(d) ........................................................................22

N.Y. Lab. Law § 195.1(a)........................................................................24

v

**Other Authorities**

Dep't of Labor Opinion Letter, File No. RO-07-0009....................................................................23

Firm:44029984

## PRELIMINARY STATEMENT

Defendant Empire Merchants, LLC ("Empire" or "Defendant") respectfully submits this brief in support of its Rule 56 motion for summary judgment dismissing the claims asserted by Plaintiff Derrick Campbell ("Campbell" or "Plaintiff") in his Class Action and Collective Action Complaint (the "Complaint") for: (1) unpaid overtime pay pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and the New York Labor Law ("NYLL"), Art. 6, § 190 *et seq.*, Art. 19, § 650 *et seq.*; (2) unpaid "spread-of-hours" pursuant to N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4 (July 24, 2009); (3) unpaid wages pursuant to NYLL § 191.1(d); and (4) wage notice and recordkeeping violations pursuant to NYLL § 195.  For the reasons addressed below, Plaintiff's claims have no merit and summary judgment granting dismissal is warranted.

In this action, Plaintiff, a shape-up worker who was not a bargaining unit member in Empire's regular workforce, seeks compensation for time he waited to see if he would receive a work assignment as a participant in the shape-up procedure Empire has operated in the same manner for more than 36 years to supplement its regular workforce on an as-needed basis; Plaintiff does not dispute that he was paid properly for the hours he actually worked after he received a work assignment.  Plaintiff is not entitled to any wages or overtime pay under either the FLSA or NYLL for the time he participated in Empire's shape-up procedure because he was free to: appear at Empire's Brooklyn warehouse facility when he wished to indicate his desire and availability to work, or not appear or remain at all; wait to see if employment was available to him, or not wait at all; and use his time waiting for a potential work assignment as he chose for his own purposes, or no use or purpose at all.  Because Plaintiff was off duty and freely engaged in personal activities while he chose to wait for a potential work assignment, he was not engaged by Empire in any respect and his claims for unpaid wages and overtime pay under the

FLSA and NYLL for time he spent voluntarily waiting to be engaged are without merit and summary judgment dismissal is warranted.

Plaintiff's unpaid wages claim under the NYLL fails because the statutory provision under which Plaintiff purports to proceed, NYLL§ 191.1(d), involves only the timeliness of wage payments, and Plaintiff does not assert a claim concerning the timeliness of his wage payments. Therefore, summary judgment dismissal of Plaintiff's NYLL § 191.1(d) claim is warranted.

Plaintiff's NYLL spread-of-hours claim fails because Empire paid Plaintiff well in excess of the New York State minimum wage. Therefore, Empire was not required to pay Plaintiff spread-of-hours pay and summary judgment dismissal of this claim is warranted.

Finally for purposes of the instant motion, Plaintiff received all wage notices to which he was entitled from Empire, and in any event, there is no private right of action for failure to provide annual wage notices. Similarly, there is no private right of action for Plaintiff's recordkeeping claims under the NYLL. Accordingly, summary judgment dismissal of Plaintiff's wage notice and recordkeeping claims is warranted.

## STATEMENT OF FACTS

### A. The Parties

Empire, a wine and spirits distributor in the Metropolitan New York area, was formed in 2007 through the legal combination of Charmer Industries Inc. and Peerless Importers, Inc. ("Peerless"). (Compl. ¶¶9, 11; Affidavit of James Ching, sworn to September 18, 2017 ("Ching Aff.") ¶4; Affidavit of Lucy Romano, sworn to September 18, 2017 ("Romano Aff.") ¶3; Affidavit of Annette Perry, sworn to September 18, 2017 ("Perry Aff.") ¶3).

Plaintiff first worked for Empire on April 1, 2016 and his employment ended on June 22, 2016. (Pl. Tr. 41-47, 52-55, 59-61; *see* Declaration of Allen B. Roberts, dated September 18, 2017 ("Roberts Dec."), Roberts 6). During that period of less than three months, Plaintiff

worked a total of 28 days at Empire's main facility located at 16 Bridgewater Street in Brooklyn, New York, (the "Brooklyn Facility"), during which time he variously was assigned to work in and around the warehouse as a warehouse associate and/or on Empire's delivery trucks as a helper assisting drivers. (Pl. Tr. 24-25; Compl. ¶¶ 11, 12; Ching Aff. ¶27; Affidavit of Ronnie Rojas, sworn to September 18, 2017 ("Rojas Aff.") ¶24).

**B.    Empire's Business Operations**

Operating from its Brooklyn Facility and another warehouse in Queens, Empire receives product during the day and loads its delivery trucks at night for daytime deliveries to customers. (Ching Aff. ¶5; Rojas Aff. ¶4; Ching Tr. 40; Rojas Tr. 20-23, 26, 37).  Empire employs a regular workforce that includes warehouse workers represented by Wine, Liquor & Distillery Workers Union Local 1-D, UFCW, AFL-CIO ("UFCW Local 1-D"), and distribution drivers and helpers represented by Teamsters Local Union No. 917, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters Local 917"). (Ching Aff. ¶6; Rojas Aff. ¶5; Romano Aff. ¶4).  Each of these unions has negotiated a collective bargaining agreement ("CBA") with Empire, governing the terms and conditions of employment of employees working in their bargaining units. (Rojas Aff. ¶5; Rojas 1; Ching Aff. ¶6; Ching 1).

**C.    Empire's Shape-Up Procedure**

Because of customer buying patterns, seasonal variations, and various other operational or market factors, Empire's business fluctuates on a daily and weekly basis. (Geneva Tr. 96-97; Rojas Aff. ¶7; Ching Aff. ¶7; Romano Aff. ¶5).  In order to adjust its day-to-day operations in response to such fluctuations in business volume, Empire supplements its regular workforce in both bargaining units on an as-needed basis by assigning work, when available, to individuals who have been deemed qualified and then report to Empire's Brooklyn Facility and sign in on a given day to indicate their desire to work. (Rojas Aff. ¶7; Ching Aff. ¶7; Romano Aff. ¶4; *see*

Ching Tr. 17-19).  Empire has utilized the same shape-up procedure since its formation in 2007, and the same shape-up procedure was used by Peerless since at least 1979. (Geneva Tr. 22, 96; Romano Aff. ¶5; Romano Tr. 14, 94; *see also* Ching Aff. ¶7; Ching Tr. 26-27).

1. **Applicants Must Be Deemed Initially and Preliminary Eligible to Begin to Seek Work Through the Shape-Up.**

In a program coordinated by Lucy Romano ("Romano"), an Empire Security Manager who oversees the hiring process for the shape-up, Empire advertises in local newspapers (*e.g.*, New York Post, Queens Gazette) and online, at job search websites like CareerBuilder.com, to provide notice of the availability of the shape-up for warehouse and distribution work. (Romano Aff. ¶6; Romano 1; Romano Tr. 58-59). Empire generally accepts employment applications from individuals who wish to become eligible to seek work through the shape-up process during an "open house" conducted by Romano and other Security Department managers at the Brooklyn Facility one day per week, generally on Wednesday. (Romano Aff. ¶7; Romano Tr. 47, 57-58).

Empire reviews employment applications submitted during the open house to determine whether an individual qualifies initially and preliminarily as eligible to receive a work assignment through the shape-up procedure. (Romano Aff. ¶8).  After review of an employment application, Empire may advise an individual by telephone that he or she has been deemed initially and preliminarily eligible to begin seeking work through the shape-up procedure, and provide information about the shape-up procedure, including where the shape-up is conducted and to whom the individual should report on the first day he or she chooses to appear at the Brooklyn Facility.[1] (Romano Aff. ¶8; Romano Tr. 64-65).

---

[1] If an individual indicates that he or she will begin participating in the shape-up procedure, either Romano or another Security Manager adds the individual's name to a list of "new hires" that Romano sends via e-mail to the managers in Empire's distribution and warehouse operations. (Romano Aff. ¶9; *see* Romano 2; Romano Tr. 65-68). Individuals participating in the shape-up procedure must then further qualify by passing a background check and a drug test after being employed for at least ten days. (Romano Aff. ¶10; Romano Tr. 60-61).

2.    **Empire Advises Applicants That Work Through the Shape-Up Is Not Guaranteed.**

Empire advises applicants in several ways that work assigned through the shape-up procedure is not regular, guaranteed employment and that individuals appearing for the shape-up may not receive a work assignment on any given day. (Romano Aff. ¶11; *see also* Romano Tr. 61-62).   A notice displayed on the table where individuals may submit applications during Empire's open house states: "PLEASE BE ADVISED THAT THIS IS NOT STEADY FULL-TIME EMPLOYMENT.   IT IS SHAPE-UP WORK WHEN WORK IS AVAILABLE YOU WORK, IF NOT THEY CAN SEND YOU HOME."  (Romano Aff. ¶11; Romano 3).  The same text is repeated in the body of, or as an attachment to, Romano's standard e-mail response to CareerBuilder.com inquiries. (Romano Aff. ¶11; Romano 4; Romano Tr. 116-119).  As Empire's experience receiving few applications relative to the large number of recruitment inquiries demonstrates, shaping up is not everyone's cup of tea; after learning that there is no assurance of receiving a work assignment on any given day, individuals who prefer to seek regular, steady employment often are deterred from submitting applications to Empire for work through the shape-up process. (Romano Aff. ¶12).

3.    **Empire Supplements Its Regular Workforce with Workers Who Receive Assignments at a Shape-Up Conducted Daily.**

Empire's daily assignments of employees to trucks servicing delivery routes and to warehouse work are prioritized by operational needs and terms of the Teamsters Local 917 CBA and UFCW Local 1-D CBA. (Rojas Aff. ¶9; Ching Aff. ¶9; Rojas Tr. 37, 39-45).  Under the Teamsters Local 917 CBA, steady drivers and helpers have regular reporting times for either a 6:30 AM dispatch or 7:30 AM dispatch, set by semi-annual bidding preferences. (Rojas Aff. ¶9; Rojas 1 at §§3.3, 3.70; Rojas Tr. 79-80).   Other employees in the Teamsters Local 917 bargaining unit receive assignments through Empire's shape-up procedure, with employees

classified as "extra" employees receiving work assignment preference over "casual" employees. (Rojas Aff. ¶9; Rojas 1 at §§3.4, 4.21, 4.22; Rojas Tr. 39-45).  Regular warehouse associates have a scheduled starting time for a full five-day workweek under the UFCW Local 1-D CBA, (Ching Aff. ¶9; Ching 1 at §§ 12.1, 12.3, 12.5, 12.7, 12.9), while employees classified as "per diem" who have attained bargaining unit seniority are guaranteed five days of work in each period of two consecutive weeks (Ching Aff. ¶9; Ching 1 at §9.5.a). Per diem employees receive work assignments through Empire's shape-up procedure. (Ching Aff. ¶9).

An employee having no guarantee of daily employment who has attained status as a member of either the Teamsters Local 917 bargaining unit or the UFCW Local 1-D bargaining unit participates in the shape-up procedure by signing in next to his or her name on a pre-printed bargaining unit list posted daily for each shape-up, and he or she is eligible for priority to a shape-up assignment, but only to an available position in the designated bargaining unit – meaning a member of the Teamsters Local 917 bargaining unit may not receive a warehouse assignment and a UFCW Local 1-D bargaining unit member may not be assigned as a delivery helper. (Rojas Aff. ¶10; Ching Aff. ¶10; Rojas Tr. 43, 50, 118; Geneva Tr. 33-35, 102-03). Individuals who have no bargaining unit status under either CBA and who wish to seek assignment for either delivery or warehouse work through Empire's shape-up procedure on a particular day may receive consideration by signing blank sheets to indicate their availability, but they have no entitlement to selection priority. (Rojas Aff. ¶11; Ching Aff. ¶11; Rojas Tr. 50; Geneva Tr. 101-02).  The separate types of sign-in sheets are placed on clipboards that hang on a wall in the locker room located outside of the Brooklyn Facility warehouse, adjacent to the Teamsters Local 917 dispatcher's office, for: (1) Teamsters Local 917 extra employees, (2) Teamsters Local 917 casual employees, (3) UFCW Local 1-D per diem employees, and (4) non-

bargaining unit shape-up employees. (Rojas Aff. ¶12; Ching Aff. ¶12; Rojas Tr. 34-35, 42-43, 56, 117-18; Ching Tr. 46; Geneva Tr. 69, 101).

> **4.     Empire Does Not Require Individuals to Report to the Shape-Up Procedure, and Individuals Are Free to Use Their Time Waiting for a Potential Work Assignment on Their Own Terms.**

Empire's steady (Teamsters Local 917) and regular (UFCW Local 1-D) bargaining unit employees have required reporting times (Ching Tr. 47; Ching 1 at §12.5; Rojas Tr. 79-80; Rojas 1 at §3.3), and they must call in if they will be absent from work or late, or they face potential disciplinary action (*See* Perry 1; Geneva Tr. 65-66). Empire also expects regular attendance from its steady and regular bargaining unit employees, and disciplines them for excessive absenteeism or a pattern of absenteeism. (Perry Aff. ¶4; Perry 1).  In contrast, Empire does not require individuals who wish to shape up to report at a certain time and does not monitor arrival times. (Rojas Aff. ¶16; Rojas Tr. 60-61, 77-78; Ching Aff. ¶¶16, 17; Ching Tr. 48, 54). Indeed, while the selection of individuals for work assignments through the shape-up procedure begins each morning at approximately 7:30 AM by the terms of the Teamsters Local 917 CBA (Rojas Aff. ¶16; Rojas 1 at §3.4), the sign-in time is not noted on sign-in sheets and the order of signing in is not a factor in selection (Pl. Tr. 65; Rojas Aff. ¶16; Rojas Tr. 50; Ching Aff. ¶16; Ching Tr. 62). On busy days, if a sign-in sheet is removed to start scheduling assignments, or if it is filled with signatures, another sheet is made available. (Rojas Tr. 56-57, 87, 104, 117-19; *see also* Geneva Tr. 123-24; Romano Tr. 100-01, 103, 105-06).

Individuals participating in Empire's shape-up procedure are free to use the time they are waiting, before their receipt of a work assignment, on their own terms and remain for whatever length of time they wish. (Geneva Tr. 48, 56, 120; Ching Aff. ¶18; Rojas Tr. 83-85; Romano Tr. 70).  There is no designated area where individuals appearing to participate in the shape-up procedure must wait, to the extent they choose to wait at all. (Ching Aff. ¶18; Rojas Aff. ¶20;

Romano Tr. 70). Among the places individuals may choose to wait on any given day they opt to seek work through the shape-up procedure are the following areas: the room located adjacent to the Brooklyn Facility warehouse where shape-up sign-in sheets are available; grounds outside the warehouse, both within or outside the gates surrounding a yard area of the warehouse; at or around a coffee truck typically parked in the morning near the entrance to the warehouse yard area; or any other public areas outside the gates of the Brooklyn Facility. (Geneva Tr. 48; Pl. Tr. 68-69; Romano Tr. 70).

While Empire maintains work rules that prohibit certain conduct during work time and subject individuals who engage in unauthorized personal activities during work time to potential disciplinary action (Perry Aff. ¶15; *see* Perry 2), there are no rules restricting the ability of individuals voluntarily waiting for a potential work assignment through the shape-up procedure to engage in such personal activities (Pl. Tr. 80-82). Thus, individuals participating in the shape-up engage routinely in varied personal activities while voluntarily waiting for a potential work assignment, such as, placing or receiving calls and sending or receiving text messages on their mobile phones; reading a newspaper, magazine, or book; checking social media; drinking; eating; playing dominoes or card games; smoking and ball-playing outdoors – all in addition to general socializing and congregating.[2] (Ching Aff. ¶18; Pl. Tr. 68-73, 77). Individuals shaping up and not yet assigned work also may leave the Brooklyn Facility altogether with any frequency and for any length of time after their arrival. (Ching Aff. ¶18; *see also* Rojas Tr. 83-84). They also may refuse or decline an available delivery or warehouse assignment that is not to their liking. (Ching Aff. ¶18). In contrast, employees – including shape-up employees who have received and accepted a work assignment – are subject to discipline for engaging in any of the

---

[2] Empire has never taken adverse action against a shape-up worker for such conduct in which he or she engaged during the time he or she spent waiting for a potential work assignment. (Geneva Tr. 107).

following activities during work time: using their mobile phones to place or receive calls, send or receive text messages, and/or check social media or the Internet; wearing headphones to listen to music; reading; drinking; eating; drinking; socializing; congregating; leaving designated work areas; and refusing or declining a work assignment.[3] (Perry Aff. ¶5; Perry 2; *see* Pl. Tr. 80-82).

> **5.     Because of Variations in Empire's Operational Needs and Other Factors, a Shape-Up Worker Has No Assurance of a Work Assignment on Any Given Day.**

Individuals having no bargaining unit status have no assurance of a work assignment on any given day. (Rojas Aff. ¶17; Ching Aff. ¶19).  A number of factors influence whether any individual who has signed in on any given day will receive an assignment of work through Empire's shape-up procedure, among them: the volume of business; the number and type of work assignments available; the availability of steady, extra and casual members of the Teamsters Local 917 bargaining unit; the availability of regular and per diem members of the UFCW Local 1-D bargaining unit; and the number of individuals who signed in indicating their availability for a work assignment on delivery trucks or in the warehouse.[4] (Rojas Aff. ¶17; Ching Aff. ¶19; Ching Tr. 20-23).  Empire's business cycle affects some of these factors, particularly with respect to delivery work. (Rojas Aff. ¶17; Ching Aff. ¶19).  July, November and December are Empire's busiest months, while February, March and August generally have

---

[3] Notwithstanding their freedom to act as they choose during the off-duty time they participate in Empire's shape-up procedure, once shape-up workers punch in to record their receipt and acceptance of a work assignment, they are subject to the same rules and discipline applicable to Empire's regularly scheduled workforce and they do not enjoy personal time again until either of the structured two 15-minute break times or the one-hour meal break, as set by the UFCW Local 1-D CBA (Ching 1 at §§12.4, 13.4), or the 15-minute break taken thirty minutes after a delivery truck leaves the Brooklyn Facility or the one-hour meal break, as set by the Teamsters Local 917 CBA (Rojas 1 at §§3.6, 3.7).  (*See* Pl. Tr. 73-77).

[4] Distribution and warehouse management also monitors each individual's number of days worked in the warehouse or on delivery trucks, respectively, because of terms applicable under the Teamsters Local 917 and UFCW Local 1-D CBAs once an individual works a certain threshold number of days or specified number of days in a calendar year. (Ching Tr. 58-59; Rojas Aff. ¶15; Rojas 1 at §4.21; Ching Aff. ¶15; Ching 1 at §9.5.c; Geneva Tr. 33-35).

the lowest volume of deliveries.[5] (Rojas Aff. ¶17; Ching Aff. ¶19; Rojas Tr. 24, 45-46; Ching Tr. 69-72).  Although the business cycle has a greater impact on daily distribution volume than on daily warehouse operations, operational or supplier projects also affect the availability of warehouse work assignments. (Ching Aff. ¶19; Ching Tr. 70-72).

With the seasonal and daily variations in Empire's business volume and staffing demands, the number of shape-up workers appearing to sign in to indicate availability for a work assignment also varies, as individuals may elect not to report for shape-up assignments in periods or on days when fewer trucks are dispatched. (Rojas Aff. ¶18; Rojas Tr. 30-31, 82, 86-87; Ching Aff. ¶¶20, 21; Ching Tr. 21-22; Geneva Tr. 45-46, 58-59, 119).  To gauge the likelihood of receiving an assignment, some shape-up workers regularly call Ronnie Rojas ("Rojas"), Empire's Dispatch Manager, early in the morning to learn from him the number of trucks that will be dispatched that day. (Rojas Aff. ¶18; Rojas Tr. 17, 19, 31, 80-82).

### 6. Empire Follows a Sequential Selection Process Set by the Teamsters Local 917 CBA and the UFCW Local 1-D CBA for Assigning Work Through the Shape-Up Procedure.

Because Empire's priority each morning is to deliver customer orders, the assignment of drivers and helpers to delivery trucks being dispatched on routes takes precedence over the assignment of day warehouse work. (Rojas Aff. ¶13; Rojas Tr. 91-92; Ching Aff. ¶15; Ching Tr. 22-23; Romano Tr. 104).  Approximately 11 to 13 trucks are dispatched as 6:30 AM routes, typically assigned only to steady employees who have bid for the early start time and receive premium "undertime" pay as drivers or helpers. (Rojas Aff. ¶13; Rojas 1 at §§3.3, 3.70; Rojas Tr. 32, 38, 73-74, 79-80).  On days when there may be more trucks that must be dispatched early, steady employees may each be assigned to drive a truck, with additional employees – *i.e.* extra,

---

[5] The day of the week also is significant:  Monday is a slow day and volume tends to peak on Tuesday and Wednesday and then tapers down on Thursday and Friday. (Rojas Aff. ¶17; Ching Aff. ¶19; Rojas Tr. 108; Geneva Tr. 46, 119).

casual and, on rare occasions, shape-up workers having no bargaining unit seniority – being assigned as helpers.  (Rojas Aff. ¶13; Rojas Tr. 23-24, 32-33, 79).

For the majority of Empire's delivery trucks scheduled to go out starting at 7:30 AM, after making assignments to steady employees who are guaranteed work, Rojas first assigns extra employees and then casual employees in order of seniority as required by the Teamsters Local 917 CBA. (Rojas Aff. ¶14; Rojas Tr. 38-44, 74).  If delivery assignments remain after extra and casual lists have been exhausted, Rojas then will select for work assignment individuals shaping up who have no seniority under the Teamsters Local 917 CBA. (Rojas Aff. ¶14; Rojas Tr. 45). In making daily selections from the list of individuals who have signed in and have no bargaining unit status, Rojas takes into consideration an individual's reputation as a good helper; knowledge likely to assist new drivers with respect to the route or area in which deliveries are scheduled; driver requests; legibility of the individual's name on the sign-in sheet; and the number of days the individual has worked on Empire's delivery trucks. (Rojas Aff. ¶15; Rojas Tr. 48-50, 94, 96).

To consider daily assignments on the 8:00 AM shift in the warehouse, at approximately 7:50-7:55 AM each day, Day Operations Manager James Ching ("Ching") generally begins reviewing the lists signed by shape-up workers who seek available warehouse assignments through the shape-up procedure and have no bargaining unit status. (Ching Aff. ¶14; Ching Tr. 20, 27, 44-45).   Having reviewed each morning's report of UFCW Local 1-D bargaining unit absentees and the number of work assignments to be filled that day, Ching normally estimates the number of available work assignments and then seeks to fill them, first with Local 1-D bargaining unit members who have acquired seniority preference, and then from other shape-up workers who are not in the Teamsters Local 917 bargaining unit. (Ching Aff. ¶13; Ching Tr. 17-

21, 67).  Ching marks the daily sign-in lists by highlighting names of individuals he has selected for an available warehouse work assignment, taking into consideration: prior work experience; past satisfactory performance; and number of days worked in one week and in total in the Brooklyn Facility warehouse. (Ching Aff. ¶¶14, 15; Ching Tr. 20-21, 41-43).   Because the assignment of helpers to trucks that need to be dispatched takes priority, Ching's selection of a shape-up worker for a warehouse work assignment may be preempted, and the employee may be assigned instead by Dispatch Manager Rojas to work as a helper on a truck. (Ching Aff. ¶15; Ching Tr. 22-23; Romano Tr. 103-04).

### 7.    Names of Individuals Selected for Shape-Up Assignments Are Announced.

Once the selection process is complete, Empire's management provides the names of the selected individuals to the Teamsters Local 917 dispatcher, a bargaining unit member, who uses a microphone to call out the names of the individuals who have been selected for work assignments. (Pl. Tr. 55; Rojas Aff. ¶19; Ching Aff. ¶22; Rojas Tr. 83-84; Ching Tr. 23-25).   If the individual whose name was called does not report to the dispatcher's window to obtain his or her work assignment, the dispatcher will repeat the call and, if the individual still does not respond, a manager will be asked to use an intercom so the announcement is broadcast over loudspeakers placed in areas away from the area where the shape-up is conducted where individuals may have moved, either elsewhere in the Brooklyn Facility or in the warehouse yard, or outside the gate of the Brooklyn Facility yard. (Rojas Aff. ¶¶19, 20; Ching Aff. ¶¶22, 23; Rojas Tr. 83-85; Geneva Tr. 52-53).   An individual who has signed in to indicate availability for a work assignment but then moves to an outside area beyond the hearing range of the loudspeakers may miss his or her name being called and lose the assignment to which he or she

did not respond[6]; however, he or she may receive another assignment that day when he or she returns and reports his or her presence and availability. (Rojas Aff. ¶20; Ching Aff. ¶23; Rojas Tr. 85-86, 102).

> **8.    Individuals May Receive Work Assignments Through the Shape-up Procedure in the Warehouse or as Helpers on Empire's Delivery Trucks.**

Work available through the shape-up procedure on any given day for individuals having no bargaining unit status may include assignments on one of Empire's delivery trucks or in and around the Brooklyn Facility warehouse. (Pl. Tr. 24-25; Romano Tr. 97-98; *see also* Ching Tr. 53-54).  Helpers working on Empire's delivery trucks assist the driver in delivering product to Empire's customers. (Rojas Aff. ¶21; Geneva Tr. 28; *see also* Romano Tr. 98).  Day warehouse workers may perform any of a variety tasks in and around Empire's Brooklyn Facility warehouse, including such tasks as: receiving merchandise; replenishing bottle lines and case flow lines to be loaded onto the delivery trucks by the night crew; sorting pallets; repacking beverages into cases; performing daily cycle counting of sections of Empire's beverage and case inventory; building "combos," which are mixed cases of assorted beverages; cleaning and maintaining the building or outside grounds. (Ching Aff. ¶24; Ching Tr. 29-30; Geneva Tr. 27-28; *see also* Romano Tr. 97-98).

**D.    Plaintiff's Employment as a Shape-Up Worker**

Plaintiff submitted an employment application and resume to become eligible to seek work through Empire's shape-up procedure during an open house held at the Brooklyn Facility on March 30, 2016. (Romano Aff. ¶13; Romano 5).  Plaintiff understood that he was applying to become eligible to seek work through Empire's shape-up procedure, and he had not performed

---

[6] The dispatcher will repeat the announcement several times before the Dispatch Manager or Day Operations Manager reverts to the sign-in sheet to select another individual for the work assignment. (Rojas Tr. 83-85; Ching Tr. 25-26; Geneva Tr. 52).

shape-up work prior to his Empire employment. (Pl. Tr. 38-39).   After a review of Plaintiff's employment application and determination that he was initially and preliminary eligible to seek work through the shape-up procedure, Romano advised Plaintiff on March 30, 2016 that he could begin seeking work through the shape-up procedure on March 31, 2016, if he so chose. (Romano Aff. ¶14).   Plaintiff informed Romano that he would appear at the Brooklyn Facility the following day to begin participating in the shape-up. (Romano Aff. ¶14; *see* Romano 2).

1.      **After Plaintiff Was Selected for a Work Assignment, He Worked Variously on Empire's Delivery Trucks and in the Warehouse for a Total of 28 Days.**

Plaintiff had no assurance of receiving a work assignment on any given day by appearing at the Brooklyn Facility and signing in[7], but if he did receive and accept an offer of a work assignment, he could be assigned to work as a helper on one of Empire's delivery trucks or to perform various tasks inside or outside Empire's warehouse. (Pl. Tr. 24-25; Ching Aff. ¶¶19, 24; Rojas Aff. ¶¶17, 21).   During his employment from April 1, 2016 to June 22, 2016, Plaintiff received and accepted work assignments as a helper on Empire's delivery trucks on 14 days, and he received and accepted work assignments in and around Empire's warehouse on 14 days. (Pl. Tr. 41-47, 52-55, 59-61; Roberts 6; Rojas Aff. ¶24; Ching Aff. ¶27).

Plaintiff's work time began after he received a work assignment through the shape-up procedure and he punched his time card in the time clock to designate the start of his work day; Plaintiff also punched his time card at the end of his work day, as well as the period of a lunch break when assigned to work in the warehouse, so he could be paid properly for the work time he recorded. (Pl. Tr. 41-47, 52-55, 59-61, 82-83; Roberts 6; Rojas Aff. ¶22; Ching Aff. ¶25; Ching Tr. 29; Rojas Tr. 65-67, 69-70).   Plaintiff understood, also, that he could obtain adjustment of his

---

[7] Plaintiff signed in to indicate his presence and availability for a work assignment by printing his name on the blank shape-up list having no pre-printed names, used for individuals having no seniority rights under either the Teamsters Local 917 CBA or the UFCW Local 1-D CBA. (Pl. Tr. 56).

time card and additional pay by notifying an Empire manager if compensable work time was not recorded accurately, and he successfully gave such notice and accomplished a desired adjustment on a single occasion. (Pl. Tr. 47-48, 82-83; *see* Roberts 6 at Bates No. EM000112; Rojas Aff. ¶23; Ching Aff. ¶¶26, 27).

    **2.**    **Plaintiff Was Paid Well in Excess of the New York State Minimum Wage and Received All Required Wage Notices.**

The CBAs between Empire and UFCW Local 1-D, and Empire and Teamsters Local 917, govern the compensation paid to Empire's employees who work in the warehouse or as drivers and helpers on Empire's delivery trucks, respectively. (Ching 1 at Arts. IX, XII; Rojas 1 at VI). Thus, on each day Plaintiff received a work assignment, Empire paid Plaintiff $13.00 per hour for each straight time hour he worked in a warehouse assignment and $14.00 per hour for each straight time hour he worked as a helper on an Empire delivery truck. (Roberts 6, 8; Pl. Tr. 24-25).  Plaintiff received notices advising him of the hourly rate of pay he received for his warehouse work under the terms of the UFCW Local 1-D CBA and for his distribution work under the terms of the Teamsters Local 917 CBA, and he signed acknowledgments confirming his receipt of the notices. (Pl. Tr. 23-25; Roberts 7).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *see also* Fed. R. Civ. P. 56(a).  The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

**ARGUMENT**

**POINT I**
**EMPIRE IS ENTITLED TO SUMMARY JUDGMENT DISMISSAL OF**
**PLAINTIFF'S FLSA AND NYLL UNPAID WAGE AND OVERTIME CLAIMS**

Plaintiff's claims for unpaid wages and overtime pay under the FLSA and NYLL fail as a matter of law because undisputed facts establish that Plaintiff was off duty and waiting to be engaged during the time he voluntarily waited for a potential work assignment through Empire's shape-up procedure, and therefore, the time Plaintiff spent waiting during the shape-up procedure was not compensable.

**A. PLAINTIFF'S TIME SPENT VOLUNTARILY WAITING FOR A POTENTIAL WORK ASSIGNMENT IS NOT COMPENSABLE AS A MATTER OF LAW AND THERE IS NO MERIT TO HIS CLAIMS FOR UNPAID WAGES AND OVERTIME.**

Employees are entitled to statutorily mandated and judicially enforced pay only for hours worked, and as an employee free to appear at Empire's Brooklyn Facility when he wished and to use his time for his own purposes when he waited to see if employment was available to him through Empire's shape-up procedure, Plaintiff was not entitled to compensation under the FLSA and NYLL until he was engaged to work by receiving an assignment.  The FLSA requires that employers pay employees only for "hours worked," 29 U.S.C. §§ 206, 207(a)(1), and the NYLL is in accord, 12 N.Y. Comp. Codes R. & Regs. tit 12, §§ 142-2.1(b), 142-2.2.  While "work" is generally defined as "'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business,'" *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 522 (2d Cir.1998) (citing *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)), time spent waiting constitutes work only if the "'time is spent predominantly for the employer's benefit,'" not the employee's – which "'is a question dependent upon all the

16

circumstances of the case.'"  *Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008) (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)); *see also Reich v. Southern New Eng. Telcomms. Corp.*, 121 F.3d 58, 64-65 (2d Cir. 1997).  Additionally, where the activity at issue occurs outside the scheduled workday, an employer need not compensate an employee for any activities which are neither the principal activity nor integral and indispensable to the principal activity.  29 U.S.C. § 254(a).

Waiting time is not considered part of the principal activity of employment unless an employee is "engaged to wait" rather than "waiting to be engaged," 29 C.F.R. §§ 785.14-.16; *Zhong v. Zijun Mo*, No. 10-CV-0806, 2012 U.S. Dist. LEXIS 99966, at *14 (E.D.N.Y. July 18, 2012) (analyzing FLSA and NYLL claims for unpaid wages and overtime during waiting time). In determining whether an employee is engaged to wait, or waiting to be engaged, the critical inquiry is whether the time spent waiting is primarily for the benefit of the employer or the employee.  *See Armour*, 323 U.S. at 133.  Among the factors courts consider to determine whether waiting time is predominantly for the benefit of the employer or the employee, none of which are controlling or exhaustive, are the following: (i) whether the agreements and understandings between the employer and employee indicate that waiting time will be compensated (*Skidmore v. Swift & Co.*, 323 U.S. 134, 136-67 (1944); 29 C.F.R. § 785.14); (ii) whether the employer requested or required that the employee wait (*Vega ex rel. Trevino v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994)); (iii) the extent to which an employee's free will is constrained during the waiting time (*Birdwell v. City of Gadsden*, 970 F.2d 802, 808 (11th Cir. 1992)); 29 C.F.R. § 785.16(a)); and (iv) the extent to which the employer actually benefits from the waiting time (*Irwin v. Clark*, 400 F.2d 882, 884 (9th Cir. 1968)).  *See also Zhong*, No. 10-CV-0806, 2012 U.S. Dist. LEXIS 99966, at *14-16.  All of the circumstances relevant to

17

Plaintiff's employment with Empire demonstrate that the time Plaintiff waited after he signed in for consideration for a potential work assignment through the shape-up procedure, and before he was assigned work, is not compensable as a matter of law.

**1.** **Plaintiff's Waiting Time Was Neither Requested Nor Required.**

Courts have long recognized "shape-up work" as a daily arrangement whereby an individual who seeks employment on a per diem basis "shapes up" to see if work is available, with no assurance that work will be available and assigned on any particular day. *See, e.g.*, *NLRB v. News Syndicate Co.*, 279 F.2d 323, 331 (2d Cir. 1960) (describing the operation of a shape-up when prevalent in the newspaper industry), *aff'd,* 365 U.S. 695 (1961); *Sacco v. Pataki*, 114 F. Supp. 2d 264, 266 (S.D.N.Y. 2000) (describing the shape-up arrangement for trade shows at the Javits Center), *aff'd sub nom., Abramson v. Pataki*, 278 F.3d 93 (2d Cir. 2002). Also, the Second Circuit Court of Appeals recently addressed the shape-up procedure in the context of the constitutional right of individuals to seek work by gathering on a daily basis at public areas to solicit employment. *Centro de la Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, No. 15-2914-cv, 2017 U.S. App. LEXIS 15935 (2d Cir. Aug. 22, 2017).

That Empire did not require Plaintiff to report to its Brooklyn Facility on any day or require Plaintiff to report at a certain time in order to be considered for a potential work assignment is evident from Plaintiff's knowledge and practice; Plaintiff unilaterally and without prior or subsequent consultation with, or notice to, Empire, set the days and times he would appear at Empire's Brooklyn Facility. (Ching Aff. ¶¶16, 17; Rojas Aff. ¶16). The evidence indisputably shows that unlike Empire's steady (Teamsters Local 917) and regular (UFCW Local 1-D) bargaining unit employees, Plaintiff was free to: (i) choose which days he wished to seek work through Empire's shape-up procedure; (ii) arrive at Empire's premises at times of his own choosing, either before or during the shape-up procedure; and (iii) opt to not to show up at all if

he did not wish to seek work on a particular day; and (iv) opt to leave any area of Empire's Brooklyn Facility altogether at any time, temporarily or for the remainder of the day, week or month, before he commenced a work assignment by recording the start of work by punching a time card. (Pl. Tr. 41-47, 52-55, 59-61; Ching Aff. ¶¶16-18; *see* Perry Aff. ¶4; Perry 1). Empire neither monitored nor recorded Plaintiff's arrival time on any day, and management did not consider where Plaintiff entered his name on the sign-in sheet, relative to other shape-up workers, in their selection of individuals for work assignments. (Rojas Aff. ¶16; Rojas Tr. 50; 60-61, 77-78; Ching Aff ¶16; Ching Tr. 48, 54, 62). Plainly, Empire did not influence by request or requirement whether Plaintiff would show up and wait on any day or for any length of time, *Vega*, 36 F.3d at 425, and there was no agreement or understanding between Plaintiff and Empire indicating that the times he chose to wait for an assignment would be compensated, *Skidmore*, 323 U.S. at 136-67; 29 C.F.R. § 785.14.

**2.    Plaintiff Was Free to Use Time Waiting to See If He Would Receive an Assignment as He Wished, or to Not Wait at All.**

During the time Plaintiff chose to wait for a work assignment on any day, occupying himself however he chose, he suffered no burden from Empire controlling or requiring the sort of physical or mental exertion that would be compensable under *Holzapfel*, 145 F.3d at 522. Plaintiff's deposition testimony establishes that he was free to engage in an array of personal activities while waiting to learn if he would receive a work assignment – all of which would have been subject to disciplinary action if engaged in during his working time – including, but not limited to: using his cell phone to read and respond to text messages; checking Facebook; eating; and drinking coffee.[8] (Pl. Tr. 68-73, 77, 80-82). Far from being engaged by Empire to wait,

---

[8] While Plaintiff may have refrained from some of the personal activities by others waiting to be engaged, he observed shape-up workers reading newspapers, speaking on their mobile phones, smoking cigarettes outside in the yard and playing cards, until they were called for work assignments. (Pl. Tr. 68-73).

during the days he chose to appear for Empire's shape-up procedure to see if a work assignment was available, Plaintiff knew he had freedom to do the same things he would be able to do if he were searching for a job by such other means as Internet search, reading classified ads, or going door-to-door, with interludes for breaks to read other things, get and consume food or beverages, congregate and socialize with others, peruse social media, play cards, or go outdoors for a smoke. (Pl. Tr. 68-73).   While Plaintiff was permitted to use his time during the shape-up procedure for his own purposes and in any way he wanted, and he could leave – and return, or not – with any frequency and at any time after his arrival (Ching Aff. ¶18), once he punched in to record his receipt and acceptance of a work assignment, Plaintiff did not again enjoy personal time until either of the structured two 15-minute break times or the one-hour meal break, as set by the UFCW Local 1-D CBA, or the 15-minute break taken thirty minutes after leaving the Brooklyn Facility or the one-hour meal break, as set by the Teamsters Local 917 CBA. (*See* Pl. Tr. 73-77; Ching 1 at §§12.4, 13.4; Rojas 1 at §§3.6, 3.7).

Empire and its employees know the clear distinction between impermissible activity during compensable work time and permissible activity during non-compensable shape-up time: during compensable work time, Empire does not suffer or permit its working employees to engage in the sort of socializing, congregating, phoning, texting, internet surfing, eating, drinking, playing of music and games, horseplaying, or leaving their assigned area in which individuals participating in the shape-up procedure engage openly and notoriously while they are waiting to see if they will be selected for a work assignment – it punishes them. (Perry Aff. ¶5; Perry; *see* Pl. Tr. 80-82).   Nor does Empire allow its employees who have work assignments as steady or regular bargaining unit employees to fail to report for work or arrive late or leave early without permission or excuse, or to decline or refuse a work assignment – options available to

shape-up workers waiting as they wish and without consequence. (*See* Perry 2; *see also* Ching Aff. ¶¶17, 18). Because Empire derived no benefit from any of Plaintiff's waiting time before he received a work assignment, as evidenced by Plaintiff's unconstrained exercise of free will to set his own timetable to arrive, leave, and engage in personal activities during its daily shape-up, Plaintiff's waiting time is not compensable. *Birdwell*, 970 F.2d at 807; 29 C.F.R. § 785.16(a)).

### 3. The Time Plaintiff Spent Waiting for a Potential Work Assignment Was for Plaintiff's Benefit.

The time Plaintiff spent waiting on or around Empire's premises prior to the start of an assignment was for his benefit, not Empire's. Empire never required Plaintiff report to the Brooklyn Facility on any given day or at any particular time, and Empire neither monitored Plaintiff's activities or presence on days he chose to appear and wait for a potential work assignment, nor imposed rules restricting his ability to use the time as he chose. (Rojas Aff. ¶16; Rojas Tr. 60-61, 78-79; Ching Aff. ¶¶16, 17; Ching Tr. 48, 54; Geneva Tr. 47). Indeed, Empire required nothing of Plaintiff during the time he waited after signing in. (Geneva Tr. 58, 56, 120; Ching Aff. ¶18). Rather, Empire offered Plaintiff the option of being able to seek work on only those days and times when he chose for reasons of his own, and Plaintiff could reject or decline an assignment that was not to his liking. (*See* Ching Aff. ¶18).

\* \* \*

Because Plaintiff was off duty and freely engaged in whatever personal activities he preferred while he waited for a potential work assignment during Empire's shape-up procedure, Empire did not benefit from his waiting time, *Irwin*, 400 F.2d at 883, his claims for unpaid wages and overtime pay under the FLSA and NYLL are without merit, and Plaintiff's claims for unpaid overtime in his First and Second Causes of Action must be dismissed. *See, e.g.*, *Zhong*, No. 10-CV-0806, 2012 U.S. Dist. LEXIS 99966, at \*14-16 (ticket seller/tour guide was "waiting

21

to be engaged," or off duty and not entitled to compensation under the FLSA and NYLL, during time spent waiting for patrons to return to bus, and she was not obligated to assist patrons and was free to spend her time for her own benefit, gambling, shopping, or engaging in other personal activities).

## POINT II
**PLAINTIFF WAS PROPERLY PAID FOR ALL HOURS WORKED
AND RECEIVED OVERTIME COMPENSATION FOR ALL HOURS WORKED IN
EXCESS OF FORTY HOURS PER WEEK, AS REQUIRED BY THE NYLL**

Plaintiff's Fourth Cause of Action for unpaid wages under the NYLL must be dismissed because NYLL § 191 is an inappropriate vehicle for resolution of a dispute of whether wages or overtime should have been paid at all for a certain time.  Although Plaintiff frames his Fourth Cause of Action as a claim for failure to pay timely wages under NYLL § 191.1(d), he does not assert that any wage payments for the time he actually worked after receiving a work assignment were untimely, and the gravamen of his claim is that the wages Empire paid him for his hours worked were not equal to what Plaintiff alleges he was entitled to receive. (*See* Compl. ¶¶86-91). "[New York] Labor Law § 191 by its terms only involves the timeliness of wage payments, and does not appear to afford to plaintiffs any substantive entitlement to a *particular* wage."  *Myers v. Hertz Corp.*, 624 F.3d 537, 545, n.1 (2d Cir. 2010); *see Sampson v. MediSys Health Network, Inc.*, No. 10-CV-1342, 2012 U.S. Dist. LEXIS 103052, at *22-23 (E.D.N.Y. July 24, 2012); *Perez-White v. Advanced Dermatology of N.Y. P.C.*, No. 15 Civ. 4858, 2016 U.S. Dist. LEXIS 120642, at *28 (S.D.N.Y. Sep. 6, 2016) (NYLL § 191 "only involves the timeliness of wage payments") (citing *Myers*, 624 F.3d at 545). Accordingly, Plaintiff's Fourth Cause of Action for unpaid wages under the NYLL must be dismissed.

Firm:44029984

## POINT III
## PLAINTIFF IS NOT ENTITLED TO SPREAD-OF-HOURS PAY

Plaintiff erroneously claims he is entitled to spread-of-hours pay under the NYLL.  The statutory provision upon which Plaintiff relies, however, only applies with regard to minimum wage concerns, requiring employers to pay employees "one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage," for any day in which the employee works for more than 10 hours.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4.  Spread-of-hours pay does not apply to employees who are paid in excess of the minimum wage.  *Williams v. Tri-State Biodiesel, LLC*, No. 13 Civ. 5041, 2015 U.S. Dist. LEXIS 7926, at *43 (S.D.N.Y. Jan. 23, 2015) (collecting cases); *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 369 (S.D.N.Y. 2012) (citing N.Y.S. Dep't of Labor Opinion Letter, File No. RO-07-0009, at 1 (Mar. 16, 2007)). This principle has been recognized within the Eastern District of New York in *Morel v. Manhattan Beer Distribs.*, No. 13-CV-2296 (VSB), slip op. at 41-42 (E.D.N.Y. Sept. 18, 2015) (ECF No. 71) ("Because Defendants have established that there is no genuine dispute of material fact that Plaintiff earned more than minimum wage and was therefore ineligible for spread-of-hours pay, Defendants are entitled to summary judgment on Plaintiff's spread-of-hours claim under the NYLL.").

Plaintiff's own admissions and his contemporaneous payroll records showing that Empire paid him well in excess of the New York State minimum wage ($9.00 during Plaintiff's three-month employment in 2016) bar his spread-of-hours cause of action. (Compl. ¶¶81-85; Pl. Tr. 24-25). Because the pay Plaintiff received from Empire far exceeded the minimum wage for the entirety of his employment, Plaintiff is excluded from a spread-of-hours entitlement under NYLL, and summary judgment dismissing his spread-of-hours claim is appropriate.

Firm:44029984

**POINT IV**
**PLAINTIFF RECEIVED ALL NYLL WAGE NOTICES**
**AND THERE IS NO PRIVATE RIGHT OF ACTION FOR WAGE**
**NOTICE OR RECORDKEEPING CLAIMS**

Plaintiff's wage notice claim under NYLL Section 195 must be dismissed because Empire provided all requisite wage notices to Plaintiff.  The NYLL states that an employer must provide a wage notice to each employee at the time of hiring.   N.Y. Lab. Law § 195.1(a). Empire accepted Plaintiff's employment application and advised him on March 30, 2016 that he had been deemed initially and preliminary eligible to appear at Empire's Brooklyn Facility to seek work assignments through the shape-up procedure. (Romano Aff. ¶¶13, 14). Plaintiff's last day of work before his employment with Empire was terminated was June 22, 2016. (Pl. Tr. 60-61).  Therefore, the only time Empire was obligated to provide Plaintiff with an annual wage notice was within the first ten business (10) days of his hire on March 30, 2016.  Empire did so, providing annual notices to Plaintiff of the regular rate of pay for work performed in the Brooklyn Facility warehouse and as a helper on Empire's delivery trucks, on March 30, 2016. (Roberts 7; Pl. Tr. 23-25).   Because Plaintiff received the notice required by NYLL Section 195.1(a), his wage notice claim has no merit and summary judgment is appropriate.   To the extent Plaintiff asserts recordkeeping violations under NYLL § 195.4 (*see* Compl. ¶95), such claims must also be dismissed because "nothing in the NYLL authorizes an independent cause of action based on a violation of § 195(4)." *Carter v. Tuttnaeur USA Co.*, 78 F. Supp. 3d 564, 571 (E.D.N.Y. 2015) (Spatt, J.).

**CONCLUSION**

For the foregoing reasons, it is respectfully submitted that Defendant's motion for partial summary judgment dismissing Plaintiff's claims for: (1) overtime pay under the FLSA and NYLL; (2) unpaid wages under the NYLL; (3) spread-of-hours pay; and (4) wage notice and

24

recordkeeping violations should be granted, with prejudice, and that the Court should grant such

further relief as it deems just and proper.

Dated:  September 18, 2017
       New York, New York

                                   EPSTEIN BECKER & GREEN, P.C.

                                   By: _____
                                      Allen B. Roberts, Esq.
                                      Adriana S. Kosovych, Esq.

                                 250 Park Avenue
                                 New York, New York 10177
                                 Phone: (212) 351-3780

                                 *Attorneys for Defendant*
                                 *Empire Merchants, LLC*